*Pro Se 15 2016*

FILED
LODGED    **MAIL**
RECEIVED

MAY 1 1 2023

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                    DEPUTY

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| ABHIJIT BAGAL, an individual, | Civil Action No. _23-cv-721-RAJ_ |
| *Plaintiff,* | **COMPLAINT FOR:** |
| v. | |
| KSHAMA SAWANT, in her official and individual capacities as Councilmember, District 3, of the Seattle City Council; LISA HERBOLD, in her official and individual capacities as Councilmember, District 1, of the Seattle City Council; and BRUCE HARRELL, in his official and individual capacities as the Mayor of the City of Seattle, | **1. Civil Rights Violations – Free Exercise of Religion**  **2. Civil Rights Violations – Denial of Procedural Due Process**  **3. Civil Rights Violations – Denial of Equal Protection**  **DEMAND FOR JURY TRIAL** |
| *Defendants.* | |

## COMPLAINT

Plaintiff Abhijit Bagal ("Plaintiff") hereby asserts the following causes of action against

Defendants, Kshama Sawant, in her official and individual capacities as Councilmember, District

3, of the Seattle City Council; Lisa Herbold, in her official and individual capacities as

Councilmember, District 1, of the Seattle City Council; and Bruce Harrell, in his official and

individual capacities as the Mayor of the City of Seattle, (collectively "Defendants"), as follows:

*Pro Se 15 2016*

1

2                                          **INTRODUCTION**

3     1.   On February 21, 2023, the Seattle City Council passed an alarming unconstitutional law that

4          expands existing antidiscrimination statutes to include "caste" as a specific category of

5          prejudice. Introduced by District 3 Councilmember Kshama Sawant, the Seattle City Council

6          passed the caste discrimination ordinance in a 6-1 vote. Councilmember Sara Nelson who cast

7          the lone dissenting vote agreed with opponents calling the ordinance "a reckless, harmful

8          solution to a problem for which we have no data or research." Nelson asked whether the Seattle

9          City Council had any scientific data to support claims of "widespread and systemic" caste

10         discrimination. She also made the point that without ways to identify caste, there would be no

11         way to implement it properly. How exactly do you determine who is an "upper caste" and who

12         is a "lower caste"? And if you can't determine what caste someone belongs to, how do you

13         litigate that case? Even if you could identify someone's caste, what would the city do if

14         someone from a "lower caste" attempted to sue someone from another "lower caste"? If

15         someone chooses not to identify with a caste and someone accuses them of caste

16         discrimination, will the city of Seattle force a caste upon them?  Councilmember Nelson's

17         questions went unanswered. Nelson also expressed concern that the ordinance would get the

18         city of Seattle entangled in unnecessary, time consuming, and expensive legal battles to which

19         Sawant responded: "Bring it on."

20    2.   The initial proposal, drafted by Councilmember Kshama Sawant, and sponsored by

21         Councilmember Lisa Herbold, singled out, targeted, and demonized South Asians (more

22         specifically Indians and Hindus) by projecting them as a group that inherently discriminates

23         more than any other and thus requires a special caste law and subsequent monitoring.

24

Complaint for violation of civil rights - 2                          ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

3. Just prior to the passing of the proposal, on February 20, 2023, upon receiving numerous complaints, Councilmembers Herbold and Sawant hastily made amendments to the proposal (to obfuscate the initial and obvious singling out of South Asians/Indians/Hindus) which made it even worse by explicitly stating that "Although caste is often associated with Hinduism and India...." thereby emphasizing the same reductive, negative, and false stereotypes.

4. The Seattle City Council rushed through the hearing without proper due diligence, in a secretive and rash manner, pushing it through without input from all sides and without even a discussion in committee (thus breaking their own protocols) and created a discriminatory caste law that can have serious implications for the South Asian community and for Seattle.

5. On February 23, 2023, the ordinance was approved and signed by Bruce Harrell, Mayor of the City of Seattle. The Seattle Office for Civil Rights, headed by Derrick Wheeler-Smith, Director, will enforce the caste law.

6. On February 24, 2023, reporting on the abovementioned caste law, The Seattle Times published an article by Alexandra Yoon-Hendricks, titled "Seattle has banned Caste Discrimination." The article described caste as "an ancient social hierarchy that originated with Hinduism in India. Caste is assigned at birth and rooted in concepts of so-called spiritual purity. The system has existed in some form for at least 3,000 years. Of the five main caste groups, Brahmins, known as the priestly caste, are at the top of the hierarchy, while Dalits, formerly known as 'untouchables' are at the bottom. There are thousands of subcastes."

7. Subsequently, Plaintiff looked at the official website of the city of Seattle to check the definition of the newly added protected category of caste. Plaintiff was surprised to find that although a new category of caste had been added, the definition of caste had been blindly copied (verbatim) from the already existing protected category of ancestry. Initially Plaintiff assumed that this was an oversight that was going to be corrected in a few days. Plaintiff

Complaint for violation of civil rights - 3                    ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

checked the website again after one week (and every week since then) and was shocked to find that the definition of caste had not been changed and it continued to be the same as ancestry. As of May 10, 2023, over two months and fifteen days have passed since the caste law was approved, yet Defendants did not bother to correct the title and contents of the caste protected category. This demonstrates the callousness of the defendants, their lack of understanding of caste, and highlights their utter incompetence. Screenshots of the official website of the city of Seattle showing the definition and contents of both ancestry and caste, confirming that the Defendants blindly copied the title and contents of ancestry and pasted it under the newly created caste category, is attached hereto as **Exhibit A**. *See* **Exh. A.**

8. Unfortunately, it appears that the Defendants either intentionally or implicitly intended to target members of the Indian/South Asian community and adherents of the Hindu religion wrongly and unfairly for disparate treatment under the new caste law by taking the position that caste is inextricably intertwined with the Hindu religion and India/South Asia.

9. This new caste law, by stating that "Although caste is often associated with Hinduism and India" seeks to define the Hindu religion as including caste and an alleged oppressive and discriminatory caste system as foundational religious tenets. That not only is an inaccurate depiction of the Hindu religion, but the First Amendment to the United States Constitution prohibits the City of Seattle and the State of Washington from defining the contours of Hinduism (or any religion). See, e.g., *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020) ("the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion."); *Commack Self-Serv. Kosher Meats, Inc.* v. Weiss, 294 F.3d 415, 427 (2d. Cir. 2002) (Establishment Clause violated where law "require[s] New York to adopt an official State position on a point of religious doctrine").

Complaint for violation of civil rights - 4                    ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

10. This new caste law is inherently discriminatory by its's singling out and targeting only diasporic communities and immigrants, including those who are refugees, from South Asia, Southeast Asia (Japan), and Africa (Somalia) — in other words, most people of color to the exclusion of people of White, European descent, Chinese Americans, Native American Indians/Alaska Natives, and Native Hawaiians & Other Pacific Islanders.

11. This new caste law also violates the city's existing nondiscrimination policies by seeking to treat disparately people based on their ancestry, creed, immigration or citizenship status, national origin, and religion.

12. This was done even though caste prejudice is already covered under existing laws that prevent discrimination based on ancestry, religion, and creed. Notably, caste is different from these other categories because it applies only to Americans of a specific ethnicity and heritage. By invoking caste, the law singles out Hindus/Indians/South Asians as singularly oppressive people, frames them as uniquely likely to discriminate against others, and brands them worthy of extra special monitoring and policing. No other protected category addresses any specific ethnicity, ancestry, religion or alleged religious practice. "[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 523 (1980) (Stewart, J., dissenting) (internal quotation marks omitted)). That is the case "even for so-called 'benign' racial classifications . . . ." *Johnson v. Calif.*, 543 U.S. 499, 505 (2005) (citations omitted). As a result, the caste law violates the Equal Protection Clause of the Fourteenth Amendment.

13. Defendants and all others who have stated that caste discrimination is just like any other form of discrimination and will be handled in a similar manner are mistaken. Every single American has a race, just like everyone has an age and ethnicity. But when it comes to caste,

*Pro Se 15 2016*

it is only a sub section of Americans (like Hindu/Indian/South Asian Americans) who are presumed to have a caste (that is inherently discriminatory) while other Americans (like Chinese Americans) are assumed to be exempt from caste discrimination.

14. In addition, the defendants have included endogamy in their definition of caste which means that a spouse's background could be evidence of caste discrimination. Consequently, while personal information about anyone else's spouse would be irrelevant in a work-related discrimination investigation, if one is of Hindu/Indian/South Asian descent, it could be. Thus, unlike age and ethnicity, caste is not a neutral category that is supposed to provide everyone with equal protection with the obligation to treat everyone fairly. In passing this caste ordinance, Defendants are now in violation of the US Constitution's guarantees of equal protection and due process that prohibit the state from treating disparately people on account of their national origin, ethnicity, or religion, and implementing a vague, facially discriminatory, and arbitrary category.

15. Over a century ago, on, September 16, 1906, the Puget Sound American, a local Seattle area daily, published a xenophobic diatribe over a small number of Indian migrants residing in the area. "Have we a dusky peril," the paper asked, pointing to the "Hindu caste system" among the reasons why locals should "keep the Hindus out." For at least the past century or longer, one of the most persistent stereotypes Hindus/Indians faced, along with "cows and karma" is "caste". The wording of Defendants' caste ordinance traffics in those very stereotypes about Hindus and Indians — equating caste with Hinduism — to achieve a political goal and unearths Americas ugly xenophobic past. In the late 1800s and early 1900s, nativist Californians passed laws targeting various communities of color. One law was the 1850 Foreign Miners' Tax that levied a substantial monthly fee on California-born Mexicans and foreign immigrants for the right to mine. Others were the California Alien Land Laws of

ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

1913 and 1920 that targeted "aliens ineligible for citizenship" — Japanese, Chinese, Korean and Indian immigrant farmers — to deprive them of their agricultural land and long-term leases. On February 21, 2023, Defendants added one more xenophobic ugly law to this list.

16. By implementing this caste law, Defendants have limited equal protection and due process rights of South Asians (and others similarly situated), resulting in racial profiling because it legislates false claims based on national origin, ethnicity, and ancestry. The unintended negative consequences of Defendants' actions are enormous and could result in great harm. Every racial and ethnic community has its internal dynamics, some positive and others harmful. Harmful dynamics may spill over into the workplace or other places where discrimination is prohibited. But there are laws in place that offer protection and appropriate remedies if that happens.

17. As the United States grows increasingly diverse, the solution to addressing subtler forms of intra-community discrimination is not to expand specific categories that target particular ethnic groups, resulting in discrimination against them. It is by deploying existing laws with their broad, neutral categories that provide everyone with protection and the obligation to treat everyone fairly. In contrast, Defendants have intentionally created a discriminatory law that singles out South Asians primarily (briefly referencing other communities of color), although existing laws already protect against discrimination based on birthplace, descent, culture, or accent — all things that can apply to caste, clan, kin, tribe or any of the many ways people identify, without singling out particular ethic groups for scrutiny.

18. Other than making generic statements about caste being a rigid social stratification, this new caste law does not provide a clear definition of caste and what constitutes caste discrimination. Caste is not a term understood by people of ordinary intelligence; indeed, most Americans, who will be governed by this law are unfamiliar with the term or its

*Pro Se 15 2016*

meaning or contexts. According to Professor Arvind Sharma (Birks Professor of Comparative Religion at McGill University), there are over nine thousand books alone on caste. However, academicians have no consensus about "how the caste system came into being and what sustains it" (Martin Farek et al. Western Foundations of the Caste System). The caste scholars have developed no framework and parameters to study caste and caste oppression. After all the studies, writes Professor Prakash Shah of Queen Mary University of London (Caste studies today: Imaginary victims and perpetrators; Oñati Socio-Legal Series 2023), "it is not at all clear what phenomena caste and caste discrimination are, or what caste violence or atrocities are." Therefore, this caste law is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

19. Plaintiff is a Hindu American citizen and a first-generation immigrant from India, who graduated from Seattle University, and is currently an alumnus of Seattle University residing in Research Triangle Park (RTP), North Carolina. Plaintiff brings this action to prevent Defendants from enforcing the caste law and to safeguard Plaintiff's constitutional rights, as well as the rights of other Americans who are similarly situated.

20. While Plaintiff applauds Defendants effort to take a firm stance in favor of inclusion and against discrimination – something on which plaintiff is in complete agreement – the addition of caste as a protected status unfairly singles out and targets persons of Indian/South Asian origin and members of the Hindu religion while providing exemption (from perpetrating caste discrimination) to other Americans e.g., White Americans, Chinese Americans, Native American Indians/Alaska Natives, and Native Hawaiians & Other Pacific Islanders.

21. By this lawsuit, Plaintiff seeks a determination that the term caste as used in the new law is unconstitutionally vague and violates the rights of Plaintiff (and similarly situated individuals)

*Pro Se 15 2016*

1  under the First and Fourteenth Amendments to the United States Constitution, as well as the

2  Washington Law Against Discrimination, RCW 49.60

3  22. The City of Seattle does not need to include the pejorative and demeaning term caste to

4  protect persons of Indian/South Asian descent or those who identify with, or are perceived to

5  be, practitioners of the Hindu religion since its policy already precludes discrimination

6  specifically based on national origin, ancestry, ethnicity, and religion. The Government of the

7  United Kingdom (UK) after much deliberation and public consultation spanning multiple

8  years, announced on July 23, 2018, that caste discrimination was already covered by ethnic

9  origins and that adding a new category of caste would be of "clearly controversial nature."

10  The UK public consultation findings state that "legislating for caste is an exceptionally

11  controversial issue, deeply divisive within certain groups, as the last few years have shown: it

12  is as divisive as legislating for class to become a protected characteristic would be across

13  British society more widely. Reliance on case-law, and the scope for individuals to bring

14  claims of caste discrimination under ethnic origins rather than caste itself, is likely to create

15  less friction between different groups and help community cohesion."

16  23. Plaintiff also seeks an immediate and temporary restraining order and an injunction to prohibit

17  Defendants from enforcing the unconstitutional caste law.

18  24. The harm at issue here is significant. As the Supreme Court has repeatedly held, the "loss of

19  First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

20  irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

21  25. That is precisely what the caste law does by seeking to define the Hindu religion as including

22  caste and an alleged oppressive and discriminatory caste system, and by singling out adherents

23  of the Hindu religion and those of Indian/South Asian descent.

24

Complaint for violation of civil rights - 9                    ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

1

## **PARTIES**

2   26. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth

3       herein.

4   27. Plaintiff was born in India and is an adherent of Hinduism. Plaintiff became a naturalized US

5       citizen in July 2006. Plaintiff currently lives and works in the healthcare data analytics

6       technology sector in Research Triangle Park (RTP), North Carolina.

7   28. Plaintiff lived in the City of Seattle during 1995 to 1997 and attended graduate school at Seattle

8       University located in the heart of tech-heavy Seattle's eclectic Capitol Hill (CHOP)

9       neighborhood. Plaintiff graduated from Seattle University in June 1997 with a master's degree

10      in software engineering with a culminating thesis comprised of an industry-strength yearlong

11      capstone project sequence sponsored by Microsoft, Seattle. Immediately after graduation,

12      Plaintiff became a lifelong member of the Seattle University Alumni Association (SUAA) and

13      remains connected as an active member of the Seattle University community.

14  29. Plaintiff wants to travel to Seattle to attend in-person Career and Mentoring sessions for

15      Alumni at Seattle University but is afraid to do so due to unknown potential violations and/or

16      repercussions of the newly implemented and vague caste law. Plaintiff also intends to attend

17      future in-person project day sessions and student reunions at Seattle University to catch up

18      with classmates and professors but is fearful to travel to Seattle due to Defendants actions.

19  30. On April 28, 2023, Plaintiff attended the 2023 State of the University (SOTU) address by

20      Seattle University President Eduardo Peñalver. Fortunately, this event was livestreamed, so

21      Plaintiff was able to join and attend the online event remotely. The next event (called Projects

22      Day) is on June 2, 2023, and has an in-person (only) poster session and reception that Plaintiff

23      wants to attend. The poster session and reception will not be live streamed so the only way to

24      attend this event is by being physically present at the Seattle University campus. Plaintiff has

Complaint for violation of civil rights - 10                    ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

1    registered for this in-person event and purchased airline tickets for traveling to Seattle on June

2    2, 2023. However, implementation of this demeaning and intimidating caste law by the

3    Defendants has caused a chilling effect on plaintiff and plaintiff is fearful of being physically

4    present within the Seattle city limits unless the caste law is repealed by this court. Copies of

5    invitations, confirmation of reservation of events, event tickets, flight itinerary, flight ticket,

6    and payment receipt for fight tickets is attached hereto as **Exhibit B.** *See* <u>**Exh. B.**</u>

7    31. Plaintiff holds the sincere religious belief that neither caste nor a discriminatory caste system

8    are in any way part of the Hindu religion or its teachings. To the contrary, Plaintiff abhors the

9    notion that a caste system is a tenet of Hinduism and sincerely believes that the Hindu religion's

10   core principals are compassion, equanimity, generosity, and equal regard for all humans to

11   honor the divine in everyone, which is directly contrary to a discriminatory caste system.

12   32. Plaintiff does not identify as being member of any caste and fears that the Defendants will

13   ascribe a caste to Plaintiff under the caste law. Indeed, how else will the City of Seattle be

14   able to determine if discrimination based on caste occurred unless they ascribe a caste not

15   only to the allegedly discriminating actor but to the alleged victim as well?

16   33. By linking the Hindu religion with a caste system and caste discrimination, Defendants have

17   infringed the constitutional rights of Plaintiff by singling out Plaintiff's religious beliefs for

18   ridicule, by seeking to define the Hindu religion's practices and customs as including a caste

19   system, and by improperly ascribing to it an oppressive and discriminatory intent.

20   34. Further, this caste law makes the presumption that certain groups of Americans are inherently

21   more discriminatory than others, and that if caste exists, it only has an oppressive feature i.e.,

22   the mere co-presence of "lower/dominated/oppressed castes" and "upper/dominant/oppressor

23   castes" in the same room involves discrimination or oppression because of the latter's

24   perception and presumed "guilty until proven innocent" instead of the other way around.

Complaint for violation of civil rights - 11                    ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

35. Plaintiff fully supports efforts to end all discrimination in Seattle, and elsewhere, that are consistent with the United States Constitution and State Laws, and which do not single out any religion, alleged religious practice, ethnicity, national origin, or social group of individuals like Indians and South Asians or Hindus. Had the caste law used neutral and generally applicable terms to broadly protect individuals from discrimination based on, for example, social or economic status in all its forms, Plaintiff would not have filed this action. Instead, the caste law uses a term that Defendants associate to Hinduism and that also is directly targeted to people of Indian/South Asian descent.

36. It is also important to note that both statistically and anecdotally, caste becomes less and less salient to the identities of subsequent generations of Indian and Hindu Americans and through inter-community, inter-linguistic, inter-ethnic and inter-racial marriage. Nonetheless, even if caste discrimination occurs rarely, it should be adjudicated and remedied under existing laws prohibiting ethnicity or ancestry-based discrimination.

37. All Defendants are being sued in both their official and individual capacities. Defendants are responsible for drafting, introducing, approving, adopting, and enforcing the caste law. They are named as Defendants in this lawsuit in their official and individual capacities. Plaintiff seeks declaratory and injunctive relief against Defendants in their official capacities, including a ruling that Defendants are in violation of Plaintiffs' First Amendment rights. Plaintiff also seeks to enjoin Defendants' unconstitutionally vague and discriminatory caste law. Defendants are an arm of the City of Seattle. However, because Defendants are being sued in their official capacities for temporary restraining order and prospective injunctive relief, the sovereign immunity provisions of the Eleventh Amendment do not apply to them. Finally, Plaintiff seeks compensatory damages against Defendants in their individual capacities for violating Plaintiffs right to free exercise of religion.

*Pro Se 15 2016*

## JURISDICTION AND VENUE

38. This case arises directly under the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq.*, and the Washington Law Against Discrimination, RCW 49.60.

39. This Court has jurisdiction over this action and federal claims pursuant to 28 U.S.C. § 1331 and 1343 as this case arises under the laws and Constitution of the United States; specifically, 42 U.S.C. § 1983 , and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

40. This Court should exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367 because the state law claims arise from the same case or controversy that give rise to jurisdiction under 28 U.S.C. § 1331.

41. This Court has personal jurisdiction over all the Defendants because each of them are present, domiciled, resident, or a citizen of this state, working as an elected representative for the state, or undertook the actions alleged herein in this state.

42. This Court has authority to issue a temporary restraining order, preliminary and permanent injunction, declaratory judgment, attorneys' fees, compensatory damages, punitive damages, nominal damages, and other necessary and proper relief under 28 U.S.C. §§ 2201 and 2202.

43. Plaintiff seeks a temporary restraining order, declaratory, and injunctive relief against Defendants in their official capacities, including a ruling that Defendants are in violation of Plaintiffs First Amendment rights. Plaintiff also seeks to enjoin Defendants' unconstitutionally vague and discriminatory caste law.

44. Plaintiff seeks compensatory damages against Defendants in their individual capacities for violating Plaintiffs clearly established right to free exercise of religion and freedom to either believe or not believe in the caste system. Defendants have no business or authority to

*Pro Se 15 2016*

1   forcefully assign a caste to Plaintiff, declare Plaintiff to be inherently discriminatory, and

2   presume Plaintiff to be guilty, as it violates Plaintiffs right to free exercise of religion.

3   45. Venue is proper in this Court under both 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2),

4   and 42 U.S.C. § 2000e-5(f)(3) as the act of drafting, sponsoring, creating, approving,

5   implementing, publicizing, monitoring, and enforcing the new caste law giving rise to the

6   claims of this suit occurred within the Western District of Washington and the Defendants

7   reside and work in this District, or the substantial part of the events or omissions giving rise to

8   the claims at issue occurred in the Seattle Division of the Western District of Washington.

9   **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

10  46. On February 20, 2023, an official letter was sent to Seattle City Councilmembers from a

11  diverse coalition of over 100 organizations and businesses urging them to vote NO on the

12  proposed caste ordinance. In addition, several thousand emails and letters (including one from

13  Plaintiff as well) were sent to the Seattle City Council opposing the bill.

14  47. On March 4, 2023, Plaintiff sent an email complaint to the Washington State Executive Ethics

15  Board to prevent Defendants from enforcing the caste law. On March 6, 2023, Plaintiff

16  received an email response from Kate Reynolds, Executive Director of Washington State

17  Executive Ethics Board stating that they do not have jurisdiction over the Seattle City Council

18  and that Plaintiff may wish to contact the Seattle Ethics and Elections Commission or consult

19  a private attorney about any available legal options.

20  48. On March 6, 2023, Plaintiff sent an email complaint to the Seattle Ethics and Elections

21  Commission to prevent Defendants from enforcing the caste law. On March 6, 2023, Plaintiff

22  received an email response from Wayne Barnett, Executive Director of Seattle Ethics and

23  Elections Commission stating that "The Ethics and Elections Commission administers the

24  Ethics, Elections, Whistleblower and Lobbying Codes. It has no jurisdiction over First

*Pro Se 15 2016*

1   Amendment issues. If you believe the Council has violated the Constitution, you will need to

2   pursue that in the courts."

3   49. On March 6, 2023, Plaintiff filed a complaint with the United States Department of Justice,

4   Civil Rights Division to prevent Defendants from enforcing the caste law. On March 7, 2023,

5   Plaintiff received a response from the Department of Justice stating that the federal civil rights

6   laws they enforce do not cover Plaintiff's situation. The response also stated that "Your issue

7   may be covered by other federal, state, or local laws that we do not have the authority to

8   enforce. We are not determining that your report lacks merit" and advised Plaintiff to seek

9   legal advice.

10  50. On March 6, 2023, Plaintiff filed a complaint using the City of Seattle Claim for Damages

11  Form and the State of Washington Standard Tort Claim Form (General Liability Claim Form

12  #SF 210) and sent it by USPS Priority Mail to Seattle City Clerk's Office. On March 10,

13  2023, Plaintiff received an email response letter from Joel Lambert, Claims Manager, Risk

14  Management Division, Seattle City Finance stating that "We are in receipt of your claim as

15  referenced above. This claim has been shared with the City Attorney's Office. We do not

16  guarantee any decisions will be made at the claims stage and you should act to protect your

17  rights." Pursuant to RCW 4.96.020, more than sixty calendar days have elapsed and Plaintiff

18  has not received any decision on the claim or any other information related to the claim.

19  51. All required conditions precedent under Title VII (42 U.S.C. § 2000e, et seq.) have been

20  exhausted and/or performed by Plaintiff before filing this complaint. Copies of complaints to

21  United Stated Department of Justice Civil Rights Division, claim damage and state tort forms

22  sent to City of Seattle is attached hereto as **Exhibit C.** *See* **Exh. C.**

23

24

Complaint for violation of civil rights - 15                ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

**FACTUAL BACKGROUND**

**The Seattle Caste Law**

52. The Seattle caste law dated February 21, 2023, is titled: AN ORDINANCE relating to human rights; including protections against discrimination based on an individual's caste; making technical amendments; and amending Sections 3.14.910, 3.14.931, 3.110.260, 4.80.020, 5.30.020, 6.02.270, 6.202.230, 14.04.020, 14.04.030, 14.04.040, 14.06.020, 14.06.030, 14.08.015, 14.08.020, 14.08.045, 14.08.070, 14.08.190, 14.10.010, 14.10.020, 14.11.020, and 18.12.280 of the Seattle Municipal Code.

53. The summary of the law states that "This legislation would define 'caste' and add it to the list of classes against which discrimination is not permitted in the City of Seattle. Defendants state that Caste is "a system of rigid social stratification characterized by hereditary status, endogamy, and social barriers sanctioned by custom, law, or religion." Discrimination based on caste is occurring in Seattle, and this legislation would prohibit such caste-based discrimination against individuals."

54. The Seattle Office for Civil Rights (SOCR) will enforce most of the provisions of this legislation and would need additional resources to do so effectively as per a memorandum dated February 10, 2023, from Caedmon Magboo Cahill of SOCR Policy Division. While SOCR supports the policy goal of this bill—to address discrimination based on caste—SOCR requires additional ongoing resources not only to ensure competent enforcement, which includes appropriate outreach, education, and technical assistance, but also to update their educational and notice materials to reflect changes to city. Unlike other City enforcement departments such as Office of Labor Standards and Seattle Department of Construction & Inspections, SOCR does not have an outreach budget or business liaisons to provide technical assistance to businesses or landlords. To implement this legislation, SOCR needs Council to

ABHIJIT BAGAL, Plaintiff, *Pro Se*

1    authorize an additional 1.0 FTE (Full Time Employee), appropriate an additional $185,000 in

2    ongoing funding for this position and outreach efforts, and appropriate another $100,000 in

3    one-time funding for items such as media, materials, and rulemaking efforts. Without this

4    funding and position, SOCR will not be able to implement the legislation as contemplated.

5    55. A memorandum dated February 16, 2023, from Asha Venkataraman, Analyst, Central Staff of

6    Seattle City Council attempts to provide a confusing definition of caste by quoting from

7    Merriam-Webster dictionary, and The United Nations Special Rapporteur on minority issues

8    that describes caste as "**sanctioned social structure of Hinduism**" and goes on to say that the

9    caste system has traveled with diasporas to regions all over the world, including the Americas

10   without providing any data, evidence, and/or hard facts such as the number of caste related

11   complaints filed in the US in the last ten years. This glaring lack of data/evidence/facts is

12   rationalized as "It is difficult to find sources of quantitative, disaggregated data about the scope

13   and scale of caste-oppressed populations in Seattle. This is the case in part because there is no

14   existing systematic data collection at the local level and because self-identifying as belonging

15   to a caste oppressed group can put individuals at risk." and justifies the lack of factual data as

16   the reason to add caste as a new category in the law to solicit future caste complaints.

17   56. On September 11, 2021, a three-day conference titled "Dismantling Global Hindutva" was

18   held online in which the Hindu/Indian/South Asian diaspora was accused of supporting caste

19   discrimination practices. This conference had a panel on the "hierarchical caste system" as

20   reported by the Washington Post. One of the panelists at the event, Akanksha Mehta, confirmed

21   that the goal of the conference was to destroy Hinduism. Another panelist presented a "hit list"

22   of "Upper/Dominant/Oppressor" caste last names such as "Trivedi", "Sharma", "Iyer", etc.

23   that can be used to easily identify and target people who are "inherently discriminatory" and

24   are presumed to actively participate in caste discrimination just because of their last name.

*Pro Se 15 2016*

57. Caste is not a term that is familiar to most Americans. Thus, Americans are left to guess – at their peril – what constitutes reportable caste discrimination conduct. An American unfamiliar with caste could be accused of violating the caste law despite the lack of definition. When Plaintiff travels to Seattle to attend Alumni programs, Plaintiff could be charged with caste discrimination based on skin color/tone, occupation of ancestors, and/or diet e.g., Plaintiff having a vegetarian meal at the Seattle University Cafeteria and mentioning to someone else at the table that Plaintiffs' grandfather had a "sacred" pet cow at Plaintiffs' ancestral village in India and that the cow would participate in religious festivals. Plaintiff could also be assigned a "oppressor" caste and charged with caste discrimination for wearing *Mauli*, a sacred red thread, on the wrist since it's a religious marker. Additionally, Plaintiffs' spouse has a different last name than Plaintiff and this particular last name is in the "hit list" so Plaintiff now faces a double whammy of potential caste discrimination charges within Seattle city limits.

58. Defendants rely heavily and exclusively on data from a 2018 survey by Equality Labs which Defendants call "a Dalit civil rights organization." Equality Labs is a for-profit entity and receives funding from unknown sources. Equality Labs also conducts fee-based (amounting to thousands of dollars) caste competency trainings at various organizations in the US, so it seems like a Conflict of Interest that the same for-profit entity, whose survey is cited as primary evidence of caste discrimination in the US, is at the same time lobbying the Defendants and stands to profit by providing caste competency training to the Defendants.

59. The 2018 caste survey by Equality Labs is flawed and has several problems. A few glaring issues to note are: (a) While the survey claims to study "caste in the US," it was open to participants from anywhere in the world. (b) Religion data of respondents who are reported as Dalits is kept out of the Equality Labs' survey report, even though the survey calls out Hindu terms throughout. (c) Further, Equality Labs conducted its survey without sample

*Pro Se 15 2016*

1   randomization and without qualifying the "sample". Responses were collected using an

2   online self-administered platform, which makes the data likely to be biased in favor of the

3   agenda pushed by the organization soliciting feedback. (d) Strikingly, a breakdown of

4   respondents by religion is not provided despite the survey asking about religious identity. So,

5   the religion of individuals reported as Dalit is not disclosed.

6   60. A subsequent survey dated June 9, 2021, on Indian Americans by the Carnegie Endowment

7       for International Peace called out the Equality Labs survey's flaws in Footnote 29, indicating

8       the following: "This study relied on a nonrepresentative snowball sampling method to recruit

9       respondents. Furthermore, respondents who did not disclose a caste identity were dropped

10      from the data set. Therefore, it is likely that the sample does not fully represent the South

11      Asian American population and could skew in favor of those who have strong views about

12      caste. While the existence of caste discrimination in India is incontrovertible, its precise

13      extent and intensity in the United States can be contested."

14  61. The above-mentioned scientific survey on Indian Americans by the Carnegie Endowment for

15      International Peace, a neutral, unbiased, and objective organization, dated June 9, 2021, is the

16      only authoritative survey on the social realities faced by Indian Americans that examined the

17      issue of caste identities and caste discrimination, finding that while discrimination on the

18      basis of gender, religion, color and national origin is reported as quite common, allegations

19      of discrimination on the basis of caste is exceedingly rare. The study reveals four important

20      findings related to caste in America:

21          a. Half of Indian Americans surveyed reported facing alleged discrimination. The basis of

22          alleged discrimination reported was color (30%), gender (18%), religion (18%) and

23          national origin (1%).

24

Complaint for violation of civil rights - 19                    ABHIJIT BAGAL, Plaintiff, *Pro Se*

b. Only 5% of those surveyed reported encountering alleged discrimination on the basis of caste, with almost half of those respondents reporting the perpetrator of the alleged discrimination being of non-Indian origin, indicating that caste may have been conflated with some other factor or basis.

c. A majority of Hindu respondents (53%) do not identify with any caste group at all.

d. Within the group that does identify with a caste, there is a significantly lower number of US-born Hindu Indian Americans who identify with a caste group (34%) versus those that are foreign-born (53%), which may indicate that caste identification becomes increasingly less relevant with every generation.

62. Equality Labs was formed to advocate for California to specifically require school textbooks to falsely state that caste discrimination is inherent to and mandated by the Hindu religion. In line with this activism, Equality Labs and its supporters also frequently demonize common Indian and Hindu cultural and religious practices, such as vegetarianism, celebration of holidays like Diwali and Holi, or even simply worshiping at a Hindu temple as "discriminatory upper caste" practices. Thenmozhi Soundararajan, the founder of Equality Labs, promotes hatred towards practicing Hindus via social media and other channels. Hinduism, a minority faith in the US, is an ancient indigenous way of life, that is often misrepresented in western culture, especially when contrasted with the monotheistic religions that dominate the world. For example, Soundararajan, on March 2, 2020, wrote an article "Why do we say no to Holi" claiming that the popular Hindu festival of Holi is "upper caste" and that it celebrates the burning of a Dalit woman by "upper caste" men.  After being live for more than one year, this hateful article was eventually deleted by Equality Labs (without providing any explanation) to hide the blatant Hindu hate they have been propagating. On March 6, 2020, Soundararajan made a tweet urging people to desist from celebrating Holi

ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

due to its violent history and the immolation of a Bahujan Femme. Although the article has

been deleted, an archived version of the article can still be found at:

*https://web.archive.org/web/20200306101500/https://medium.com/@EqualityLabs/why-do-*

*we-say-no-to-holi-a-guide-to-challenge-casteism-ad592d0735cb*

63. On November 9, 2017, during a public testimony hearing at the California Department of

Education (CDE), Soundararajan, suddenly tried to cut ahead of many Hindu American

parents and children respectfully waiting in line since 6:30 AM and bypass CDE staff and

security personnel. Soundararajan and her colleagues were reportedly being disruptive and

acting aggressively, and as a result were escorted out of line and warned by CDE staff and

security personnel. Soundararajan and her colleagues, however, continued arguing angrily

with CDE staff and security, and she was then removed from the building. Soundararajan

was eventually allowed to return to the building after an hour, after her colleagues pleaded

with CDE staff. Even after being let back in, she reportedly continued to act disrespectfully

to the CDE staff and officials and other members of the public waiting in line.

64. Equality Lab's Political Director, Sharmin Hossain, originally from Bangladesh, has in the

past publicly spoken of the need to demolish Hinduism itself, saying, "Arguing to salvage

Hinduism is dominant caste rhetoric. Caste is rooted in the Hindu scriptures."  In another

tweet Hossain says "Absolutely, Brahmins have appropriated all their Gods from Dalits &

Adivasis. Brahmins have stolen the Buddha, the hand of Fatima & other Islamic relics.

Hinduism cannot be a part of progressive discourse until we dismantle Brahminism."

65. Soundararajan, Hossain, and others at Equality Labs have the liberty to hate Hinduism (or

any other faith) and work towards ending it. They should not however, then be

simultaneously seen as neutral, objective, and honest interpreters or representatives of

practicing Hindu Americans who do value and practice their faith. What is even more

*Pro Se 15 2016*

concerning is that the Defendants chose to use the Equality Labs report as its primary source of caste discrimination data and statistics in the United States to justify the caste law even though Equality Labs has a strong bias against Hinduism which is reflected in their survey.

66. Defendants quote an editorial published on May 25, 2021, in The New York Times, By Professors Paula Chakravartty and Ajantha Subramanian as justification for the caste law. Professor Ajantha Subramanian from Harvard University is the author of *"The Caste of Merit: Engineering Education in India,"* in which she maps White American elitism to the upper castes of India in a similar fashion that author Isabel Wilkerson does in her 2020 bestselling book *"Caste: The origins of our discontents."* Wilkerson compares American racism to India's caste system and social hierarchy in Nazi Germany. Subramanian, similarly, applies Critical Race Theory (CRT) to develop her conceptual framework that Brahmins of India, using the prestigious Indian Institutes of Technology (IIT) produce more upper caste engineers, who then move to Silicon Valley and conspire against the lower castes in the United States which results in rampant caste discrimination. Subramanian ignores the fact that the technology-heavy makeup of Indian immigrants in the United States is not caused by caste privilege but a result of US immigration policy that prefers merit and those who can contribute to its society.

67. Defendants highlight the Cisco case No. 20CV37266 as evidence of rampant caste discrimination in the United States although there was no trial, no testimony or evidence have been provided, and none of the allegations have been proven to be true. The Cisco case was still pending at the time Defendants introduced this caste law, and there has been no ruling on whether any form of caste-based discrimination or harassment did in fact occur. Still, Defendants declare that "in October 2022, the California Department of Fair Employment and Housing won an appeals court ruling to proceed with a lawsuit alleging that a Dalit engineer

at Cisco Systems—a multibillion-dollar tech conglomerate—was actively targeted by his dominant-caste managers, and denied professional opportunities, a raise and promotions because of his caste background." Defendants however, forget to mention that on December 30, 2022, a Case Management Statement filed by Cisco Systems against California Department of Fair Employment and Housing, now called California Civil Rights Department (CRD), suggests that CRD appears to be burying the egregious facts of this case from public scrutiny by approaching Cisco for confidential mediation (which Cisco has accepted), contrary to CRD's past efforts to hastily publicize the case in the press, leaking the names and pictures of Cisco employees accused of alleged caste discrimination, lobbying senators, and in their repeated opposition to arbitration, Page 4, Section 16c.

68. Defendants equate caste to the Hindu religion and India by stating that "caste is often associated with Hinduism and India." Defendants make sensational claims like "one in four caste-oppressed people faced physical and verbal assault, one in three face education discrimination, and two in three face workplace discrimination." Defendants declare that there is rampant caste oppression in the United States based on the self-acknowledged, unscientific, spurious 2018 survey by Equality Labs. On February 3, 2021, Hon. Judge Drew C. Takaichi of the Superior Court of California, County of Santa Clara, denied judicial notice of this bogus and skewed 2018 Equality Labs caste survey in Cisco case No. 20CV37266, CALIFORNIA-DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, an agency of the State of California, Vs. CISCO SYSTEMS, INC. a California Corporation; SUNDAR IYER, an individual; RAMANA KOMPELLA, an individual, in the Order Re: Motion To Proceed Using Fictitious Name, Page 4, Lines 6,11.

69. Hon. Judge Drew C. Takaichi of the Superior Court of California, County of Santa Clara also notes that: *In support of Plaintiff's and Doe's position, Plaintiff submits the declarations of*

Pro Se 15 2016

*DFEH counsel Siri Thanasombat, Dr. Suraj Yengde, Executive Director of Equality Labs Thenmozhi Soundararajan, Doe, and Professor Laurence Simon. Plaintiff also requests judicial notice of a report by the U.S. Department of State, Bureau of Democracy, Human Rights and Labor concerning human rights practices in India, **and 23 articles. The articles are not proper subjects of judicial notice and the request for judicial notice as to these articles is DENIED**. The report by the U.S. Department of State is a proper subject of judicial notice, but its relevance is unclear as to the determination of whether the complainant may proceed with a fictitious name. While the report establishes violence, human rights violations, and discrimination towards those members of the Dalit in India, **it does not concern members of the Dalit in the United States**, or any actions against those persons. **Similarly, the declarations of Yengde and Simon concern discrimination and violence towards the Dalit in India.** While the Court has great sympathy for the plight of those members of the Dalit in India, **research has not revealed any case authority—and Plaintiff has not pointed to any case authority—as to whether residents of another country or another country's discriminatory practices is a consideration** as to whether a party in California may remain anonymous in a lawsuit alleging violation of the California FEHA against a corporation in California,* Page 4, Lines 5-15.

70. Defendants conveniently forget to mention that for the abovementioned Cisco case No. 20CV37266, on December 30, 2022, according to a Case Management Statement filed by Sundar Iyer and Ramana Kompella, it appears that CRD has agreed to voluntarily dismiss individual Defendants pending approval of the Director of the CRD (Kevin Kish). This concession by the CRD is indicative of and exposes their past egregious behavior in this case. Page 5, Section 18.

*Pro Se 15 2016*

71. Defendants seem oblivious to the fact that for the abovementioned Cisco case No. 20CV37266, on January 11, 2023, Sundar Iyer and Ramana Kompella filed a Motion for Sanctions alleging an improper purpose (to harass or to cause unnecessary delay or expense) by the CRD. This further counters the CRD's fabrications of allegations "of a caste hierarchy" and a "hostile to Dalit environment." The motion alleges that the CRD lawsuit was legally meritless from the beginning, yet CRD persisted in pursuing the litigation, ignored the law and did not have any factual records. Accordingly, the motion requests the court to sanction CRD and its counsel and to pay sanctions to Sundar Iyer and Ramana Kompella.

72. Defendants declare that "in December 2019, Brandeis University announced a first-in-the-nation policy adding caste to its campus-wide non-discrimination and harassment policy;" but fail to declare that in the past three years, after adding caste to its policy, Brandeis University is yet to receive a caste discrimination complaint. On March 20, 2023, Plaintiff sent an email request to Brandeis University asking for details of their caste policy such as the definition of caste, definition of caste discrimination and the number of caste discrimination complaints reported at Brandeis University prior to and after adding caste to its policy.

73. On March 20, 2023, Plaintiff received an email reply from Professor Laurence Simon of Brandeis University stating that "I will be happy to serve as the point person for Brandeis on the information you seek and will be back in touch with you shortly." However, about an hour later, Plaintiff received another email from Professor Simon with the message "After consultation with the University's General Counsel, I understand that the University is not able to respond to your request." Considering that Professor Simon is the Joint Editor in Chief of "Caste / A Global Journal on Social Exclusion" at Brandeis University and that Professor Simon also provided a written declaration in court supporting CRD's motion against Cisco (which was later denied by Hon. Judge Drew C. Takaichi) Plaintiff was disappointed to learn

*Pro Se 15 2016*

that Brandeis University was not willing to provide even the basic definition of caste and empirical caste discrimination data. It is rather unfortunate since Brandeis University is perhaps the first trail-blazer organization in the United States to add a caste policy as early as December 2019 which means that Brandeis is in a unique position with access to at least a six-year "pre-caste" and "post-caste" period (2017 - 2019 / 2020 - 2022) of immensely valuable caste information and caste data that could have a major impact on future caste studies, policies, statutes, regulations, and lawsuits. Brandeis University, being the leader in the caste policy implementation, should make this information public.

74. Another Harvard academic, Dr. Suraj Yengde, (senior fellow at the Harvard Kennedy School), in his written declaration in court supporting CRD's motion against Cisco (which was later denied by Hon. Judge Drew C. Takaichi) states that "India's caste system is a complex yet stratified hierarchical order. The immense diversity of India's population is organized under the broader principles of the caste system. It emanates from the Hindu alias Brahminical books of rule that have provided certain qualifiers—such as one's ancestry— to ascribe caste status and religion." Dr. Yengde also claims that Hinduism did not exist until the mid-nineteenth century and that Hinduism is a political invocation to unite Brahmins. This leads to an inherent contradiction: on the one hand Hinduism gets blamed for creating the caste system in ancient times, thousands of years ago, and yet, on the other hand it is claimed that Hinduism did not exist until recent times. Dr. Yengde's overall position on caste is inconsistent. At times he says that the caste system was brought by the Aryans when they invaded India. He then states it was not in the Vedas and was later created by Brahmins. And then again, he claims that "It is no accident that Aryans found a spiritual homeland in India's Hindu laws and its callous caste system" which seems to imply that Hindu laws and callous caste system had existed before the Aryans came to India.

*Pro Se 15 2016*

75. On March 20, 2023, Plaintiff sent an email request to Harvard (since Harvard is part of a growing list of universities that include caste as a category in their nondiscrimination policies as per an article in the Harvard Crimson dated October 13, 2022, in which Dr. Yengde calls on Harvard to implement further "proactive policies" to fund research into caste, increase scholarships and outreach to Dalit potential applicants, and hire Dalit faculty) requesting that Harvard share with Plaintiff details of their caste policy such as definition of caste and caste discrimination and data/statistics on caste discrimination in Harvard. Since Professor Subramanian and Dr. Yengde are associated with Harvard, they were also included in that email, however, Plaintiff has not yet received any acknowledgement or answer from anyone at Harvard including Professor Subramanian and Dr. Yengde. Plaintiff also wants to point out that both Professor Subramanian and Dr. Yengde have been made aware (multiple times) of the counter facts of the Cisco case No. 20CV37266, yet they refuse to make public retractions of their erroneous statements as per academic ethics.

76. An amicus curiae in the Cisco case No. 20CV37266, filed on behalf of Ambedkar International Center, Inc. (AIC) dated February 22, 2021 asserts that the Cisco supervisor accused of caste discrimination is a Brahmin even though the supervisor's personal web page (that was created over 20 years ago at Stanford University) states that "The below is not about religion (**I don't profess knowledge of, and have never practised any**).. I care too little to comment upon ancient texts, and neither is this about individuals, and their personal beliefs." This web page was always available (and still is) in the public domain and can be reached at

77. The AIC amicus curiae in page 5, footnote 22, makes personal attacks by speculating, "Higher—caste workers sometimes view lower—caste workers such as John Doe who benefit from affirmative action programs as incompetent and undeserving … That attitude is evident in the case before the court: John Doe's Cisco supervisor told colleagues that Doe was not on

*Pro Se 15 2016*

1    the main list at one of India's universities." This while fully aware (as they quoted declarations

2    of the defendants) that the same Cisco "Brahmin" discriminatory supervisor gave all his top

3    three Head positions first, to a different Meritorious Dalit on the same team.

4    78. John Rushing, an attorney representing AIC told an Indian news organization, The Wire:

5    *Caste is also a form of race and color discrimination, both of which are outlawed by*

6    *California. ... All Dalits are South Asian, and in California, discriminating against someone*

7    *based on race is illegal. ... If the complainant was not South Asian, and belonged to any other*

8    *race, he would not have been subjected to caste discrimination.*

9    This is a very confusing statement since it suggests that caste discrimination can be handled

10   under current discrimination laws based on race and color, then suggests that only South Asians

11   face caste discrimination by other South Asians as opposed to it being a global issue.

12   79. Cisco did an internal investigation and found no evidence that the employee was discriminated

13   or retaliated against based on caste. The employee also had the opportunity to seek a thorough

14   second-level review of the outcome of the initial investigation, which was conducted, and the

15   initial findings of no caste discrimination or retaliation were confirmed. Mark Chandler, Chief

16   Legal and Compliance Officer (at that time), Cisco, also stated that "Given our principles, had

17   we found discrimination or retaliation, we would have remediated it, regardless of the fact that

18   there is no legal basis in the US for a claim of caste discrimination." which supports Plaintiff's

19   argument that caste discrimination can be handled under current discrimination laws, however

20   none of these facts were taken into account by the Defendants and they continue to cite the

21   Cisco case No. 20CV37266 as proof of rampant caste discrimination by "upper caste"

22   Hindu/Indian Americans in the US, especially in the Silicon Valley technology sector.

23   80. The Cisco caste lawsuit filed by CRD, in Exhibit 11, makes a circular self-reference to itself

24   (Case No. 20CV37266) in an article. In that exhibit, Professor Kevin Brown is introduced as a

*Pro Se 15 2016*

reputed professor of law and an expert on caste who believes that "there are very little protections for Dalits in the United States for the discrimination that they encounter here with caste Hindus."  Professor Brown has also been quoted as "I have been involved in Dalit struggles for 20 years now. The current brief that is filed in Cisco case, is a very critical case for attacking discrimination based on untouchability in the US. What I would highlight when thinking about these issues, American law arguably fundamentally changed this past June 2020. With the opinion issued by the US Supreme Court in Bostok vs Claton county. That opinion already means that Caste discrimination is already covered by Title VII of the Civil Right Act 1964 and more importantly it also outlawed Under 42 USC Section 1981 and 1982. So, if it is the Cisco case or any other case that goes to US Supreme Court and I would certainly urge the Dalit community to look for additional plaintiffs to file additional Title VII lawsuits against any form of discrimination that they encounter in the United States."

81. Professor Brown seems to be stating that caste discrimination is already covered by Title VII of the Civil Right Act 1964 and outlawed under 42 USC Section 1981 and 1982 which further solidifies Plaintiff's argument that caste discrimination is already covered under current discrimination laws. Professor Brown also seems to be encouraging the Dalit community to look for more victims to file additional Title VII lawsuits against any form of discrimination that they encounter in the United States, yet Plaintiff is unaware of any such caste lawsuit or caste complaint other than the Cisco case No. 20CV37266. On March 20, 2023, Plaintiff sent an email to Professor Brown requesting information and data on caste and caste discrimination. In response, Professor Brown replied back by providing a research paper in which he was the lead author, suggesting that the research paper may provide answers that the Plaintiff is seeking. Plaintiff read through all 58 pages of the research paper several times and concluded that the paper defines caste as a 3000-year-old hierarchical system of the Indian subcontinent

*Pro Se 15 2016*

consisting of four groups that the authors refer to as "Caste Hindu" and that Dalits are a fifth caste outside the four groups. The paper also mentions that the Rigveda, one of the most sacred Hindu creation "myths" sanctions the caste system which contradicts some of Dr. Yengde's views on the addition of caste to the Vedas as an Aryan versus Brahmin phenomenon and the existence of Hinduism in ancient times.

82. Defendants have ignored the Pew Research Center survey dated June 29, 2021, done in India, some of whose key findings are: (a) Across the country, most people (84%) say that to be "truly Indian," it is very important to respect all religions. Indians also are united in the view that respecting other religions is a very important part of what it means to be a member of their own religious community (80%). (b) the survey finds that most Indians do not perceive widespread caste-based discrimination. Just one-in-five Indians say there is a lot of discrimination against members of SCs, while 19% say there is a lot of discrimination against STs and somewhat fewer (16%) see high levels of discrimination against OBCs. Members of Scheduled Castes and Scheduled Tribes are slightly more likely than others to perceive widespread discrimination against their two groups. Still, large majorities of people in these categories do not think they face a lot of discrimination. The survey finds that most people – including most members of lower castes – say there is not a lot of caste discrimination in India. (c) In other words, Indians' concept of religious tolerance does not necessarily involve the mixing of religious communities. While people in some countries may aspire to create a "melting pot" of different religious identities, many Indians seem to prefer a country more like a patchwork fabric, with clear lines between groups.

83. Plaintiff has sent email requests to various companies, organizations, institutions, and universities who have recently added caste discrimination in their policy. This includes Apple Inc., Brown University, Colby College, University of California Davis, and others but Plaintiff

*Pro Se 15 2016*

has not received any acknowledgement or answers. It is interesting to note that Vice President for Institutional Equity and Diversity Sylvia Carey-Butler at Brown admitted that "The previous policy would have protected people experiencing caste discrimination. But we felt it was important to lift this up and explicitly express a position on caste equity." In other words, Brown made an unnecessary policy change without regard for consequences, just to make a political point.

84. Defendants refer to Lakireddy Bali Reddy who was convicted in 2001 by federal law enforcement officials on human trafficking charges as a "caste oppressor." Similarly, the BAPS class action lawsuit that was filed in May 2021, is projected as "massive caste exploitation" even though the federal investigators are treating this as a human trafficking case. Paul Fishman, the former U.S. Attorney of New Jersey who is representing BAPS, said in a statement that BAPS will "fully cooperate with the federal investigation and draw attention to the many factual and cultural inaccuracies in the civil complaint." BAPS has denied the allegations made in the lawsuit. Individuals and Organizations involved in human trafficking or violating labor laws must be held accountable and punished if found guilty. But that should not implicate the entire Hindu American community (a minority in the US) just like crimes committed by other American minorities are not attributed/corelated to crimes committed outside the US and entire American minority communities are not branded as criminals.

85. On April 10, 2023, after being threatened by sanctions by the Cisco engineers for fabrication of evidence, CRD voluntarily dismissed **with Prejudice** its Case No. 20CV37266 in Superior Court against Cisco engineers Sundar Iyer and Ramana Kompella, who faced allegations of caste-based discrimination. With a tersely worded filing that assigned no reason, the CRD brought the curtain down on almost three years of trial by publicity and innuendo against Sundar Iyer and Ramana Kompella on charges that they had discriminated against "John Doe"

ABHIJIT BAGAL, Plaintiff, *Pro Se*

based on caste. Contrary to their past actions to keep this in the Court, CRD approached Cisco, yet again, for mediation, to keep their egregious behavior, false allegations, and fabrications away from public scrutiny. Filed nearly three years ago, CRD's legal action made global headlines, with false claims about the Hindu religion and xenophobic depictions of people of Indian origin, eliciting widespread outrage in the Indian and Hindu American communities. Two Hindu Americans endured a nearly three-year nightmare of unending investigations, a brutal online witch hunt, and a presumption of guilt in the media after the CRD sullied their reputation alleging that they engaged in discrimination based on caste. This Cisco trial presents a cautionary tale of the legal morass that awaits Indians, Hindus, and all South Asians, if the Defendants are allowed to adopt the new caste law that applies to only South Asians and institutionalizes false and negative claims that stigmatize a particular community. Defendants should be prevented from ethnically profiling South Asians with the creation of caste as a stand-alone category, as the case launched by the CRD against the two Cisco engineers is a brutal illustration of a fate that can befall any South Asian living or traveling in Seattle. Defendants should be made aware that the best avenue of remedy for allegations of caste or other intra-community discrimination is under existing law and categories such as national origin, ethnicity, and/or ancestry. "***Caste/Gate/Files***", a fact-based, grassroots, crowd-sourced, whistleblower platform of nonpartisan American volunteers, has published a repository of the Cisco case. Plaintiff is a contributing volunteer for "***Caste/Gate/Files***." Details and timeline of the Cisco case from "***Caste/Gate/Files***" is attached hereto as **Exhibit D.** *See* **Exh. D.**

86. Considering the above facts, Plaintiff asserts that the Defendants used an unscientific, biased, and skewed 2018 survey from the anti-Hindu and hateful Equality labs with a Conflict of Interest, quoted the legally frivolous and meritless Cisco lawsuit (which has now been dismissed) with fabricated claims, used statements from unethical and biased academics, and

Case 2:23-cv-00721-RAJ   Document 1   Filed 05/11/23   Page 33 of 48

provided news articles, events, and anecdotes from India which were later denied by Hon. Judge Drew C. Takaichi. Defendants cite numerous statements from numerous individuals, groups, and organizations who accuse "upper caste" Hindu/Indian/South Asian Americans of unspecified caste discrimination, without naming any specific incident, without naming their alleged caste discriminators, without giving any specifics of any caste discrimination directed on them, without location, date, time or any details or any collaborating witnesses while concluding that more than 40% of Dalits in the US have faced caste discrimination. Individual lawsuits and the information cited by Defendants without any evidence do not establish generalized truths that can be made into a discriminatory ordinance that is unconstitutional.

87. Plaintiff also asserts that the Defendants, instead of solving real problems that exist in Seattle such as homelessness, rising crime, drug abuse, healthcare, and education have started a witch hunt in the name of caste equity. In November 2022, the City of Seattle was sued by Joshua Diemert, an ex-employee of Seattle's Human Services Department for creating a hostile work environment. Complaint has been registered as Civil Action No. 2:22-cv-01640-LK and assigned to Hon. Judge Jamal N Whitehead of this same court - THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE. The workplace hostility stems from Seattle's Race and Social Justice Initiative (RSJI), a citywide effort that began in 2004 as city council and mayoral directives to end city government's purported "institutional racism" and to achieve racial equity in the community. Led by the very same Seattle Office for Civil Rights (SOCR) that is now supposed to enforce the new caste law, the RSJI initiative forces city employees to apply a "Racial Equity Toolkit"--derived from Critical Race Theory (CRT) —to every city function imaginable.

88. In February 2023, the City of Seattle agreed to pay $3.6 million to settle another lawsuit brought on over how the city handled the Capitol Hill (CHOP) protest zone in 2020. Seattle

University is located inside the CHOP zone where Plaintiff attended graduate school earlier. It is evident that Defendants are purposefully wasting precious resources, valuable time, and taxpayer money to mislead the public and drive their own ideological and political agendas to advance their interests and careers; hence they must be held accountable and brought to trial by jury to answer for their unlawful actions and subsequent violations of the US Constitution.

## LEGAL FRAMEWORK

89. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

### The First Amendment

90. The First Amendment to the United States Constitution provides, in part, that "Congress shall make no law respecting an establishment or religion or prohibiting the free exercise thereof." U.S. CONST. amend I (the "Religion Clauses").

91. Those Religion Clauses are the basis of the religious freedoms enjoyed in the United States.

92. The Religion Clauses are applicable to the States under the Fourteenth Amendment. See, e.g., *Kennedy v. Bremeton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022).

93. The Religion Clauses have "'complementary' purposes, not warring ones where one Clause is always sure to prevail over the other . . . ." *Id.* at 2426 (quoting *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 13 (1947)). As the Supreme Court recently held:

Among other things, ***the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion***. State interference in that sphere would obviously violate the free exercise of religion, ***and any attempt by government to dictate or even influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion.***

Pro Se 15 2016

*Our Lady of Guadalupe Sch.,* 140 S.Ct. at 2060 (internal punctuation and citations omitted) (emphasis added).

94. As the Supreme Court held long ago, "when . . . presented with a state law granting a denominational preference, [Supreme Court] precedents demand that [courts] treat the law as suspect and that [courts] apply strict scrutiny in adjudging its constitutionality." *Larson v. Valente,* 456 U.S. 228, 246–48 (1982); *see also Trump v. Hawaii,* 138 S. Ct. 2392, 2417 (2018); *Washington v. Trump,* 847 F.3d 1151, 1167 (9th Cir. 2017).

95. This case now before the Court "pits two competing values that we cherish as a nation: the principle of non-discrimination on the one hand, and the First Amendment's protection of free exercise of religion on the other hand. . . . ***Under the First Amendment, our government must be scrupulously neutral when it comes to religion: It cannot treat religious groups worse than comparable secular ones.***" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,* No. 22-15827, 2022 WL 3712506, at \*\*2–3 (9th Cir. 2022) (emphasis added).

96. Specifically, state actors like Defendants cannot single out religions for ridicule by ascribing to them tenets that are not part of their faith and that members of that faith find repugnant.

97. The First Amendment ***requires*** that government "proceed in a manner neutral toward and tolerant\" of people's "religious beliefs.\" *Masterpiece Cakeshop Ltd. v. Colo. C.R. Comm'n,* 138 S.Ct. 1719, 1731 (2018). And, while neutrality is compelled as between religious and secular groups, there must be "strict adherence to the 'principal of denominational neutrality . . .'\" where, as here, one religion is treated differently than all others. *Adair v. England,* 183 F. Supp.2d 31, 48 (D.D.C. 2002) (quoting *Larson,* 456 U.S. at 246–47). This has been bedrock constitutional law for decades. See, e.g., *Larson,* 456 U.S. at 246 (quoting *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 305 (1963) (internal punctuation omitted) ("the fullest realization

ABHIJIT BAGAL, Plaintiff, *Pro Se*

of true religious liberty requires that government effect no favoritism among sects and that it work deterrence of no religious belief\")); *Epperson v. Arkansas*, 393 U.S. 97, 98 (1968) (emphasis added) (citations omitted) ("The First Amendment mandates governmental neutrality between religion and religion . . . . The State may not aid or oppose any religion . . . . This prohibition is absolute.\").

98. The caste law violates those basic tenets of the Religion Clauses by ascribing an oppressive and discriminatory caste system to the entire Hindu religion. In this manner, the caste law ascribes a negative (and false) attribute to a particular faith – Hinduism – that is not neutral or generally applicable since it singles out only a supposed practice of the Hindu religion.

99. Not only are Defendants constitutionally prohibited from linking caste system with the Hindu religion which they project as inherently discriminatory, that conclusion is simply wrong.

100.    Indeed, Plaintiff here does not believe in nor engage in caste discrimination at all. Rather, Plaintiff abhors it, along with all other forms of discrimination. It is Plaintiff's sincerely held religious belief that the Hindu religion in no way includes or endorses an oppressive and discriminatory caste system, yet Defendants have now told Plaintiff that it is a part of Plaintiff's religion, and that Plaintiff must be a part of inherent caste discrimination either by being the Oppressor/Dominant/Upper caste or the Oppressed/Dominated/Lower caste.

**The Equal Protection Clause**

101.    The Equal Protection Clause of the Fourteenth Amendment "prohibits the government from classifying people based on suspect classes, unless the classification is narrowly tailored to satisfy a compelling governmental interest . . . .\" *Al Saud v. Days*, 36 F.4th 949, 953 (9th Cir. 2022) (citing *Kadmas v. Dickinson* Pub. Sch., 487 U.S. 450, 457–58 (1988)).

102.    "[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect.\" *Fisher*, 570 U.S. at 310 (quoting *Fullilove*, 448 U.S. at 523).

*Pro Se 15 2016*

103.   Consequently, the general rule is that when a state actor explicitly treats an individual differently based on race, strict scrutiny is applied. *Id.; Johnson*, 543 U.S. at 505; Adarand Const., Inc. v. Pena, 515 U.S. 200, 227 (1995). The Supreme Court has "insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications, such as race-conscious university admissions policies, race-based preferences in government contracts, and race-based districting intended to improve minority representation.\" *Johnson*, 543 U.S. at 505.

104.   Race, ethnicity, national origin, and religion are protected classes under the Equal Protection Clause. See, e.g., *Days*, 36 F.4th 949; *Mitchell v. Washington*, 818 F.3d 436, 444–45 (9th Cir. 2018).

105.   By drafting the caste law to specifically include caste as a protected category, Defendants impermissibly singled out Hindu Americans (like Plaintiff) and those of Indian/South Asian origin, based on their perceived national origin or ancestry (Indian/South Asian) and religion (Hinduism).

106.   Defendants cite numerous unrelated news articles, anecdotes, events, and individual statements to declare that caste is found significantly among South Asian Americans and that 1 in 4 caste-oppressed people faced physical and verbal assault, 1 in 3 education discrimination, and 2 in 3 (67 percent) workplace discrimination. Defendants do not provide any factual data or evidence (such as the number of caste discrimination assaults, complaints, police records, court dockets, or lawsuits reported in the US in the last ten years and their outcomes) to support these scandalous statements and sensational statistics of caste discrimination in the US.

**The Due Process Clause - Vagueness**

107.   The Due Process Clause of the Fourteenth Amendment requires:

ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

First, laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. . . . The vagueness doctrine's second requirement aims to avoid arbitrary and discriminatory enforcement, and demands that laws provide explicit standards for those who apply them. A law that relies on a subjective standard—such as whether conduct amounts to an annoyance—is constitutionally suspect. *Edge v. City of Everett,* 929 F.3d 657, 664–65 (9th Cir. 2019) (internal citations and quotation marks omitted); see also *Arce v. Douglas,* 793 F.3d 968, 988 (9th Cir. 2015). This is referred to as the vagueness doctrine. See Edge, 929 F.3d at 664.

108.    While a statute or policy need not be perfectly clear to survive a vagueness challenge, it must nonetheless provide a code of conduct that ordinary citizens can follow to reasonably avoid violation. See *Wal-Mart Stores, Inc. v. City of Turlock,* 483 F. Supp.2d 987, 1021 (E.D. Cal. 2006) (internal citations and quotation marks omitted) ("If a statute is not sufficiently clear to provide guidance to citizens concerning how they can avoid violating it and to provide authorities with principles governing enforcement, the statute is invalid.\"); *Santa Cruz Lesbian & Gay Comm. Ctr. v. Trump,* 508 F. Supp.3d 521, 536 (N.D. Cal. 2020) (executive orders considered void for vagueness when they left plaintiffs unsure as to whether they could continue providing diversity and inclusion training without violating them).

109.    The caste law is unconstitutionally vague to the extent that it prohibits discrimination based on caste.

110.    The caste law does not provide any clear guidelines on determining the caste of any person (including Plaintiff) other than making vague and absurd suggestions like "caste does not have visible markers (analogous to sexual orientation), so exposing discrimination may require self-identification that can itself expose those individuals to further discrimination." Nor does it

Complaint for violation of civil rights - 38                    ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

provide any framework for determining whether caste discrimination took place or not. As per this caste law, Seattle residents could be charged with caste discrimination based on their name, who they are married to, their dietary habits, for celebrating popular festivals like Holi and Diwali, for visiting their local temples, or for not inviting their co-worker to a party.

111. Even those of Indian origin or those who identify as Hindu may very well be unfamiliar with what caste means because there simply is no universally agreed upon definition and because it is a foreign concept. This is especially true for second and third generation Hindu Americans whose parents or grandparents may have come from different parts of India with different names and skin color. Further, some names are shared by people from different regions of India belonging to different castes, so the Seattle Office for Civil Rights may have to send its investigators to different States of India to determine the "true" caste of a person.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR DECLARATORY JUDGMENT**

**VIOLATION OF PLAINTIFF's FIRST & FOURTEENTH AMENDMENT RIGHTS**

**(AGAINST ALL DEFENDANTS)**

112. Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

113. Plaintiff has viable claims under the First and Fourteenth Amendments to the United States Constitution as explained herein.

114. Consequently, Plaintiff faces certainly impending injuries under the caste law.

115. A declaratory judgment holding the caste policy unconstitutional, and thus unenforceable, as to caste discrimination will relieve the Plaintiff of very realistic fears of impending injury. See *Crossley v. Cal.*, 479 F. Supp.3d 901, 920 (S.D. Cal. 2020) (quoting *Steffel v. Thompson*, 415 U.S. 452, 460 (1974) (In order to prevail on a claim for declaratory relief, "[t]he plaintiff

*Pro Se 15 2016*

1  must demonstrate that the probability of [a] future [undesirable] event is real and substantial

2  [and] 'of sufficient immediacy and reality to warrant the issuance of a declaratory

3  judgment.'")).

4  116.   Plaintiff is therefore entitled to declaratory relief declaring this new law to be

5  unconstitutional to the extent that it references caste and to injunctive relief enjoining

6  Defendants from enforcing the caste provision of the law.

7  **SECOND CLAIM FOR VIOLATION OF FREE EXERCISE CLAUSE**

8  **OF THE FIRST AMENDMENT TO THE UNITED STATES**

9  **CONSTITUTION – 42 U.S.C. § 1983**

10  **(AGAINST ALL DEFENDANTS)**

11  117.   Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set

12  forth herein.

13  118.   42 U.S.C. §1983 prohibits any state actor or person acting under color of state law from

14  depriving others of their rights, privileges, or immunities under the United States

15  Constitution.

16  119.   Defendants were state actors and/or acting under color of state law when they

17  promulgated the caste law.

18  120.   Defendants are state actors and/or acting under color of state law in enforcing the caste

19  law.

20  121.   Violations of the First Amendment are actionable under 42 U.S.C. §1983.

21  122.   "The [Free Exercise Clause of the] First Amendment protects the rights of religious

22  institutions 'to decide for themselves, free from state interference, matters of church

23  government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch.*, 140 S. Ct.

24

Complaint for violation of civil rights - 40            ABHIJIT BAGAL, Plaintiff, *Pro Se*

at 2055 (*citing Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

123.   The caste law violates the Free Exercise Clause of the First Amendment by, inter alia, defining the contours and practices of the Hindu religion by impermissibly (and erroneously) concluding that inherent to the teachings and practices of Hinduism is a "caste system" characterized as a racist and oppressive system of discrimination and violence against others.

124.   This new law is neither neutral nor generally applicable in that it, inter alia, refers to caste (associated primarily with Hinduism); is being specifically applied only to the certain groups of people; and does not apply to other groups such as White Americans, Chinese Americans, American Indians/Alaska Natives, and Native Hawaiians & Other Pacific Islanders.

125.   The caste law is not narrowly tailored to meet a compelling government interest.

126.   As a result of the caste law violating the Free Exercise Clause, Plaintiff has suffered a de facto irreparable injury.

127.   Enforcing the caste law will not only cause Plaintiff (and others similarly situated) to live with the fear of being disciplined for committing discrimination they did not commit, but such accusations also – and indeed the mere stereotypes and implicit bias the caste law has perpetuated – will follow them throughout the rest of their careers and lives as has happened with Mr. Sundar Iyer in the Cisco caste lawsuit. Mr. Iyer, over 20 years ago, while he was a student at Stanford University, had published a blog (which is still available in public domain) in which he had declared himself irreligious. Mr. Iyer also personally solicited John Doe (in part due to his long-standing relationship with Doe as a classmate at the Indian Institute of Technology) and hired Doe as a Principal Engineer with a very high salary, despite his alleged knowledge of Doe's caste. Mr. Iyer gave up 100% of his CEO equity worth several million dollars to all his employees, including to John Doe. Mr. Iyer also promoted a different

1    Meritorious Dalit to a leadership position, but the CRD did not even bother to interview that

2    Meritorious Dalit. Yet, the CRD labeled Mr. Iyer, based on his last name, a "Brahmin

3    Oppressor", personal details and pictures were leaked online, and Mr. Iyer had to leave Cisco,

4    while John Doe is still anonymous and working at Cisco.

5    128.    Similarly, because the caste law does not describe what repercussions exist for alleged

6    caste discrimination (or even explain what caste discrimination is), anyone in Seattle, including

7    those who may travel there to visit their alma mater (like Plaintiff), regardless of their ancestry

8    or actual religious beliefs, could be subject to being branded as "oppressors" and might lose

9    their jobs if they are even accused of caste discrimination without any evidence.

10    129.    Plaintiff has no adequate remedy at law to prevent or redress the irreparable injuries alleged

11    herein.

12    130.    Unless Defendants are enjoined and restrained from enforcing the portion of the law

13    applying caste as a protected category, Plaintiff will be irreparably injured and deprived of

14    rights under the United States Constitution forever.

15    131.    As Plaintiff's constitutional violations are ongoing and capable of repetition, Plaintiff is

16    entitled to injunctive relief.

17    132.    Because Defendants' actions may require Plaintiff to retain counsel and incur attorney's

18    fees and costs to bring this action, Plaintiff is entitled to the recovery of those fees and costs

19    pursuant to, inter alia, 42 U.S.C. § 1983 et seq. and 42 U.S.C. § 1988(b).

20    **THIRD CLAIM FOR VIOLATION OF THE ESTABLISHMNET CLAUSE**

21    **OF THE FIRST AMENDMENT TO THE UNITED STATES**

22    **CONSTITUTION – 42 U.S.C. § 1983**

23    **(AGAINST ALL DEFENDANTS)**

24

*Pro Se 15 2016*

133.   Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

134.   Defendants, through the caste law and elsewhere, have unilaterally determined that the contours of Hinduism include caste and an oppressive and discriminatory caste system.

135.   Some groups like Chinese Americans have been provided immunity from caste discrimination while some others like Indian Americans are being singled out and targeted.

136.   The caste law is not narrowly tailored to meet a compelling government interest.

137.   Defendants were state actors and/or acting under color of state law when they promulgated the caste law.

138.   Defendants are state actors and/or acting under color of state law in enforcing the caste law.

139.   As a result of the caste law violating the Establishment Clause, Plaintiff has suffered a de facto irreparable injury.

140.   Enforcing the caste law will not only cause Plaintiff (and others similarly situated) to live with the fear of being disciplined for committing discrimination they did not commit, but such accusations also – and indeed the mere stereotypes and implicit bias the caste law has perpetuated – will follow Plaintiff throughout the rest of Plaintiff's career and life. Similarly, because the caste law does not describe what repercussions exist for alleged caste discrimination (or even explain what caste discrimination is), anyone in Seattle, including those who travel there to visit their alma mater, or to attend a work meeting, regardless of their ancestry or actual religious beliefs, could be subject to being branded as "oppressors" and might lose their jobs if they are even accused of caste discrimination without any evidence.

141.   Plaintiff has no adequate remedy at law to prevent or redress the irreparable injuries alleged herein.

*Pro Se 15 2016*

142.   Unless Defendants are enjoined and restrained from enforcing the portion of the caste law applying caste as a Protected Status, Plaintiff will be irreparably injured and deprived of rights under the United States Constitution forever.

143.   As Plaintiff's constitutional violations are ongoing and capable of repetition, Plaintiff is entitled to injunctive relief.

144.   Because Defendants' actions may require Plaintiff to retain counsel and incur attorney's fees and costs to bring this action, Plaintiff is entitled to the recovery of those fees and costs pursuant to, inter alia, 42 U.S.C. § 1983 et seq. and 42 U.S.C. § 1988(b).

**FOURTH CLAIM FOR VIOLATION OF THE DUE PROCESS CLAUSE**

**OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES**

**CONSTITUTION – 42 U.S.C. § 1983**

**(AGAINST ALL DEFENDANTS)**

145.   Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

146.   "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).

147.   A government policy, statute or regulation violates the Due Process Clause of the Fourteenth Amendment where it "is unclear as to what facts must be proved" to violate it. *United States v. Williams*, 553 U.S. 285, 306 (2008).

148.   Such vagueness claims are actionable under 42 U.S.C. § 1983.

149.   First, laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. . . . The vagueness doctrine's second requirement aims to avoid arbitrary and discriminatory enforcement, and demands that laws

*Pro Se 15 2016*

provide explicit standards for those who apply them. A law that relies on a subjective standard—such as whether conduct amounts to an annoyance—is constitutionally suspect. *Edge*, 929 F.3d at 664.

150.    The caste law is so vague that people of ordinary intelligence do not know what conduct is prohibited by the caste. The caste law assumes that caste discrimination can happen in only one direction from "Upper/Dominant/Oppressor" to "Lower/Dominated/Oppressed" without considering reverse discrimination or the complex hierarchy of thousands of sub castes. The caste law also does not address how those Americans who are agnostic, atheist, animist, irreligious, or pagan will be handled if they report, or, are accused of, caste discrimination.

151.    The caste law does not provide explicit standards sufficient to survive a vagueness challenge.

152.    Thus, the caste law is unconstitutionally vague in violation of the Due Process Clause to the extent that it prohibits discrimination based on caste.

153.    Enforcing the caste law will not only cause Plaintiff (and others similarly situated) to live with the fear of being disciplined for committing discrimination they did not commit, but such accusations also – and indeed the mere stereotypes and implicit bias the caste law has perpetuated – will follow Plaintiff throughout the rest of Plaintiff's career and life. Similarly, because the caste law does not describe what repercussions exist for alleged caste discrimination (or even explain what caste discrimination is), anyone in Seattle, including those who travel there to visit their alma mater, or attend a conference, regardless of their ancestry or actual religious beliefs, could be subject to being branded as "oppressors" and might lose their jobs if they are even accused of caste discrimination without any evidence.

*Pro Se 15 2016*

154.    Unless Defendants are enjoined and restrained from enforcing the portion of this new law applying caste as a Protected Status, Plaintiff will be irreparably injured and deprived of rights under the United States Constitution forever.

155.    As Plaintiff's constitutional violations are ongoing and capable of repetition, Plaintiff is entitled to injunctive relief.

156.    Because Defendants' actions may require Plaintiff to retain counsel and incur attorney's fees and costs to bring this action, Plaintiff is entitled to the recovery of those fees and costs pursuant to, inter alia, 42 U.S.C. § 1983 et seq. and 42 U.S.C. § 1988(b).

## RESERVATION OF RIGHTS

157.    Plaintiff reserves the right to add, revise, or withdraw any claims, or add additional claims during the course of litigation as information is gained through litigation.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays for judgment against Defendants, in their official and individual capacities, and relief as follows:

A. For an immediate, temporary restraining order enjoining Defendants from enforcing the law to the extent that it prohibits discrimination based on caste;

B. For a preliminary injunction enjoining Defendants from enforcing the law to the extent that it prohibits discrimination based on caste;

C. For permanent injunctive relief preventing Defendants from enforcing the law to the extent that it prohibits discrimination based on caste;

D. For a declaratory judgement that Defendants violated Plaintiff's rights as secured by the First Amendment, Due Process, Equal Protection Clause of the Fourteenth Amendment, Title VII of the Civil Rights Act, and the Washington Law Against Discrimination;

*Pro Se 15 2016*

E. Compensatory damages against the Defendants in their individual capacities, in an amount to be determined by the Court to compensate Plaintiff for their interference with Plaintiffs rights under the U.S. Constitution and for the significant emotional distress, mental trauma, humiliation, intimidation, and belittlement experienced by Plaintiff;

F. Enjoin the Defendants from engaging in any act or practice that seeks to define Hinduism or any other religion as including a caste system or any other belief or practice;

G. Enjoin the Defendants from ascribing religious or moral beliefs or practices to persons or groups who expressly disclaim any such beliefs or practices;

H. Enjoin the Defendants from engaging with, or using any caste competency trainings provided by Equality Labs or any other entities or persons associated with Equality Labs;

I. Retain jurisdiction over this action to assure full compliance with the orders of the Court and with applicable law and require Defendants to file such reports as the Court deems necessary to evaluate compliance;

J. For attorneys' fees and costs (should Plaintiff retain an attorney in the future) under 42 U.S.C. § 1988 and other applicable law. Plaintiff is not seeking attorney's fees and costs for any *pro se* work;

K. For all Nominal, Compensatory, Punitive, and other damages including but not limited to emotional distress, mental anguish, loss of enjoyment of life, humiliation, inconvenience, special, general, and/or other damages pursuant to RCW 49.60, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., 42 U.S.C.A. § 1981a(b)(3), and as otherwise authorized by law, to be determined later during litigation, and:

L. For such all further legal and equitable relief as this Court deems just and appropriate.

Complaint for violation of civil rights - 47                ABHIJIT BAGAL, Plaintiff, *Pro Se*

*Pro Se 15 2016*

**DEMAND FOR JURY TRIAL**

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury on all issues so triable.

**CERTIFICATION AND CLOSING**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          May 10, 2023

Signature of Plaintiff

Printed Name of Plaintiff     ABHIJIT BAGAL
                              Plaintiff, *Pro Se*
                              125 Vista Brooke Drive
                              Morrisville, NC 27560
                              Phone: (919) 917-3839
                              Email: abebagal@gmail.com