# Stigmatic Harm and Standing

*Thomas Healy**

*ABSTRACT: If the government violates the law in a way that stigmatizes a particular group, does a member of that group have standing to challenge the violation in federal court? In the well-known case of* Allen v. Wright, *the Supreme Court said no. According to the Court, stigmatic harm is too abstract and generalized to support standing in most cases. To permit standing on the basis of stigmatic harm alone, the Court stated, would "transform the federal courts into no more than a vehicle for the vindication of the value interests of concerned bystanders."*

*This Article revisits that decision. It begins by explaining that, despite* Allen, *the Court has never completely ruled out stigmatic harm as a basis for standing. In equal protection, electoral districting, and Establishment Clause cases, the Court has sometimes invoked stigmatic harm as a basis for standing, while in its recent opinion in* Lawrence v. Texas *the Court relied on stigmatic harm to reach an issue that was not necessary to the resolution of the case. The Article then makes the normative claim that stigmatic harm should be a sufficient injury for purposes of standing. Drawing on social science research, it examines the nature of stigma, the role of law in creating and reinforcing stigma, and the harms experienced by the stigmatized. This research shows that stigmatic harm is just as concrete as other injuries the Court recognizes as sufficient for standing. Finally, after considering a number of possible objections, the Article describes various scenarios in which plaintiffs might rely on stigmatic harm as a basis for standing.*

*    Associate Professor, Seton Hall School of Law. B.A., The University of North Carolina; J.D., Columbia University School of Law. Thanks to Michelle Adams, Baher Azmy, Jake Barnes, Carl Coleman, Rachel Godsil, Tristin Green, Edward Hartnett, Andrea McDowell, Frank Pasquale, James Pfander, Edward Purcell, Charles Sullivan, and, especially, Arlene Chow. Thanks also to the participants at the Seton Hall Scholarship Retreat, to Sarah Farley and Matthew Schueller for excellent research assistance, and to the editors of the *Iowa Law Review.* The ideas in this Article were presented at the poster session of the 2006 Association of American Law Schools Annual Meeting.

HEALY_CE_AU                                              3/7/2007 11:41:23 AM

418                    92  *IOWA LAW REVIEW*              [2007]

INTRODUCTION ...........................................................................419

I.   STIGMATIC HARM AND STANDING: FROM *ALLEN* TO *LAWRENCE* .............423
     A.   *THE EVOLUTION OF INJURY IN FACT* ....................................423
     B.   ALLEN V. WRIGHT .............................................................428
     C.   *STIGMATIC HARM AFTER* ALLEN ..........................................431
          1.   Denial of Equal Treatment ...........................................431
          2.   Electoral Redistricting ..............................................433
          3.   Establishment Clause .................................................436
          4.   *Lawrence v. Texas* .................................................438

II.  AN ALTERNATIVE VIEW OF STANDING .......................................443

III. THE NATURE OF STIGMATIC HARM ..........................................447
     A.   *A MARK OF DISGRACE* ......................................................448
     B.   *STIGMA AND LAW* ...........................................................450
     C.   *THE EXPERIENCE OF THE STIGMATIZED* .................................453
     D.   *STIGMATIC HARM AS A CONCRETE INJURY* .............................458

IV.  POTENTIAL OBJECTIONS ......................................................462
     A.   *QUESTIONS OF CAUSATION AND REDRESSABILITY* .....................462
     B.   *PROVING STIGMATIC HARM* .................................................466
     C.   *OPENING THE FLOODGATES* .................................................472
     D.   *FINDING THE BEST LITIGANT* ..............................................474

V.   STIGMATIC HARM IN APPLICATION ..........................................475
     A.   *PAST CASES* ..................................................................476
          1.   *Allen v. Wright* .......................................................476
          2.   *Linda R.S. v. Richard D.* ...........................................478
          3.   *Doe v. Commonwealth's Attorney for the City of Richmond* ...........480
     B.   *FUTURE CASES* ...............................................................482
          1.   Racial Profiling ......................................................482
          2.   Discrimination and HIV ...............................................484
     C.   *SUMMARY* .....................................................................486

CONCLUSION ...............................................................................487

HEALY_CE_AU                                                                3/7/2007 11:41:23 AM

*STIGMATIC HARM AND STANDING*                                              419

## INTRODUCTION

Under the Supreme Court's well-established standing doctrine, a plaintiff has standing only if he has suffered an "injury in fact" that is fairly traceable to the defendant's conduct and is likely to be redressed by a decision in his favor.[1] The injury must be concrete, not abstract, and actual or imminent, not conjectural or hypothetical.[2] Although most plaintiffs assert economic injuries, standing also can be based on non-economic injuries.[3] For instance, the Court has held that injuries to aesthetic interests—such as the desire to enjoy a particular forest or park—are sufficient to support standing.[4] But there is one non-economic injury the Court has been reluctant to recognize as a basis for standing. In *Allen v. Wright*, the Court denied standing to African Americans who alleged that the government's failure to enforce antidiscrimination laws against private schools stigmatized them.[5] Although the Court acknowledged that stigmatic harm is serious, it said such harm is too abstract to serve as a basis for standing.[6] To rule otherwise would "transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'"[7] "Constitutional limits on the role of the federal courts," the Court added, "preclude such a transformation."[8]

The Court's holding in *Allen* has substantially limited the ability of minority groups to challenge government action that reinforces private discrimination. It precluded the plaintiffs in *Allen* from seeking the enforcement of antidiscrimination laws against segregated schools.[9] It has barred lawsuits by gays and lesbians seeking to overturn criminal sodomy laws.[10] And it has blocked efforts by African Americans to deny licenses to radio stations accused of racial discrimination.[11]

---

1.  Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 771 (2000).

2.  *Id.*

3.  *See infra* notes 75–82 and accompanying text.

4.  *See, e.g.*, Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 173–74 (2000) (holding that interference with recreational use of a river is sufficient for standing); Lujan v. Defenders of Wildlife, 504 U.S. 555, 562–63 (1992) (stating that inability to use or enjoy animal species is a cognizable injury); United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 686–87 (1973) (recognizing the inability to use natural resources as an injury).

5.  Allen v. Wright, 468 U.S. 737, 755 (1984).

6.  *See id.*

7.  *Id.* at 756 (quoting *Students Challenging Regulatory Agency Procedures*, 412 U.S. at 687).

8.  *Id.*

9.  *See id.* at 755–56.

10. Christopher R. Leslie, *Standing in the Way of Equality: How States Use Standing Doctrine to Insulate Sodomy Laws from Constitutional Attack*, 2001 WIS. L. REV. 29, 40.

11. Rainbow/PUSH Coal. v. FCC, 396 F.3d 1235, 1241 & n.6, 1243–44 (D.C. Cir. 2005).

    Lawyers and legal scholars seem largely to have accepted this state of affairs. Although several writers have criticized *Allen* on other grounds,[12] in the two decades since the decision no one has seriously examined the Court's conclusion that stigmatic harm is inadequate to support standing.[13] And given the considerable time that has passed since *Allen* was decided, it might seem too late to revisit the ruling now.

    But there are two important reasons to reconsider *Allen*. First, despite the Court's holding, it has never entirely dismissed stigmatic harm as a basis for standing. In *Allen* itself, the Court stated that stigmatic harm would support standing for plaintiffs who were personally denied equal treatment.[14] And in the years since *Allen*, the Court has invoked stigmatic harm, either explicitly or implicitly, as a basis for standing in electoral districting[15] and Establishment Clause cases.[16]

    Second, and perhaps more intriguingly, is the Court's recent opinion in *Lawrence v. Texas*.[17] In *Lawrence*, two men challenged their conviction under a Texas law that prohibited sodomy between same-sex couples but not between opposite-sex couples.[18] Although the Court could have invalidated the law on equal protection grounds, it instead struck down the law as a violation of substantive due process,[19] thereby overturning its decision seventeen years earlier in *Bowers v. Hardwick*.[20] In justifying this approach, the Court explained that the law invited discrimination against homosexuals "both in the public and in the private spheres."[21] And because a decision based on equal protection would not preclude Texas from criminalizing sodomy between all couples, the law's "stigma might remain even if it were not enforceable as drawn."[22] Therefore, the Court concluded, it was

---

    12.    *See, e.g.*, Gene R. Nichol, Jr., *Abusing Standing: A Comment on* Allen v. Wright, 133 U. PA. L. REV. 635, 636–37 (1985) (questioning *Allen*'s focus on separation of powers); Girardeau A. Spann, *Color-Coded Standing*, 80 CORNELL L. REV. 1422, 1457 (1995) (criticizing *Allen* for being "directly at odds with the *Northeastern Florida* decision, which flatly disregarded similar problems of an abstract and speculative injury"); Recent Cases, *Standing—Injury-in-Fact Requirements*, 98 HARV. L. REV. 236, 241 (1984) (criticizing *Allen*'s "rather casual dismissal of the causal chain").

    13.    The only article to explore the question at any length is a student note. *See generally* Note, *Expressive Harms and Standing*, 112 HARV. L. REV. 1313 (1999). Although well-executed, that note left many questions unanswered and did not explain why stigmatic harm should be sufficient for standing.

    14.    *See Allen*, 468 U.S. at 755.

    15.    *See infra* notes 135–56 and accompanying text.

    16.    *See infra* notes 157–68 and accompanying text.

    17.    Lawrence v. Texas, 539 U.S. 558 (2003).

    18.    *Id.* at 563.

    19.    *Id.* at 578.

    20.    Bowers v. Hardwick, 478 U.S. 186 (1986).

    21.    *Lawrence*, 539 U.S. at 575.

    22.    *Id.*

# EXHIBIT K - DECLARATION 15

*STIGMATIC HARM AND STANDING*                                    421

required to reach the due process issue and revisit *Bowers*: "Its continuance as precedent demeans the lives of homosexual persons."[23]

The Court's approach in *Lawrence* seems sharply at odds with *Allen*. Had the Court struck down the Texas law on equal protection grounds, the defendants' convictions would have been reversed and their interest in the case would have ended. It was thus unnecessary to reach the due process claim. But the Court apparently concluded that the defendants suffered two harms. One was the conviction and accompanying fine.[24] The second was the stigma the Texas law imposed on gays and lesbians.[25] A decision on equal protection grounds would redress the first harm, but only a decision on due process grounds would redress the second. And because the Court felt obligated to eliminate this stigmatic harm, it struck down the law as a violation of due process.[26] Thus, whereas *Allen* held that stigmatic harm was insufficient to justify the exercise of judicial power, *Lawrence* relied on precisely such harm to justify a decision that was not necessary to resolve the case.

Of course, *Lawrence* is not technically a standing decision, and I am not suggesting that it formally overrules *Allen*. But *Lawrence* does suggest that stigmatic harm is a judicially cognizable injury. And to the extent that *Allen* rested on a contrary conclusion, *Lawrence* raises the question whether stigmatic harm should be sufficient for standing.

This Article attempts to answer that question. Part I begins by briefly describing the history of standing doctrine and the evolution of the injury-in-fact requirement. It then discusses the Court's decision in *Allen* and shows how, despite that decision, the Court has not completely ruled out standing for stigmatic harm. Finally, Part I provides a more detailed analysis of *Lawrence* and the implications of the Court's holding for *Allen*.

After setting forth this descriptive account, the Article turns to the normative argument, which is that stigmatic harm should be sufficient for standing. Before doing so, however, Part II considers a preliminary issue, which is whether it makes sense to argue in the abstract about what injuries are adequate for standing. Some scholars have argued that the injury-in-fact requirement is incoherent and that standing should instead turn on whether the substantive law at issue in a case gives the plaintiff a cause of action.[27] If these scholars are right, one might think it pointless to argue that stigmatic harm—or any type of injury—is sufficient for standing in general. Instead, one should ask whether the substantive law in a given case was intended to protect against stigmatic harm. But as Part II explains, the Supreme Court

---

23.   *Id.*
24.   *See id.* at 563.
25.   *See id.* at 575.
26.   *See Lawrence*, 539 U.S. at 594.
27.   *See infra* notes 197–206 and accompanying text.

has not adopted this theory of standing and shows no intention of abandoning the injury-in-fact requirement. Furthermore, even under this theory there would be good reason to explore the nature of stigmatic harm, since courts would still have to make subjective judgments about what interests are protected by various legal provisions.

Part III proceeds with the normative claim. Although the Court has often invoked stigmatic harm, it has never explored the nature of stigma or what it means to be stigmatized.[28] This Part therefore draws on the work of Erving Goffman and other social scientists to provide a fuller understanding of what stigma is, how it is created and reinforced by law, and how it affects those who are stigmatized. In brief, stigma is a mark of disgrace imposed on individuals who possess a characteristic or trait that society views as deeply discrediting.[29] This mark spoils the social identity of its bearer and reduces him "from a whole and usual person to a tainted, discounted one."[30] Stigma invites discrimination and prejudice against the stigmatized, poses threats to their self-esteem, and creates self-doubt that can diminish their abilities, thus confirming the very stereotypes that help generate stigma in the first place.[31] These injuries are as significant and concrete as other injuries the Court has recognized. Moreover, these harms distinguish the stigmatized individual from a concerned bystander who merely seeks to vindicate value interests. For these reasons, the Court should formally recognize stigmatic harm as a sufficient injury for standing.

Part IV considers several objections, including concerns about causation and redressability, the difficulty of proving stigmatic harm, and the possibility of a flood of lawsuits. While these objections are not insignificant, Part IV explains why none of them justify rejecting stigmatic harm as a basis for standing.

Finally, Part V provides examples where stigmatic harm could be relied upon to challenge government action. For instance, if a government agency refused to enforce a federal statute protecting African Americans from discrimination (as in *Allen*), African Americans would have standing to argue that the agency had violated the law.[32] If a prosecutor adopted a policy of not enforcing child support obligations against the fathers of illegitimate children, the mothers of illegitimate children (and the children themselves) would have standing to argue that the policy violated equal protection.[33] If a city police force receiving federal funds engaged in racial profiling, members of the targeted race would have standing to challenge the practice

---

28.   *See infra* note 228 and accompanying text.
29.   *See infra* Part III.A.
30.   Erving Goffman, Stigma: Notes on the Management of Spoiled Identity 3 (1963).
31.   *See infra* notes 282–334 and accompanying text.
32.   *See infra* Part V.A.1.
33.   *See* Linda R.S. v. Richard D., 410 U.S. 614, 617–18 (1973).

STIGMATIC HARM AND STANDING        423

under Title VI of the Civil Rights Act of 1964.[34] In each of these cases, stigmatic harm provides the plaintiffs with standing.[35] But whether they ultimately prevail depends upon a showing that the government has acted unlawfully.

### I. STIGMATIC HARM AND STANDING: FROM *ALLEN* TO *LAWRENCE*

#### A. THE EVOLUTION OF INJURY IN FACT

Standing doctrine is about access to the federal courts. When we ask whether a person has standing, we are asking whether that person is "'entitled to have the court decide the merits of the dispute or of particular issues.'"[36] Although the Supreme Court has described standing as "an essential and unchanging part of the case-or-controversy requirement of Article III,"[37] it is of relatively recent origin.[38] For more than a century after the nation's founding, there was no separate doctrine of standing.[39] Instead, whether a plaintiff could be heard in federal court depended largely on the rights that the plaintiff enjoyed under substantive law.[40] If common law or a statute provided the plaintiff with a cause of action, federal courts would hear the claim. If not, the courts would dismiss the suit.[41]

This approach worked fine for disputes between private parties. If one person injured another, the plaintiff could be heard in federal court only if

---

34. 42 U.S.C. § 2000d (2000) (prohibiting discrimination by any recipient of federal money).

35. As I explain below, courts would not be required to extend standing to every member of the stigmatized group. Instead, they could limit standing to those members of the stigmatized group who live or work in the political subdivision in which the stigmatizing action takes place. *See infra* notes 385–93 and accompanying text.

36. Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 15 (2004) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).

37. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

38. *See* Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 MICH. L. REV. 163, 170, 180 (1992); Stephen L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 STAN. L. REV. 1371, 1374 (1988).

39. *See* Sunstein, *supra* note 38, at 170, 180; Cass R. Sunstein, *Standing and the Privatization of Public Law*, 88 COLUM. L. REV. 1432, 1434 (1988); Winter, *supra* note 38, at 1378. *But see* Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. 689, 691 (2004) (arguing that "the notion of standing is not an innovation" and that nineteenth-century American courts often limited the parties that could sue even if the courts did not use the term standing to describe what they were doing).

40. *See* William A. Fletcher, *The Structure of Standing*, 98 YALE L.J. 221, 224 (1988); Sunstein, *supra* note 38, at 170; Winter, *supra* note 38, at 1377. Woolhandler and Nelson argue that courts sometimes limited the arguments available even to people with valid causes of action. *See* Woolhandler & Nelson, *supra* note 39, at 692. But they agree that the question of whether a party could be heard in federal court generally depended on whether the common law provided a cause of action. *Id.*

41. *See* Sunstein, *supra* note 38, at 170, 180.

a common law tort provided a cause of action.[42] Likewise, if one person intruded on another's property, the property owner could sue in federal court only if he had a cause of action under the common law of property. But matters grew complicated with the emergence of the regulatory state and the proliferation of administrative agencies.[43] If an agency adopted a rule that harmed the interests of a party, how would a court determine whether that party was entitled to challenge the rule in federal court? Initially, the Court responded by adopting the "legal interest test."[44] Under this test, a plaintiff had standing to challenge agency action if the same conduct engaged in by a private party would give rise to a common law cause of action.[45] Thus, if an agency interfered with a party's rights under common law principles of property, contract, or tort, that party had standing to challenge the action.[46] But if the agency's action did not invade an interest the common law protected, standing would be denied.

One criticism of this focus on common law rights was that it favored the objects of regulation over the beneficiaries.[47] A manufacturer could argue that an agency rule requiring him to take certain safety precautions violated his property rights, thus giving him standing to challenge the law. But parties that benefited from regulation did not have common law rights that were implicated by agency action.[48] If an agency failed to enforce a statute that was intended to benefit consumers, those consumers could not claim that the agency's action violated their rights of property, contract, or tort law. Their interest in having the law enforced for their benefit was not one recognized by common law and therefore was insufficient for standing.

The Court addressed this criticism by modifying the legal interest test to include statutorily created interests.[49] Under the new formulation, if a statute conferred a benefit on a class of persons and agency action (or inaction) undermined that benefit, members of the class had standing to challenge the agency in court.[50] This was a significant shift in the law of standing. Whereas federal courts had previously been used to challenge overzealous enforcement of statutes, they were now also open to those who argued that agencies were not enforcing statutes zealously enough.[51]

---

42.  *See* Fletcher, *supra* note 40, at 224; Sunstein, *supra* note 38, at 170.

43.  *See* RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 127 (5th ed. 2003); Fletcher, *supra* note 40, at 225–27; Sunstein, *supra* note 38, at 181–83.

44.  Sunstein, *supra* note 38, at 184–85.

45.  *See* Fletcher, *supra* note 40, at 227; Sunstein, *supra* note 38, at 181.

46.  *See* Fletcher, *supra* note 40, at 227; Sunstein, *supra* note 38, at 181.

47.  *See* JOSEPH VINING, LEGAL IDENTITY: THE COMING OF AGE OF PUBLIC LAW 37–38 (1978); Sunstein, *supra* note 39, at 1436.

48.  *See* VINING, *supra* note 47, at 37–38; Sunstein, *supra* note 39, at 1436.

49.  *See* Sunstein, *supra* note 38, at 183–84.

50.  Sunstein, *supra* note 39, at 1439.

51.  *Id.* at 1442–43.

STIGMATIC HARM AND STANDING                                    425

One problem remained. It was not always easy for courts to determine whether a statute created a legal interest or benefit that was invaded by agency action. Most regulatory statutes did not specify precisely what legal interests they sought to create.[52] Moreover, deciding whether a statute conferred a legal interest on a particular plaintiff often overlapped with the merits of the case.[53] After all, the only way to determine whether the statute created a legal interest was to interpret the statute. The same interpretation often determined whether the agency had complied with the law.[54]

So in 1970, the Court altered its doctrine again. In *Association of Data Processing Service Organizations v. Camp*,[55] data processing companies challenged a ruling by the comptroller that allowed banks to offer data processing services.[56] This ruling meant increased competition for data processing companies, and they filed suit alleging that the comptroller had misinterpreted the National Bank Act.[57] The lower courts denied standing because they concluded that the plaintiffs lacked a statutorily created "legal interest."[58] Reversing, the Supreme Court said that was the wrong standard to apply.[59] "The legal interest test goes to the merits," Justice Douglas wrote for the Court.[60] "The question of standing is different."[61] Douglas also articulated a two-part test for standing. "The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise."[62] Second, a plaintiff must show that "the interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[63]

*Data Processing* thus shifted the focus of standing from a legal to a factual inquiry. Instead of asking whether the statute created a legal interest, courts would ask whether the agency's action inflicted real-world harm on the plaintiff.[64] The idea was that it would be easier for courts to answer this factual question than to determine whether the statute created a legal interest.[65] And to ensure that standing would not extend to plaintiffs who

---

52.  Fletcher, *supra* note 40, at 255–56; Sunstein, *supra* note 39, at 1441.

53.  *See* VINING, *supra* note 47, at 43–44; Sunstein, *supra* note 38, at 181–82.

54.  Gene R. Nichol, Jr., *Standing for Privilege: The Failure of Injury Analysis*, 82 B.U. L. REV. 301, 306 (2002).

55.  Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150 (1970).

56.  *Id.* at 151.

57.  *Id.* at 157 n.2.

58.  *Id.* at 152–53 & n.1.

59.  *Id.* at 153.

60.  *Data Processing*, 397 U.S. at 153.

61.  *Id.*

62.  *Id.* at 152.

63.  *Id.* at 153.

64.  Sunstein, *supra* note 38, at 185.

65.  Nichol, *supra* note 54, at 306; Sunstein, *supra* note 38, at 188–89.

were only remotely harmed, the Court required plaintiffs to show that they were "'arguably within the zone of interests'" protected by the statute at issue.[66] The use of the word "arguably" was critical. It signaled that plaintiffs would not be required to prove that the statute was intended to protect them specifically,[67] only that the statute protected their interest in a very general sense.[68]

Although *Data Processing* did not make clear whether the injury-in-fact test was a requirement of Article III or simply an interpretation of the Administrative Procedure Act,[69] that uncertainty was soon resolved. In *Barlow v. Collins*, the Court held that the plaintiffs had "the personal stake and interest that impart that concrete adverseness required by Article III,"[70] suggesting that the injury-in-fact test was a constitutional requirement.[71] The Court was even clearer in later cases, stating that the "irreducible constitutional minimum of standing" requires a plaintiff to allege an injury in fact that is fairly traceable to the defendant's conduct and is likely to be redressed by a decision in his favor.[72] Later cases also elaborated on the injury-in-fact requirement, holding that the injury alleged must be concrete and particularized, not abstract, and actual or imminent, not conjectural or hypothetical.[73]

As was the case in *Data Processing*, most injuries asserted by plaintiffs over the years have been economic in nature.[74] But dicta in *Data Processing* indicated that loss of money is not the only injury that can support standing. Discussing the zone-of-interests test, the Court noted that the interests sought to be protected by plaintiffs "may reflect 'aesthetic, conservational,

---

66. Jonathan R. Siegel, *Zone of Interests*, 92 Geo. L.J. 317, 317 (2004) (quoting *Data Processing*, 397 U.S. at 153). I refer to statutes here, and not to constitutional provisions, because courts have generally applied the zone-of-interests test only in cases in which plaintiffs seek to enforce regulatory statutes. *See* Erwin Chemerinsky, Federal Jurisdiction 98 (4th ed. 2003) (explaining that "the zone-of-interests requirement is used only in statutory cases, usually involving administrative law issues").

67. Siegel, *supra* note 66, at 321–25.

68. Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 403 (1987) (holding that a plaintiff is within the zone of interests if there is "a plausible relationship" between his interests and the policies advanced by the relevant statutory provisions); *see also* Siegel, *supra* note 66, at 323–24.

69. James Leonard & Joanne C. Brant, *The Half-Open Door: Article III, the Injury-in-Fact Rule, and the Framers' Plan for Federal Courts of Limited Jurisdiction*, 54 Rutgers L. Rev. 1, 19 (2001).

70. Barlow v. Collins, 397 U.S. 159, 164 (1970).

71. Leonard & Brant, *supra* note 69, at 19.

72. *E.g.*, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The zone-of-interests test, by contrast, was relegated to the status of a prudential requirement, along with the ban on third-party standing and generalized grievances. *See* Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 474–75 (1982); Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 99–100 (1979).

73. *Lujan*, 504 U.S. at 560. As I explain below, the Court has since rejected the requirement that an injury be particularized. *See infra* notes 353–54 and accompanying text.

74. *Barlow*, 397 U.S. at 172 n.5 ("Injury in fact has generally been economic in nature.").

STIGMATIC HARM AND STANDING                                    427

and recreational'" values.[75] It added: "We mention these noneconomic values to emphasize that standing may stem from them as well as from the economic injury on which petitioners rely here."[76]

In the years since *Data Processing*, the Court has often granted standing on the basis of non-economic injuries. In several cases, the Court has held that the inability to enjoy a national forest or park or to observe an endangered species is an injury in fact sufficient to confer standing.[77] In other cases, the Court has granted standing to plaintiffs complaining about environmental damage to areas in which they live or work.[78] The Court has also held that plaintiffs suffer an injury in fact when their voting strength is diluted,[79] when they are unable to obtain truthful information required by statute,[80] when they are denied the opportunity to compete for government benefits on a race-neutral basis,[81] or when they are denied the benefits of living in a racially integrated community.[82]

At the same time, the Court has rejected other non-economic injuries. It has held that citizens do not suffer an injury in fact simply because the government has failed to follow the law.[83] Put another way, the mere desire to ensure that government acts lawfully is not a judicially cognizable interest sufficient for standing.[84] The Court has also held that the injury-in-fact requirement is not met when plaintiffs claim that governmental conduct has chilled their speech, at least when there is no objective evidence of a chilling effect.[85] Finally, and most importantly for this Article, the Court held in *Allen v. Wright* that stigmatic harm by itself is not a sufficient injury for standing.[86]

---

75. Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 154 (1970) (quoting Scenic Hudson Pres. Conference v. FCC, 354 F.2d 608, 616 (2d Cir. 1965)).

76. *Id.*

77. *Lujan*, 504 U.S. at 562–63; United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 686–87 (1973).

78. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–88 (2000).

79. *See* Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 331 (1999); Shaw v. Hunt, 517 U.S. 899, 911–12 (1996); United States v. Hays, 515 U.S. 737, 737–38 (1995).

80. *See* FEC v. Akins, 524 U.S. 11, 21 (1998); Havens Realty Corp. v. Coleman, 455 U.S. 363, 374–78 (1982).

81. *See* Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 289–91 (1978).

82. *See Havens Realty*, 455 U.S. at 375–78; Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209–10 (1972).

83. *See, e.g., Hunt*, 517 U.S. at 923 n.3 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 573–74 (1992)); Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 477 (1982); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 217 (1974); United States v. Richardson, 418 U.S. 166, 172 (1974) (citing Frothingham v. Mellon, 262 U.S. 447 (1923)).

84. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998); *Lujan*, 504 U.S. at 573–74.

85. Laird v. Tatum, 408 U.S. 1, 13–14 (1972).

86. Allen v. Wright, 468 U.S. 737, 755–56 (1984).

HEALY_CE_AU                                                                                    3/7/2007 11:41:23 AM

## B.  ALLEN V. WRIGHT

*Allen* stemmed from the battles over desegregation in the years after *Brown v. Board of Education*.[87] During that period, many white parents pulled their children out of public schools and enrolled them in new private schools that had been founded to facilitate white flight.[88] Although these schools often excluded African American students, the Internal Revenue Service ("IRS") initially declared that they were eligible for tax-exempt status as long as they did not receive state aid.[89] After a federal court held that this policy violated the Internal Revenue Code, the IRS changed its position.[90] The IRS also took steps to comply with a court order enjoining it from granting tax-exempt status to racially discriminatory schools. But the U.S. Commission on Civil Rights criticized these steps as ineffective, and the case soon returned to court.[91]

This time, black parents in eight states filed a national class action against the IRS.[92] They argued that the measures adopted by the IRS were inadequate to ensure the denial of tax-exempt status to racially discriminatory schools.[93] In particular, they alleged that the IRS permitted schools "to receive tax exemptions merely on the basis of adopting and certifying—but not implementing—a policy of nondiscrimination."[94] As a result, the plaintiffs claimed, at least seventeen racially discriminatory schools or school systems had received tax-exempt status in violation of federal law.[95]

To support their claim of standing, the plaintiffs asserted two injuries.[96] One injury was that the IRS's failure to enforce its nondiscrimination policies against private schools had undermined efforts to desegregate public schools that their children attended.[97] The Supreme Court agreed that this was an injury in fact, but held that the plaintiffs failed the causation and redressability requirements of Article III.[98]

---

87.  Brown v. Bd. of Educ., 347 U.S. 483 (1954).

88.  RICHARD KLUGER, SIMPLE JUSTICE 523, 752, 778 (1977).

89.  *See* Wright v. Regan, 656 F.2d 820, 823 (D.C. Cir. 1981); Green v. Kennedy, 309 F. Supp. 1127, 1129–30 (D.D.C. 1970).

90.  *Wright*, 656 F.2d at 823.

91.  *Id.*

92.  *See* Allen v. Wright, 468 U.S. 737, 739 (1984). In addition to the claim that the IRS's conduct violated the Internal Revenue Code, the plaintiffs also argued that it violated Title VI of the Civil Rights Act of 1964 and the Fifth and Fourteenth Amendments. *Id.* at 745 n.12.

93.  *Id.* at 745 n.12.

94.  *Id.* at 744.

95.  *Id.*

96.  *Id.* at 745, 752.

97.  *Allen*, 468 U.S. at 752–53.

98.  *Id.* at 756–57.

STIGMATIC HARM AND STANDING                                                429

The plaintiffs also claimed they were "harmed directly by the mere fact of Government financial aid to discriminatory private schools."[99] The Court viewed this claim of injury as subject to two interpretations. It could either be "a claim simply to have the Government avoid the violation of law" or it could be "a claim of stigmatic injury, or denigration, suffered by all members of a racial group when the Government discriminates on the basis of race."[100] Under the former interpretation, the Court held, the plaintiffs lacked standing pursuant to the well-established rule that "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."[101]

The Court then held that the plaintiffs also lacked standing under the latter interpretation of their claim. Although the Court acknowledged that stigmatic harm "is one of the most serious consequences of discriminatory government action," it held that "such injury accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct."[102] The plaintiffs, the Court noted, did not allege that they were personally denied equal treatment.[103] They had not applied to and been rejected from any of the schools identified in their complaint, nor did they claim the IRS had denied them a benefit provided to similarly situated parties.[104] They claimed only that the IRS's failure to enforce the antidiscrimination laws against private schools had stigmatized them.[105] This "abstract stigmatic injury," the Court held, was insufficient for standing.[106]

In support of this conclusion, the Court offered the following parade of horribles:

If the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school. All such persons could claim the same sort of abstract stigmatic injury respondents assert in their first claim of injury. A black person in Hawaii could challenge the grant of a tax exemption to a racially discriminatory school in Maine. Recognition of standing in such circumstances would transform the federal courts into "no more than a vehicle for

99. *Id.* at 752.
100. *Id.* at 753–54.
101. *Id.* at 754.
102. *Allen*, 468 U.S. at 755 (quoting Heckler v. Mathews, 465 U.S. 728, 739–40 (1984)).
103. *Id.*
104. *Id.* at 746.
105. *Id.* at 755.
106. *Id.*

the vindication of the value interests of concerned bystanders." Constitutional limits on the role of the federal courts preclude such a transformation.[107]

   The Court's rejection of stigmatic harm as a basis for standing thus rested on several grounds. First, the Court viewed the stigmatic harm imposed by the IRS policy as abstract, not concrete. Second, and related to the first point, the Court viewed the parents alleging stigmatic harm as "concerned bystanders" attempting to vindicate value interests.[108] Finally, the Court concluded that because the injury was abstract and the plaintiffs were merely "concerned bystanders" attempting to vindicate value interests, constitutional limits precluded it from hearing the plaintiffs' claim. Although not stated explicitly, this last point clearly echoed the separation-of-powers principles that were emphasized so heavily elsewhere in *Allen*.[109]

   The dissenters in *Allen* focused primarily on the causal link between the IRS policy and segregation of the public schools.[110] In a footnote, however, Justice Brennan disputed the Court's characterization of the alleged stigmatic harm.[111] According to Brennan, the plaintiffs did not claim to suffer the same denigration "suffered by all members of a racial group when the Government discriminates on the basis of race."[112] Instead, they claimed that the IRS policy stigmatized "black children attending public schools in districts that are currently desegregating yet contain discriminatory private schools benefiting from illegal tax exemptions."[113] Framed this way, Brennan wrote, the case was similar to suits challenging racial steering practices in a "relatively compact neighborhood," and the Court's parade of horribles was thus inapplicable.[114] As explained below, Brennan's approach—which would have limited standing to those geographically closest to the stigmatizing conduct—is one way to alleviate fears that recognizing stigmatic harm as an injury in fact will lead to a flood of suits by plaintiffs far removed from the stigmatizing conduct.[115] But the majority apparently was not persuaded, for it did not respond to Brennan's argument.

---

   107.   *Allen*, 468 U.S. at 755–56 (quoting United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 687 (1973)).

   108.   The Court drove home this point in a footnote, comparing the *Allen* plaintiffs to individuals seeking merely to ensure government compliance with the law. *Id.* at 756 n.21.

   109.   *Id.* at 759–60 (stating that separation of powers "underlies standing doctrine").

   110.   *Id.* at 784 (Brennan, J., dissenting).

   111.   *Id.* at 770–71 n.3.

   112.   *Allen*, 468 U.S. at 770–71 n.3 (Brennan, J., dissenting).

   113.   *Id.*

   114.   *Id.*

   115.   *See infra* notes 387–92 and accompanying text.

*STIGMATIC HARM AND STANDING*                                    431

## C.   *STIGMATIC HARM AFTER* ALLEN

In the twenty-three years since it was decided, *Allen* has never been openly questioned by the Court.[116] But its rejection of stigmatic harm has not proved to be absolute. In several doctrinal areas the Court has invoked stigmatic harm, either explicitly or implicitly, as a basis for standing. In this Section, I discuss these areas and consider the extent to which they undermine *Allen.*

### 1.   Denial of Equal Treatment

The first area in which stigmatic harm is still relevant was identified by the Court in *Allen* itself. In rejecting the plaintiff's claim of standing, the *Allen* Court stated that stigmatic harm "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct."[117] The Court did not explain what it meant by this statement, but cited to its decision several months earlier in *Heckler v. Mathews*[118] to illustrate its point.

The case involved a challenge to a federal law that provided greater pension benefits to female government employees than to male employees.[119] Mathews was a retired male postal worker who alleged that the law violated the Fifth Amendment's guarantee of equal protection.[120] His injury seemed obvious: he received less money than he would have if Congress had not discriminated against men. However, Congress included a severability clause in the law providing, in effect, that if the law were declared unconstitutional the benefits for women would be lowered rather than extended to men.[121] Because this meant Mathews would not receive more money even if he won his suit, the district court viewed the severability clause as an effort by Congress to destroy standing and prevent challenges to the law. It therefore invalidated the severability clause.[122]

The Supreme Court disagreed with this approach. Although it acknowledged that the severability clause would preclude Mathews from receiving additional money, it held that he suffered more than economic injury.[123] "[D]iscrimination itself," the Court stated, "by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the

---

116.   *See* United States v. Hays, 515 U.S. 737, 743–44 (1995) ("*Allen v. Wright* made clear that even if a governmental actor is discriminating on the basis of race, the resulting injury 'accords a basis for standing only to "those persons who are personally denied equal treatment" by the challenged discriminatory conduct.'" (quoting *Allen*, 468 U.S. at 755)).

117.   *Allen*, 468 U.S. at 755 (quoting Heckler v. Mathews, 465 U.S. 728, 739–40 (1984)).

118.   Heckler v. Mathews, 465 U.S. 728 (1984).

119.   *Id.* at 730–31.

120.   *Id.*

121.   *Id.* at 734.

122.   *Id.* at 736–37.

123.   *Mathews*, 465 U.S. at 737–38.

432                    *92 IOWA LAW REVIEW*                    [2007]

disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."[124] In other words, Mathews was injured by the unequal treatment itself, regardless of its effect on his bank account. And because a ruling in his favor would remedy the injury of unequal treatment, he had standing to challenge the law.[125]

Read together, *Allen* and *Mathews* suggest a fairly straightforward rule: a plaintiff who alleges that he was denied equal treatment can claim standing on the basis of stigmatic harm, while a plaintiff who alleges that governmental action stigmatizes a group of which he is a member lacks standing unless he personally was denied equal treatment.

But this raises an important question. Exactly what stigmatic harm did Mathews suffer? The Court stated that discrimination can "stigmatiz[e] members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community."[126] But Mathews was a man. Is it really plausible to view him as a member of a "disfavored group" or to conclude that the law stigmatized him "as innately inferior" or as a "less worthy participant[] in the political community?"[127] Given the dominance of men in the political community, this seems doubtful.[128] One might argue that the law stigmatized women since it was premised on the belief that they are more likely than men to depend on their spouse's income. Indeed, the Court's language about the stigmatizing effect of discrimination came from *Mississippi University for Women v. Hogan*,[129] which struck down a nursing school admissions policy excluding men on the theory that the policy could stigmatize women as fit only for nursing. But even if the law in *Mathews* stigmatized women, that could not justify standing for a male plaintiff. As

---

124.    *Id.* at 739–40 (internal citation omitted).

125.    *Id.* at 740. Among the cases the Court cited to support this conclusion was *Orr v. Orr*, 440 U.S. 268 (1979), in which a divorced man challenged a state law providing that husbands, but not wives, could be required to pay alimony. The Court granted standing even though a decision for the plaintiff might not bring the relief he sought—release from his alimony obligations—since the legislature could simply respond by extending alimony obligations to wives. *Id.* at 272. *Orr*, however, was not directly on point. Although it was possible that the legislature would extend the obligations to wives, it was also possible that it would eliminate all alimony obligations. Thus, unlike in *Mathews*, it was not certain that the plaintiff would be denied tangible relief.

126.    *Mathews*, 465 U.S. at 739.

127.    *Id.* at 739.

128.    *See* Bruce K. Miller, *Constitutional Remedies for Underinclusive Statutes: A Critical Appraisal of* Heckler v. Mathews, 20 HARV. C.R.-C.L. L. REV. 79, 130 (1985) (arguing that the characterization of Mathews's injury as stigmatic harm "is plainly a fiction").

129.    Miss. Univ. for Women v. Hogan, 458 U.S. 718, 725 (1982).

*STIGMATIC HARM AND STANDING*                                    433

the Court has made clear on many occasions, a plaintiff must allege that he *personally* has been injured, not some other party.[130]

This suggests that *Mathews* was not about stigmatic harm at all. Instead, *Mathews* appears to be a pragmatic response to the difficult problem posed by underinclusive statutes. An underinclusive statute is one in which the government discriminates against a group by denying it a benefit granted to similarly situated groups.[131] Such discrimination can be remedied in one of two ways: the benefit can either be extended to the excluded class (known as leveling up) or taken away from the favored class (known as leveling down).[132] When the government announces in advance that it will respond to a finding of discrimination by leveling down, as it did in *Mathews*, it makes clear that the excluded class will not receive the benefit even if the class successfully challenges the discrimination. The Court could reject standing in such cases on the ground that the plaintiffs' injury is not redressable. But to do so "would effectively insulate underinclusive statutes from constitutional challenge."[133] Instead, the Court in *Mathews* reframed the injury as denial of equal treatment, not denial of money. And because that injury could be remedied either by leveling up or leveling down, the plaintiff's injury was redressable and he had standing.[134]

In short, despite the Court's description of *Mathews* as a case about stigma, the result seems to turn more on the problem of underinclusive statutes than on stigmatic harm.

### 2. Electoral Redistricting

The Court has also invoked stigmatic harm as a basis for standing in electoral districting cases. In a series of cases in the 1990s, white plaintiffs challenged redistricting plans that created majority-minority election districts.[135] Because these plans neither denied whites the right to vote nor diluted their statewide voting strength, some scholars argued that the

---

130. *See* Valley Forge Christian Coll. v. Ams. United for the Separation of Church & State, 454 U.S. 464, 472 (1982). The male plaintiff in *Hogan* had standing not because the school's admissions policy stigmatized women, but because it denied him admission to the school. *See* Miller, *supra* note 128, at 122.

131. *See* Miller, *supra* note 128, at 82. *See generally* Deborah L. Brake, *When Equality Leaves Everyone Worse Off: The Problem of Leveling Down in Equality Law*, 46 WM. & MARY L. REV. 513, 516 (2004).

132. Brake, *supra* note 131, at 515.

133. Ark. Writers' Project, Inc. v. Ragland, 481 U.S. 221, 227 (1987).

134. *See* Tex. Monthly, Inc. v. Bullock, 489 U.S. 1, 8 (1989) (holding that a plaintiff had standing to challenge a tax exemption for religious publications even though a decision in his favor might not reduce his tax burden).

135. Shaw v. Hunt, 517 U.S. 899, 901 (1996); Bush v. Vera, 517 U.S. 952, 957 (1996); Miller v. Johnson, 515 U.S. 900, 909 (1995); United States v. Hays, 515 U.S. 737, 739 (1995); Shaw v. Reno, 509 U.S. 630, 633–34 (1993).

plaintiffs did not suffer a judicially cognizable injury.[136] In its first redistricting case, *Shaw v. Reno*,[137] the Court did not explicitly address the question of standing. But it did offer some clues about its view of the plaintiffs' injury. In holding that the plaintiffs had stated a cause of action under the Equal Protection Clause, Justice O'Connor's majority opinion stated that "[c]lassifications of citizens solely on the basis of race . . . threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility."[138] Moreover, in the context of redistricting, O'Connor asserted that racial classification causes two specific harms. First, it "reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls."[139] Second, racial gerrymanders send a message to elected representatives that their "primary obligation is to represent only the members of [their own race] rather than their constituency as a whole."[140]

The Court returned to the issue of redistricting two years later and this time addressed the question of standing directly. In *United States v. Hays*,[141] a group of white plaintiffs challenged a Louisiana districting plan that included two majority-black districts, one in New Orleans and one in the northern part of the state. When the case began, the plaintiffs lived in the majority-black district in the north.[142] While their suit was pending, however, the state legislature redrew the electoral map in such a way that the plaintiffs were no longer assigned to that district.[143]

---

136.  *See* Samuel Issacharoff & Thomas C. Goldstein, *Identifying the Harm in Racial Gerrymandering Claims*, 1 MICH. J. RACE & L. 47, 51–54 (1996) (arguing that the Court in *Shaw* failed to link systematic harm to individual consequences); Samuel Issacharoff & Pamela S. Karlan, Commentary, *Standing and Misunderstanding in Voting Rights Law*, 111 HARV. L. REV. 2276, 2291–92 (1998) (critiquing the Court's grant of standing to voters living inside the challenged district but not to voters outside that district); Shavar Jeffries, *Colorblind Faith: Process Theory, Ely and Standing for White Voters in* Shaw v. Reno, 16 NAT'L BLACK L.J. 169, 183 (1999) (arguing that the injuries in *Shaw* were neither sufficient to create standing nor compatible with the "process-based theory of judicial review"); Pamela S. Karlan, *All Over the Map: The Supreme Court's Voting Rights Trilogy*, 1993 SUP. CT. REV. 245, 248 (claiming that in *Shaw* "the Court turned its back on the entire fabric of standing law"). *But see* John Hart Ely, Commentary, *Standing to Challenge Pro-Minority Gerrymanders*, 111 HARV. L. REV. 576, 577 (1997) (arguing that white plaintiffs do have standing to challenge the creation of majority-black districts).

137.  *Shaw*, 509 U.S. at 630.

138.  *Id.* at 643.

139.  *Id.* at 647.

140.  *Id.* at 648.

141.  United States v. Hays, 515 U.S. 737 (1995).

142.  *Id.* at 741.

143.  *Id.* at 741–42.

Raising the issue of standing on its own, the Court held that the plaintiffs could not challenge the redrawn map.[144] In an opinion by Justice O'Connor, the Court repeated its statement from *Shaw* that racial classifications "'threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility.'"[145] The Court also repeated Shaw's claim that classifying voters by race sends a message to elected officials that they represent only voters of their own race.[146] This "representational harm," as O'Connor labeled it, gives standing to individuals living within a district that has been drawn along racial lines.[147] But it does not give standing to individuals living outside that district. These voters have not been classified on the basis of race and thus do not suffer any representational harm.[148]

Despite the reference to stigma in both *Shaw* and *Hays*, it is unclear exactly what role stigmatic harm played in the standing analysis. The Court asserted that racial gerrymanders reinforce the perception that voters of the same race think and act alike.[149] But it did not explain how this stereotype stigmatizes voters of either race.[150] More importantly, if the injury of racial gerrymanders is that they reinforce racial stereotypes, it is difficult to see why white voters outside of the gerrymandered district lack standing. These voters have been stereotyped just as much as voters living in the district. In fact, white voters living in adjacent districts have presumably been excluded from the gerrymandered district on the assumption that they would vote for a white candidate. If this assumption is stigmatizing, these voters would appear to have been stigmatized. Yet in *Hays* and later cases, they have been denied standing.[151]

This suggests that the real injury in redistricting cases may be the representational harm. But as Justice Stevens has pointed out, there is a problem with that interpretation too.[152] The representational harm allegedly suffered by white voters living in a majority-minority district is that they will receive inadequate representation. This assumes two things. First, it assumes

---

144.    *Id.* at 742–44.

145.    *Id.* at 744 (quoting *Shaw*, 509 U.S. at 643).

146.    *Hays*, 515 U.S. at 744 (citing *Shaw*, 509 U.S. at 648).

147.    *Id.* at 744–45.

148.    *Id.* at 745.

149.    *Shaw*, 509 U.S. at 647.

150.    *See* David R. Dow, *The Equal Protection Clause and the Legislative Redistricting Cases—Some Notes Concerning the Standing of White Plaintiffs*, 81 MINN. L. REV. 1123, 1146 (1997) ("[I]t is difficult to see how a white plaintiff could suffer [stigmatic] harm, and in any event, this was not the injury complained of in the redistricting cases."). As explained below, stigma and stereotype are similar, but not identical. *See infra* note 310.

151.    *Hays*, 515 U.S. at 745; *see also* Shaw v. Hunt, 517 U.S. 899, 904 (1996) (holding that voters living outside the challenged district lack standing to bring an equal protection claim); Bush v. Vera, 517 U.S. 952, 957 (1996) (same).

152.    *See* Miller v. Johnson, 515 U.S. 900, 930 (1995) (Stevens, J., dissenting).

that voters in a majority-minority district will elect a minority representative.[153] Second, it assumes that minority representatives will neglect the interests of non-minority voters.[154] Yet both assumptions are based on the view that people of the same race think and act alike, the very view the Court condemned in *Shaw*.[155] In other words, the representational harm allegedly suffered by white voters is based on precisely the same stereotype underlying their challenge to racial gerrymanders.

So what exactly is the harm that supports standing for white plaintiffs in electoral districting cases? Scholars have spent much time trying to answer that question over the past decade,[156] and I do not aim to resolve it here. For my purposes, it is sufficient to note that the Court has invoked stigmatic harm as a basis for standing without adequately explaining how the drawing of majority-minority districts stigmatizes white plaintiffs living within those districts.

### 3. Establishment Clause

Several of the Court's Establishment Clause cases might also be understood as resting, at least implicitly, on stigmatic harm. In many Establishment Clause cases, the plaintiff argues that his tax dollars are being improperly used to support an establishment of religion.[157] The injury in these cases is the plaintiff's loss of money as a result of the constitutionally impermissible conduct.[158] But in many religious display cases the challenged conduct either costs no money or so little money that it is difficult to understand the plaintiff's injury as the loss of his tax dollars.[159]

---

153.  *Id.*

154.  *Id.*

155.  *Id.*

156.  *See generally* Richard H. Pildes & Richard G. Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After* Shaw v. Reno, 92 MICH. L. REV. 483 (1993). Pildes and Niemi argue that *Shaw* was "grounded in concern for expressive harms." *Id.* at 509; *see also* Issacharoff & Goldstein, *supra* note 136, at 51–54; Issacharoff & Karlan, *supra* note 136, at 2285–88; Ely, *supra* note 136, at 589–90, 594–95; Jeffries, *supra* note 136, at 178–81; Karlan, *supra* note 136, at 275–76.

157.  *See, e.g.,* Zelman v. Simmons-Harris, 536 U.S. 639, 648 (2002); Mueller v. Allen, 463 U.S. 388, 392 (1983); Flast v. Cohen, 392 U.S. 83, 85 (1968); Everson v. Bd. of Educ., 330 U.S. 1, 1 (1947).

158.  Even in these cases, the injury is somewhat tenuous. The amount of any individual's taxes that pays for the establishment is likely to be miniscule. In addition, it is highly unlikely that the plaintiff's tax burden would be lower but for the challenged conduct; the government surely would find another way to spend the money. Thus, the plaintiff's injury appears not to be the loss of money itself, but the use of his money for impermissible purposes. This is not much different from a mere "interest in the proper application of the Constitution and laws," which the Court has held to be insufficient for standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 573–74 (1992).

159.  In *County of Allegheny v. ACLU*, for instance, plaintiffs challenged the county's display of a crèche and menorah that had been donated by local religious groups. County of Allegheny v. ACLU, 492 U.S. 573, 573 (1989). The county paid no money for the displays and provided

Healy_CE_AU                                                                    3/7/2007 11:41:23 AM

*STIGMATIC HARM AND STANDING*                                          437

   If the plaintiffs in these cases are not complaining about the loss of tax dollars, what exactly is their injury? Some lower courts have held that a plaintiff is injured if he has altered his conduct to avoid seeing an offensive religious display.[160] Other courts have held that a plaintiff is injured if he is forced to confront an offending display as part of his regular routine, even if he does not alter his conduct to avoid the display.[161] The Supreme Court has not embraced either approach, although it has hinted that a plaintiff who wishes to challenge a religious display must encounter the display on a regular basis.[162]

   In the absence of an explanation from the Court, some scholars suggest the answer can be found in the endorsement test, first articulated by Justice O'Connor in a concurring opinion in *Lynch v. Donnelly*.[163] "The Establishment Clause," Justice O'Connor wrote, "prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community."[164] She then wrote that governmental endorsement of religion is impermissible because it "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."[165]

   O'Connor's discussion of endorsement was directed to the merits of the case, not the issue of standing. But it sheds light on her view of the injury in religious display cases. Plaintiffs in these cases are harmed, she implies, because the government's endorsement of religion casts them as outsiders, as second-class citizens not deserving of the same consideration given to

---

only minimal assistance in storing and erecting them. *Id.* at 577. Yet neither the appeals court nor the Supreme Court questioned the plaintiffs' standing. *See* FALLON ET AL., *supra* note 43, at 131; Marc Rohr, *Tilting at Crosses: Nontaxpayer Standing to Sue Under the Establishment Clause*, 11 GA. ST. U. L. REV. 495, 504 (1995). Likewise, in *Van Orden v. Perry*, a Texas resident challenged the presence of a Ten Commandments monument on the grounds of the state capitol. Van Orden v. Perry, 545 U.S. 677, 681 (2005). Although the monument was donated by a private group and erected at private expense, no one—including the state—suggested that the plaintiff lacked standing. *See id.*; *see also* Van Orden v. Perry, 351 F.3d 173, 176 (5th Cir. 2003).

   160.   *See* ACLU v. City of St. Charles, 794 F.2d 265, 267 (7th Cir. 1986) (holding that plaintiffs had standing to challenge the inclusion of a cross in a municipal Christmas display because they "were so offended by the lighted cross that they departed from their accustomed routes of travel to avoid seeing it"); ACLU v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098, 1108 (11th Cir. 1983) (holding that plaintiffs had standing to challenge presence of eighty-five-foot cross in state park because the presence of the cross prevented them from using the park).

   161.   *See* Harvey v. Cobb County, 811 F. Supp. 669, 675 (N.D. Ga. 1993).

   162.   *See Van Orden*, 545 U.S. at 682 (noting that plaintiff was a former lawyer who encountered the Ten Commandments monument on frequent visits to the state capitol).

   163.   Lynch v. Donnelly, 465 U.S. 668 (1984) (O'Connor, J., concurring).

   164.   *Id.* at 687.

   165.   *Id.* at 687–88.

438                          92 *IOWA LAW REVIEW*                         [2007]

adherents.[166] Though not described as stigmatic harm, this injury sounds very much like the denigration alleged by the African American parents in *Allen*.[167] Moreover, O'Connor's statement suggests that the plaintiffs in religious display cases suffer this harm regardless of whether the government paid for the display with taxpayer dollars.

The Court has never formally linked the endorsement test to the issue of standing. But a majority of the Court has adopted O'Connor's test as one way to determine whether government action violates the Establishment Clause.[168] Thus, one might conclude that standing in religious display cases rests, at least in part, on the stigmatic harm inflicted by governmental endorsement of religion.

### 4.  *Lawrence v. Texas*

Although not technically about standing, the Court's decision in *Lawrence v. Texas* also relied on stigmatic harm.[169] In *Lawrence*, two men were convicted under a Texas law that prohibited sodomy between people of the same sex but not between people of the opposite sex.[170] On appeal, the men argued that the law violated the Equal Protection Clause because it discriminated on the basis of sexual orientation.[171] They also argued that the law violated their right to privacy under the doctrine of substantive due process.[172] Because the Court had rejected this latter argument in *Bowers v. Hardwick*,[173] many observers expected that if the Court were to rule in the defendants' favor it would do so on the arguably narrower equal protection claim.[174] In fact, Justice O'Connor did just that in her concurring opinion,

---

166.    The dissenters appeared to agree with this analysis, though, like O'Connor, they did not frame it in standing terms. *See id.* at 709 (Brennan, J., dissenting) ("To be so excluded on religious grounds by one's elected government is an insult and an injury that, until today, could not be countenanced by the Establishment Clause.").

167.    *See* Pildes & Niemi, *supra* note 156, at 512–16 (discussing types of harm the Court has recognized under the Establishment Clause); Note, *Expressive Harms and Standing*, 112 HARV. L. REV. 1313, 1324–25 (comparing the stigmatic harm rejected in *Allen* to the expressive injury recognized in religious symbol cases).

168.    *See* County of Allegheny v. ACLU, 492 U.S. 573, 593–94 (1989) (endorsing Justice O'Connor's concurrence from *Lynch*); Alberto B. Lopez, *Equal Access and the Public Forum: Pinette's Imbalance of Free Speech and Establishment*, 55 BAYLOR L. REV. 167, 188–89 (2003) (stating that the Court adopted O'Connor's test five years after *Lynch*).

169.    Lawrence v. Texas, 539 U.S. 558, 575–76 (2003).

170.    *Id.* at 562–63.

171.    *Id.* at 564.

172.    *Id.*

173.    Bowers v. Hardwick, 478 U.S. 186, 194–95 (1986).

174.    *See, e.g.*, Francis J. Mootz, III, Symposium, *Nietzschean Critique and Philosophical Hermeneutics*, 24 CARDOZO L. REV. 967, 1037–38 (2003) (predicting that *Lawrence* would be decided on equal-protection and not due-process grounds); Adrienne Butcher, Note, *Selective Constitutional Analysis in* Lawrence v. Texas: *An Exercise in Judicial Restraint or a Willingness to Reconsider Equal Protection Classification for Homosexuals?*, 41 HOUS. L. REV. 1407, 1428 & n.161 (2004) ("Indeed, that the Court even considered the due process argument came as a surprise

preferring to reverse the conviction on equal protection grounds rather than on due process grounds.[175]

Justice Kennedy's majority opinion rejected that approach. Although the majority acknowledged that the defendants' equal protection argument was "tenable," it maintained that the Court was "require[d]" to address the due process issue and the "continuing validity" of *Bowers*.[176]

> Were we to hold the statute invalid under the Equal Protection Clause some might question whether a prohibition would be valid if drawn differently, say, to prohibit the conduct both between same-sex and different-sex participants. . . . If protected conduct is made criminal and the law which does so remains unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons. When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres. The central holding of *Bowers* has been brought in question by this case, and it should be addressed. Its continuance as precedent demeans the lives of homosexual persons.[177]

This statement suggests that stigmatic harm is a judicially cognizable injury sufficient to trigger the exercise of judicial power. Had the Court struck down the Texas law on equal protection grounds, the defendants' conviction would have been reversed and their interest in the case would have ended. It is true that Texas might have passed a new law criminalizing all sodomy and that the defendants would have been subject to prosecution under that law if caught in the act of sodomy again. But because standing requires an actual or imminent injury, the mere possibility of future prosecution would have been insufficient to permit the defendants to challenge the new law.[178] The only injury to the defendants would have been the stigma placed on their relationship and lifestyle.[179] And according to

---

to a number of legal analysts, many of whom anticipated that *Lawrence* could only be decided under the equal protection framework.").

175.   *Lawrence*, 539 U.S. at 579.

176.   *Id.* at 574–75.

177.   *Id.* at 575.

178.   *See* Ellis v. Dyson, 421 U.S. 426, 434–35 (1975) (holding that plaintiffs have standing to bring a pre-enforcement challenge to statute only if the threat of prosecution is "credible" or "genuine"); Younger v. Harris, 401 U.S. 37, 42 (1971) (holding that plaintiffs lacked standing to challenge a law where they had not been threatened with prosecution or shown that prosecution was likely).

179.   *See* Leslie, *supra* note 10, at 95 (explaining that "only homosexuals are societally stigmatized by the existence of sodomy laws," even when those laws prohibit both same-sex and opposite-sex sodomy).

*Allen*, that is insufficient to support standing.[180] But in *Lawrence*, the Court relied on that stigmatic harm to justify going beyond the plaintiffs' equal protection claim and reversing their conviction on due process grounds. In other words, whereas *Allen* held that a plaintiff could not rely on stigmatic harm to invoke the exercise of judicial power, *Lawrence* relied on precisely such harm to declare unconstitutional a law Texas had not even passed.[181]

One might argue that the Court did not need to rely on stigmatic harm to reach the due process issue. After all, the defendants clearly suffered an injury in fact—they were convicted and sentenced to prison—and that injury was sufficient to support either their equal protection or due process claim.[182] Moreover, where a case can be resolved on either of two claims of relief, there is no rule requiring the Court to choose the narrower claim.[183] Indeed, although there is a strong presumption against deciding constitutional questions unnecessarily,[184] there may sometimes be good reasons for disposing of a case on the broader ground.[185]

But the Court did not represent its decision to reach the due process claim in *Lawrence* as simply a policy choice. Instead, the Court said it was "require[d]" to address that claim.[186] This suggests that the Court recognized two judicially cognizable injuries. One injury was the conviction itself. The Court could redress that injury by reversing the conviction on equal protection grounds. The other injury was the stigma imposed on homosexuals by the continued existence of *Bowers* and the state's condemnation of sodomy through the criminal law. A reversal of the conviction on equal protection grounds would not redress this injury, since it would leave *Bowers* untouched and invite the state to criminalize all sodomy. The only way to redress the stigmatic injury was to reverse the conviction on due process grounds. And by stating that it was required to decide the due process claim, the Court implied that stigmatic harm is a

---

180.    *See* Allen v. Wright, 468 U.S. 737, 755 (1984).

181.    *See* Recent Case, D.L.S. v. Utah, *374 F.3d 971 (10th Cir. 2004)*, 118 HARV. L. REV. 1070, 1073–75 (2005).

182.    *See* County of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991); City of Houston v. Hill, 482 U.S. 451, 459 n.7 (1987).

183.    In his well-known concurrence in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 345 (1936), Justice Brandeis described the Court's practice of deciding cases on the narrowest grounds possible. But he made clear that this practice was discretionary, not mandatory. *Id.* at 346 ("The Court developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision.").

184.    *See* Thomas Healy, *The Rise of Unnecessary Constitutional Rulings*, 83 N.C. L. REV. 847, 848–49, 920–27 (2005).

185.    *See* CASS R. SUNSTEIN, ONE CASE AT A TIME: JUDICIAL MINIMALISM ON THE SUPREME COURT 57–60 (2001).

186.    *See* Lawrence v. Texas, 539 U.S. 558, 575 (2003).

STIGMATIC HARM AND STANDING                                            441

judicially cognizable injury sufficient to trigger the exercise of judicial power.

It is possible I am placing too much weight on the word "required." The Court may have used that word to justify a choice already made rather than to suggest that it literally had no choice in the matter. Moreover, even if the majority did think it was required to address the plaintiffs' stigmatic injury, one might argue that it would have viewed the situation differently had stigmatic harm been the only injury alleged. In other words, *Lawrence* establishes that stigmatic harm is judicially cognizable once a case is properly before the Court, not that it is sufficient by itself to set the judicial process in motion.

In this sense, I acknowledge, *Lawrence* is not technically a standing decision. Still, it is highly relevant to standing doctrine. As the Court has frequently explained, the primary purpose of standing is to maintain the separation of powers—both horizontal and vertical—mandated by the Constitution.[187] Standing doctrine keeps the courts in their "'proper—and properly limited—role'" by ensuring that they intrude on the democratic process only when presented with an injury in fact that is fairly traceable to the government's conduct and likely to be redressed by a favorable decision.[188] Yet separation-of-powers concerns are implicated not only by decisions about who has standing. They are also implicated by decisions about how to resolve a case once a court has granted standing.[189] When a challenge to government action can be resolved on either of two grounds, one narrower than the other, a decision that rests on the narrower ground intrudes less on the democratic process than a decision that rests on the broader ground.[190] Thus, even if courts are not required to choose the narrower ground, separation-of-powers concerns argue strongly in favor of doing so.

In *Lawrence*, however, the Court did just the opposite. It could have decided the case on equal protection grounds, thereby striking down only

---

187.   *See* Lujan v. Defenders of Wildlife, 504 U.S. 555, 577 (1992) (describing the "separation-of-powers significance" of the injury-in-fact requirement); Allen v. Wright, 468 U.S. 737, 752 (1984) ("The law of Article III standing is built on a single basic idea—the idea of separation of powers.").

188.   *Lujan*, 504 U.S. at 583 (quoting Warth v. Seldin, 422 U.S. 490, 499 (1974)).

189.   *Cf.* Healy, *supra* note 184, at 906 n.315 (arguing that separation of powers concerns are implicated when a court decides an issue that is unnecessary to resolving the case before it).

190.   *See* SUNSTEIN, *supra* note 185, at 26; Cass R. Sunstein, *The Supreme Court, 1995 Term—Foreword: Leaving Things Undecided*, 110 HARV. L. REV. 6, 19–20 (1996); *cf.* Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 193 (2000) (agreeing that "federal courts should aim to ensure 'the framing of relief no broader than required by the precise facts'" (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 222 (1974))).

the Texas statute and similar laws in three other states.[191] But instead it reversed the defendants' convictions on due process grounds, precluding Texas from enacting a new sodomy statute and invalidating sodomy laws in an additional nine states that applied to both same-sex and opposite-sex couples.[192] I am not suggesting that the Court's choice was wrong or that separation of powers required the Court to decide the case on equal protection grounds. Rather, I am suggesting that the Court's choice implicated separation-of-powers concerns. And if the Court was willing— possibly even "required"—to set aside those concerns to redress the stigmatic harm experienced by gays and lesbians in *Lawrence*, stigmatic harm should also be sufficient to overcome the separation-of-powers concerns that inform standing.

One might respond that my analysis of *Lawrence* is backwards and that the due process claim *was* the narrower ground for decision.[193] After all, a decision requiring the government to treat homosexuals and heterosexuals equally might have greater long-term consequences than a decision protecting the right to engage in sodomy. As Chief Justice Rehnquist suggested, such a decision might prohibit the government from favoring heterosexuals as, say, elementary school teachers.[194] However, the consequences of an equal protection decision are only far-reaching if one assumes that the Court would have applied heightened scrutiny. As long as the Court invalidated the law under rational basis review—as Justice O'Connor advocated in her concurring opinion—the decision would not have broken new ground. At most, Justice O'Connor's approach would have prohibited the government from discriminating against gays and lesbians out of pure animus, a proposition already established by *Romer v. Evans*.[195] Thus, if one compares a narrow equal protection ruling with a narrow due process ruling—which the Court issued by not explicitly declaring sodomy a

---

191. *See Lawrence*, 539 U.S. at 573 (noting that, at the time of decision, sodomy was prohibited in thirteen states, of which four enforced the ban only against homosexual conduct).

192. *See id.* at 578.

193. *See* Mary Anne Case, *Of This and That in* Lawrence v. Texas, 55 SUP. CT. REV. 75, 108–09 n.142 (2003).

194. Transcript of Oral Argument at 20, *Lawrence*, 539 U.S. 558 (No. 02-102), 2003 WL 1702534, at *20. I offer Rehnquist's example not to suggest that gays and lesbians are unfit to teach elementary school, but to show that the consequences of a decision based on equal protection might extend far beyond sexual conduct.

195. Romer v. Evans, 517 U.S. 620, 634 (1996) (stating that the Equal Protection Clause "must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest" (citing Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973)) (emphasis added)). *But see* Robert C. Post, *Fashioning the Legal Constitution: Culture, Courts, and Law*, 117 HARV. L. REV. 4, 100 (2003) (arguing that O'Connor's approach would have required the Court "to intervene into the national controversy over the status of homosexuality by branding supporters of anti-sodomy laws as prejudiced bigots").

# EXHIBIT K - DECLARATION 15

STIGMATIC HARM AND STANDING                                    443

fundamental right[196]—the due process ruling still seems broader. And if stigmatic harm was sufficient to justify that broader intrusion on the democratic process, it should also be sufficient to justify intrusion on that process in the first place.

As this analysis of the cases shows, the Court's treatment of stigmatic harm has been decidedly mixed. Although it rejected stigmatic harm as a basis for standing in *Allen*, it has been receptive to claims of stigma in other contexts. In cases involving equal protection, electoral districting, and the Establishment Clause, the Court has often invoked stigmatic harm, either explicitly or implicitly, to support standing. The Court also relied on stigmatic harm in *Lawrence v. Texas* to justify a broad ruling that was not necessary to resolve the case. Yet the Court has never acknowledged the extent to which these cases undermine *Allen* nor adequately explored the nature of stigmatic harm to determine whether it should be sufficient for standing. The remainder of this Article attempts to answer that question.

## II. AN ALTERNATIVE VIEW OF STANDING

Before doing so, however, there is a preliminary issue I should discuss. Some scholars have argued that the injury-in-fact requirement at the heart of the Supreme Court's standing doctrine is incoherent.[197] According to these scholars, it makes no sense to ask whether a plaintiff has been injured "in fact." Every plaintiff alleges that some interest important to him has been infringed, they argue, even if that interest is simply a desire to ensure that

---

196. *See* Laurence H. Tribe, Lawrence v. Texas*: The "Fundamental Right" That Dare Not Speak Its Name*, 117 HARV. L. REV. 1893, 1904, 1947–48 n.207 (2004).

197. *See* Fletcher, *supra* note 40, at 221–22; Sunstein, *supra* note 38, at 186–91. Other scholars have argued that the injury-in-fact requirement is not supported by the text of Article III or by historical practice. *See* LOUIS L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 462–67 (1965); Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional Requirement?*, 78 YALE L.J. 816, 837–40 (1969); Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 YALE L.J. 341, 345; Sunstein, *supra* note 38, at 177; Winter, *supra* note 38, at 1418–25. The Court has not accepted these arguments, and some scholars have challenged them. *See* Woolhandler & Nelson, *supra* note 39, at 691 (arguing that although modern standing doctrine may not be compelled by historical practice, it "does not contradict a settled historical consensus about the Constitution's meaning"); Bradley S. Clanton, *Standing and the English Prerogative Writs: The Original Understanding*, 63 BROOK. L. REV. 1001 (1997) (same). Edward Hartnett has attacked the injury-in-fact requirement from a slightly different angle. He argues that the ability of the United States to bring criminal prosecutions to vindicate the public interest in compliance with the law demonstrates that Article III does not require an injury in fact. Edward Hartnett, *The Standing of the United States: How Criminal Prosecutions Show that Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 MICH. L. REV. 2239, 2255–58 (1999). In a recent case, the Supreme Court appeared to respond to this argument, stating that the United States has standing to bring criminal prosecutions because violations of the law constitute an "injury to its sovereignty." Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 771 (2000).

HEALY_CE_AU                                                                    3/7/2007 11:41:23 AM

the government acts lawfully.[198] So a decision that a plaintiff has not been injured "in fact" is really a decision that the interest the plaintiff asserts is not one the courts are willing to recognize.[199] Yet the only way for courts to determine what interests they are willing to recognize is by reference to legal norms.[200] Therefore, it is wrong to claim that standing turns on a factual inquiry that is "independent of evaluation and of legal conventions."[201] As Professor Cass Sunstein argues, "There can be no such law-free inquiry. It is a conceptual impossibility, indeed a form of metaphysics."[202]

The conclusion that Sunstein and others draw from this analysis is that standing doctrine should not turn on whether the plaintiff has suffered an injury in fact.[203] Instead standing should turn on whether the substantive law at issue gives the plaintiff a cause of action.[204] If this sounds familiar, it should. This is the view of standing that prevailed before the Supreme Court's 1970 decision in *Data Processing*. Indeed, Sunstein and others maintain that *Data Processing* was a mistake that has thrown standing doctrine seriously off-course.[205] The Court never should have abandoned the legal interest test, they argue, because asking whether the plaintiff has a legally enforceable right is the only coherent way to determine whether the plaintiff's claim can be heard in federal court.[206]

If Sunstein is correct, one might think that asking whether stigmatic harm is sufficient for standing is a misguided exercise. Under Sunstein's view, we cannot determine whether a particular injury is sufficient for standing in the abstract. We can only determine whether the substantive law in a particular case confers a legally enforceable right on the plaintiff.[207] Put another way, questions about standing cannot be answered at the wholesale level; they can be answered only at the retail level.[208] It would therefore seem pointless to argue that stigmatic harm—or any other kind of injury—is

---

198.   *See* Fletcher, *supra* note 40, at 231; Gene R. Nichol Jr., *Injury and the Disintegration of Article III*, 74 CAL. L. REV. 1915, 1925 (1986); Sunstein, *supra* note 38, at 189.

199.   *See* Fletcher, *supra* note 40, at 231–32.

200.   *See id.* at 231; Sunstein, *supra* note 38, at 192.

201.   Sunstein, *supra* note 38, at 236.

202.   *Id.*; *see also* Gene R. Nichol, *The Impossibility of* Lujan*'s Project*, 11 DUKE ENVTL. L. & POL'Y F. 193, 202 (2001) (stating that "injury is not a self-defining, factual construct," but is instead "a malleable, value-laden concept").

203.   Fletcher, *supra* note 40, at 223; Sunstein, *supra* note 38, at 235–36.

204.   Lee A. Albert, *Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief*, 83 YALE L.J. 425, 425–26 (1974); David P. Currie, *Misunderstanding Standing*, 1981 SUP. CT. REV. 41, 41; Fletcher, *supra* note 40, at 223–24; Sunstein, *supra* note 38, at 166–67.

205.   *See* Fletcher, *supra* note 40, at 229–31; Sunstein, *supra* note 38, at 185–86.

206.   *See* Fletcher, *supra* note 40, at 229–31; Sunstein, *supra* note 38, at 188–91.

207.   *See* Fletcher, *supra* note 40, at 231; Sunstein, *supra* note 38, at 189–91.

208.   *See* Adam B. Cox, *Citizenship, Standing, and Immigration Law*, 92 CAL. L. REV. 373, 395 (2004) (arguing that the legal conventions that inform determinations of injury "are not trans-substantive; they depend on the specific legal claims at stake"); Harold J. Krent, Laidlaw: *Redressing the Law of Redressability*, 11 DUKE ENVTL. L. & POL'Y F. 85, 109 (2001).

STIGMATIC HARM AND STANDING                                      445

sufficient for standing in general. One must ask instead whether the substantive law in a given case confers a right on the plaintiff not to be stigmatized.[209]

Sunstein's theory of standing deserves serious consideration. But dealing properly with all the questions it raises would require an extended analysis that is not appropriate here.[210] Instead, I will offer two reasons why Sunstein's critique of standing does not undermine the premise of this Article.

First, whatever the merits of Sunstein's view, the Supreme Court has not adopted it. The Court sometimes looks to substantive law to inform its understanding of an alleged injury.[211] And it occasionally uses language reminiscent of the legal interest test.[212] But the Court still repeats the injury-in-fact requirement like a mantra at the beginning of every standing discussion[213] and has relied on it to deny standing even where the substantive law clearly provided the plaintiff with a cause of action.[214]

209. When Sunstein and others claim that standing should turn on whether the plaintiff has a cause of action, their main point is that having an injury in fact is *not necessary* to establish standing. They also make a corollary point, which is that having an injury in fact is *not sufficient* to establish standing either; a plaintiff must have a cause of action—or legal authorization to sue. *See* Currie, *supra* note 204, at 42 ("No one can sue, I should have thought, unless authorized by law to do so."); Sunstein, *supra* note 38, at 166 (stating that "an injury in fact is neither a necessary nor a sufficient condition for standing"). Their first point conflicts with modern standing doctrine, which holds that the "irreducible constitutional minimum of standing" requires a plaintiff to allege an injury in fact that is fairly traceable to the defendant's conduct and is likely to be redressed by a decision in his favor. *See, e.g.*, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Their second point, however, is not necessarily inconsistent with current standing rules. Although the relationship between the concepts of "standing" and "cause of action" is far from clear, it seems likely that a plaintiff must meet constitutional standing requirements *and* establish that his suit is authorized, either explicitly or implicitly, by some legal provision. *See infra* note 448; *see also* Richard H. Fallon, Jr., *The Linkage Between Justiciability and Remedies—and Their Connections to Substantive Rights*, 92 VA. L. REV. 633, 694 n.228 (2006).

210. For an intriguing criticism of the cause of action theory, see Anthony J. Bellia, Jr., *Article III and the Cause of Action*, 89 IOWA L. REV. 777, 832–38 (2004) (arguing that the theory is based on a misconception of the historical meaning of "cause of action" and thus would expand the judicial power beyond its historical limits).

211. The Establishment Clause cases are a good example. *See supra* Part I.C.3.

212. *See Lujan*, 504 U.S. at 560 (describing "injury in fact" as "an invasion of a legally protected interest"); Warth v. Seldin, 422 U.S. 490, 500 (1975) (stating that "the actual or threatened injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing'" (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973))).

213. *See, e.g.*, Kowalski v. Tesmer, 543 U.S. 125, 129 (2004); Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 16–17 (2004); Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 771 (2000).

214. *See* Raines v. Byrd, 521 U.S. 811, 815, 818, 820 n.3 (1997) (holding that members of Congress lacked standing to challenge the Line Item Veto Act even though the Act expressly gave them authority to sue); *Lujan*, 504 U.S. at 571–78 (holding that plaintiffs failed the injury-in-fact requirement and therefore lacked standing to challenge an administrative interpretation

Moreover, the Court has given no indication that it plans to abandon the injury-in-fact requirement.[215] This does not mean one must embrace the Court's standing framework; critiques are certainly worthwhile. But until those critiques are accepted, it also seems worthwhile to argue for change within the existing framework.

Second, even under Sunstein's approach, there would still be good reason to examine the nature of stigmatic harm. As Sunstein acknowledges, many statutes impose legal obligations on government agencies without clearly indicating who has a right to enforce those obligations.[216] The same is true of most constitutional provisions.[217] The Fourteenth Amendment does not specify which individuals can enforce the Equal Protection Clause,[218] nor does the Accounts Clause identify who is entitled to enforce its provisions.[219] Thus, when determining whether a plaintiff had standing to enforce a particular statutory or constitutional obligation, courts would often have to consider the purpose behind that obligation and whether it was intended to protect the interest asserted by the plaintiff.[220]

---

of the Endangered Species Act even though the Act explicitly authorized "any person" to commence a civil suit to enjoin violation of the Act).

    The Court limited the impact of *Lujan* in *FEC v. Akins*, 524 U.S. 11, 21 (1998), by holding that the denial of information resulting from an adverse agency decision is a sufficient injury to support standing. But it did not question the injury-in-fact requirement. Moreover, during the same term *Akins* was decided, the Court held that an environmental group did not have standing to sue a steel manufacturer for failing to comply with a federal law, despite a citizen-suit provision authorizing "any person" to sue violators of the law. *See* Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102–10 (1998). Although the Court framed its decision as resting on a lack of redressability, it also rested implicitly on the injury-in-fact requirement since the Court concluded that any harms that would be redressed by the suit were not judicially cognizable. *See id.* at 107 (stating that although a favorable ruling might make the plaintiff happier, "that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury"). The Court also rejected the suggestion that the question of standing turns on an interpretation of the substantive law invoked by the plaintiff. *See id.* at 97 n.2 (stating that "the Article III requirement of remediable injury in fact . . . has nothing to do with the text of the statute relied upon"); *see also* Gollust v. Mendell, 501 U.S. 115, 126 (1991) ("'Although Congress may grant an express right of action to persons who would otherwise be barred by prudential standing rules, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself.'" (quoting *Warth*, 422 U.S. at 501)).

    215.   *See* Fallon et al., *supra* note 43, at 132 (stating that "recent cases have not questioned the principle that Article III requires the plaintiff to show injury from the conduct under challenge").

    216.   *See* Fletcher, *supra* note 40, at 265; Cass R. Sunstein, *Standing Injuries*, 1993 Sup. Ct. Rev. 37, 53.

    217.   *See* Fletcher, *supra* note 40, at 265.

    218.   *See* U.S. Const. amend. XIV, §§ 1, 5.

    219.   *See* U.S. Const. art. I, § 9, cl. 7 (providing that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time").

    220.   *See* Fletcher, *supra* note 40, at 260–65, 271–72.

This task would involve a fair amount of subjectivity, and courts inevitably would rely on judgments about what interests are worth protecting. For instance, courts would likely be sympathetic to claims that a statute was designed to protect economic interests because courts are familiar with such interests and are accustomed to vindicating them.[221] But courts would be skeptical of claims that a statute was designed to protect an interest in, say, sexual fulfillment because that is not an interest courts have traditionally been concerned with.[222] As Professor Joseph Vining explained, courts will not exercise their power unless they "see" harm.[223] And they will not see harm unless the interest the plaintiff asserts has been recognized as a public value.[224]

Thus, even if standing turns on a retail-level determination, there is still value in discussing stigmatic harm at the wholesale level. Shedding light on the devastating consequences of social stigma can help foster a public commitment to eliminate stigma. And once elimination of stigma becomes a public value, courts will be more willing to see protection of that value as an implicit purpose of various legal provisions. As precedent, consider the history of environmentalism. A century ago, no court would have taken seriously the argument that a plaintiff had standing to challenge government actions that harmed the environment.[225] As a result of the environmental movement, however, courts came to see protection of the natural world as a public value warranting intrusion into the democratic process.[226] The courts' appreciation of stigmatic harm could evolve in a similar way. In fact, given the result in *Lawrence*, one might argue that the evolution has already begun.

## III.  THE NATURE OF STIGMATIC HARM

But there is still a long way to go. In spite of the Court's apparently heightened sensitivity to stigmatic harm,[227] it has never fully examined the

---

221.    *See* Nichol, *supra* note 54, at 326.

222.    *See* Roe v. Wade, 410 U.S. 113, 128 (1973) (denying standing for married couple who challenged abortion ban on ground that it harmed their "marital happiness"); *see also* Nichol, *supra* note 202, at 202 (noting that the Court would be unlikely to recognize a plaintiff's interest in maintaining segregation or remaining in the country undetected as an illegal alien).

223.    *See* VINING, *supra* note 47, at 61.

224.    *Id.* ("What prevents the court from seeing harm is the absence, to the court's eyes, of a 'you' to be harmed; and what prevents the court from seeing a 'you,' a person, is the absence of any public values to define a class for which the individual voice might speak."); *see also* Nichol, *supra* note 54, at 326 (stating that "judges are far more likely to embrace jurisdiction if the plaintiff seems to be saying something that the judge understands, somehow, as his own").

225.    *See* Nichol, *supra* note 198, at 1933.

226.    *See id.* at 1933–34.

227.    *See supra* Part I.

nature of stigma or what it means to be stigmatized.[228] This is a serious oversight. Although the word stigma sometimes is used casually to refer to any type of negative association, social scientists have long had a more sophisticated understanding of stigma. In this Part, I draw on that understanding to explore the nature of stigma and the experience of those who possess a stigmatizing trait. I also explain that stigma is a social construct and that the law, by shaping social norms, contributes to the cultural beliefs that generate stigma. Finally, I argue that, contrary to the Court's conclusion in *Allen*, those who are stigmatized by government action are not simply concerned bystanders attempting to vindicate value interests. Instead, they are victims who suffer injuries just as concrete as the economic, aesthetic, and environmental injuries the Court has already recognized as sufficient for standing.

### A.  A MARK OF DISGRACE

In ancient Greece, a stigma was "a sign or mark, cut or burned into the body, that designated the bearer as a person who was morally defective and to be avoided—a slave, a criminal, or a traitor, for example."[229] The term continued to carry this physical connotation through the seventeenth century, when the branding of criminals was common.[230] Today, the word stigma still refers to a mark of disgrace, but not one physically cut or burned onto a person.[231] Instead, stigma is a mark of disgrace that attaches to a characteristic or trait that society views as deeply discrediting.[232] This mark spoils the social identity of its bearer and reduces him "in our minds from a whole and usual person to a tainted, discounted one."[233] A stigmatized person is thus "disfavored or dishonored" in the eyes of others, "a kind of social outcast."[234] Indeed, "[b]y definition, . . . we believe the person with a stigma is not quite human."[235]

---

228.  *See* R.A. Lenhardt, *Understanding the Mark: Race, Stigma, and Equality in Context*, 79 N.Y.U. L. REV. 803, 812, 815–16 (2004).

229.  Jennifer Crocker et al., *Social Stigma, in* 2 THE HANDBOOK OF SOCIAL PSYCHOLOGY 504, 504 (4th ed. 1998).

230.  XVI OXFORD ENGLISH DICTIONARY 691 (noting that use of the term "stigmatize," which means to mark with a "stigma" or brand, was "very frequent in the 17th c, with reference to the then common punishment of branding").

231.  GOFFMAN, *supra* note 30, at 1–2.

232.  *Id.* at 2–3.

233.  *Id.* at 3.

234.  Lenhardt, *supra* note 228, at 809; *see also* Regina Austin, *'The Shame of It All': Stigma and the Political Disenfranchisement of Formerly Convicted and Incarcerated Persons*, 36 COLUM. HUM. RTS. L. REV. 173, 174–75 (2004) ("The stigmatized are outcasts who are to be avoided and isolated. They are dehumanized and considered defective or unwholesome.").

235.  GOFFMAN, *supra* note 30, at 5; *see also* Stephen C. Ainlay & Faye Crosby, *Stigma, Justice, and the Dilemma of Difference, in* THE DILEMMA OF DIFFERENCE: A MULTIDISCIPLINARY VIEW OF STIGMA 17 (Stephen C. Ainlay et al. eds., 1986) ("Stigma involves situations where one individual or group treats another individual or group as less than fully human."); Crocker et

STIGMATIC HARM AND STANDING                                               449

In his seminal work on the subject, Professor Erving Goffman identified three types of stigmatizing traits.[236] First, there are "abominations of the body."[237] These are physical defects, such as blindness, deafness, paraplegia, and obesity.[238] Second are "blemishes of individual character."[239] These are traits that are viewed as reflecting a flawed character, such as drug addiction, mental retardation, mental illness, homelessness, and homosexuality.[240] Finally, there are "tribal stigma"—characteristics transmitted through lineage that "contaminate all members of a family."[241] Examples of tribal stigmas include membership in devalued racial, ethnic, or religious groups.[242]

Social scientists have also categorized stigmatizing traits in other ways. For instance, some stigmatizing traits, such as physical defects, are immediately visible, while others, such as mental illness, are only apparent upon closer examination.[243] Stigmatizing traits also differ in the degree to which they are controllable.[244] Those who are mentally retarded or paralyzed can do little to change their situation, but those who are obese, addicted to drugs, or homeless have at least some ability to improve their circumstances. Related, but not identical, to controllability is the extent to which the stigmatized person is responsible for the stigmatizing trait.[245] A person who is paraplegic has little ability to regain the use of his legs, but if he was injured as a result of driving drunk, he might be viewed as responsible for his paralysis. By contrast, a person who is obese has some ability to lose weight, but his tendency toward obesity may be due to a genetic condition.

Although we can categorize stigmatizing traits, it is impossible to compile a list of all traits and characteristics that are stigmatizing. Whether a particular trait is stigmatizing depends upon that trait's meaning in a particular social context.[246] Blacks may be stigmatized in the United States,

al., *supra* note 229, at 504 (stating that "the person who is stigmatized is a person whose social identity, or membership in some social category, calls into question his or her full humanity"); John F. Dovido et al., *Stigma: Introduction and Overview, in* THE SOCIAL PSYCHOLOGY OF STIGMA 1, 1 (Todd F. Heatherton et al. eds., 2000) ("Stigmatization, at its essence, is a challenge to one's humanity . . . .").

236.   GOFFMAN, *supra* note 30, at 4.

237.   *Id.*

238.   *Id.*

239.   *Id.*

240.   *Id.*

241.   *See* GOFFMAN, *supra* note 30, at 4.

242.   *Id.*

243.   Crocker et al., *supra* note 229, at 506–07.

244.   *Id.* at 507–08.

245.   *Id.*

246.   *See* Stephen C. Ainlay et al., *Stigma Reconsidered, in* THE DILEMMA OF DIFFERENCE: A MULTIDISCIPLINARY VIEW OF STIGMA, *supra* note 235, at 3–4 (noting that "what is stigmatized is bound by culture and epoch").

but there is nothing stigmatizing about being black in many parts of the world. Obesity and homosexuality also vary in the extent to which they are stigmatizing.[247] In some cultures, during some periods of history, being overweight was desirable,[248] while sex between men was considered a normal part of male development.[249] In the modern United States, however, both obesity and homosexuality are generally considered to be stigmatizing.[250]

This illustrates that "stigma is a social construct."[251] There is nothing inherently stigmatizing about any particular trait or attribute.[252] Instead, attributes become stigmatizing as a result of cultural beliefs that develop through a process of social learning.[253] This process generates a collective understanding about what traits are desirable and what traits are discrediting. As a result, "[b]road views about what constitutes stigma are generally shared by members of a society."[254]

## B.  STIGMA AND LAW

Because stigma is a result of social understandings and cultural beliefs, it is difficult to pinpoint exactly how particular traits come to be stigmatized. Many of our cultural beliefs are passed down through a process of socialization that is so pervasive as to be almost invisible.[255] But it is possible to identify some of the forces that contribute to stigma. For instance,

247.  *See* Charles Stangor & Christian S. Crandall, *Threat and the Social Construction of Stigma*, *in* THE SOCIAL PSYCHOLOGY OF STIGMA, *supra* note 235, at 65.

248.  *See* Marc C. Stafford & Richard R. Scott, *Stigma, Deviance and Social Control: Some Conceptual Issues*, *in* THE DILEMMA OF DIFFERENCE: A MULTIDISCIPLINARY APPROACH TO STIGMA, *supra* note 235, at 80 (noting that "'fattening houses' were used formerly in certain parts of Africa to produce beautiful women").

249.  *See* Stangor & Crandall, *supra* note 247, at 66.

250.  *See* Stafford & Scott, *supra* note 248, at 77, 80; Stangor & Crandall, *supra* note 247, at 65–66.

251.  Ainlay et al., *supra* note 246, at 4; *see* Stafford & Scott, *supra* note 248, at 80 (explaining that stigma "is a relative phenomenon, meaning that what is a stigma in one social unit (family, company, nation) may not be so in others"); *see also* Gaylene Becker & Regina Arnold, *Stigma as a Social and Cultural Construct*, *in* THE DILEMMA OF DIFFERENCE: A MULTIDISCIPLINARY VIEW OF STIGMA, *supra* note 235, at 55 ("Stigma is a concept imbued with cultural meaning. It is not a property of the individual . . . .").

252.  *See* Ainlay et al., *supra* note 246, at 4.

253.  *See* Larry G. Martin, *Stigma: A Social Learning Perspective*, *in* THE DILEMMA OF DIFFERENCE: A MULTIDISCIPLINARY VIEW OF STIGMA, *supra* note 235, at 147–49 ("Social learning is a powerful mechanism for both the acquisition and maintenance of behaviors that stigmatize others.").

254.  Becker & Arnold, *supra* note 251, at 40; *see also* Crocker et al., *supra* note 229, at 511 ("For the most profoundly stigmatized social identities, there is widespread agreement within a culture about . . . the devalued status of those identities . . . .").

255.  *See* Lerita M. Coleman, *Stigma: An Enigma Demystified*, *in* THE DILEMMA OF DIFFERENCE: A MULTIDISCIPLINARY VIEW OF STIGMA, *supra* note 235, at 218 (stating that "the predisposition to stigmatize is passed from one generation to the next through social learning [] or socialization").

# EXHIBIT K - DECLARATION 15

STIGMATIC HARM AND STANDING                                          451

sociologists have observed that "beliefs about minorities and other markable groups are transmitted by parents, the media, and other socialization agents," such as churches and schools.[256]

Law also plays a role in the social construction of stigma. As legal scholars have increasingly come to appreciate, law not only reflects social norms, but also "helps shape social power and norms by prefiguring preferences, prejudices and interests."[257] Similarly, law creates and contributes to stigma.[258] When a social understanding develops that a particular trait is deeply discrediting, law often crystallizes and reinforces that understanding.[259] Consider the example of Jim Crow.[260] After the Civil War, former slaves attempted to take their place in society as equal citizens.[261] But Jim Crow laws reinforced the existing prejudice and placed a stamp of inferiority on blacks, as Justice Harlan recognized in his dissent in *Plessy v. Ferguson*,[262] and as the full court recognized in *Strauder v. West Virginia*.[263] It was not until the Court overturned *Plessy* in *Brown v. Board of Education* that this legal stamp of inferiority was removed.[264] And even then, antimiscegenation laws and the refusal of officials to enforce antidiscrimination laws continued to brand African Americans as inferior.[265]

---

256.   EDWARD E. JONES ET AL., SOCIAL STIGMA: THE PSYCHOLOGY OF MARKED RELATIONSHIPS 160–61 (1984) (explaining that according to the sociocultural view of stigma, "beliefs about minorities and other markable groups are transmitted by parents, the media, and other socialization agents" (internal quotations omitted)).

257.   William N. Eskridge, Jr., *No Promo Homo: The Sedimentation of Antigay Discourse and the Channeling Effect of Judicial Review*, 75 N.Y.U. L. REV. 1327, 1327–31, 1333 (2000); *see also* Scott Burris, *Disease Stigma in U.S. Public Health Law*, 30 J.L. MED. & ETHICS 179, 183 (2002) (explaining how law influences social perceptions and norms).

258.   *See* Lee Jussim et al., *Stigma and Self-Fulfilling Prophecies, in* THE SOCIAL PSYCHOLOGY OF STIGMA, *supra* note 235, at 404 ("Major institutions (government, businesses, churches, etc.) often do indeed have the power to 'institutionalize' stigmas.").

259.   *See* Case, *supra* note 193, at 111.

260.   *See* Rachel D. Godsil, *Race Nuisance: The Politics of Law in the Jim Crow Era*, 105 MICH. L. REV. 505, 506 n.2 (2006) (explaining that historians have not discovered how Jim Crow came to be shorthand for racial segregation).

261.   *See* Robert J. Kaczorowski, *Reflections on "From Slaves to Citizens,"* 17 CARDOZO L. REV. 2141, 2142 (1996).

262.   Plessy v. Ferguson, 163 U.S. 537, 562 (1896) (Harlan, J., dissenting) (arguing that a law requiring whites and blacks to ride in separate railroad cars places a "badge of servitude" upon blacks).

263.   Strauder v. West Virginia, 100 U.S. 303, 308 (1880) (stating that the inability of blacks to serve on a jury "is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others").

264.   *See* Brown v. Bd. of Educ., 349 U.S. 294, 300–01 (1955).

265.   *See* Lenhardt, *supra* note 228, at 857; Lawrence Lessig, *The Regulation of Social Meaning*, 62 U. CHI. L. REV. 943, 991 (1995) ("Antimiscegenation laws . . . can be seen as a tool for preserving a certain social meaning associated with being white. They preserve this meaning by protecting and perpetuating the perceived 'purity' of the white race. And by maintaining that purity, the laws helped whites preserve a social meaning difference from blacks.").

# EXHIBIT K - DECLARATION 15

Law contributes to stigma in several ways. First, it signals what behavior is appropriate toward certain groups. Thus, when law treats members of a group as second-class citizens, it invites others to discriminate against that group as well. In *Strauder*, for instance, the Court noted that excluding blacks from juries was a "stimulant" to racial prejudice.[266] And in *Lawrence*, the Court explained that the Texas sodomy law was "an invitation to discrimination against homosexuals in both the public and private spheres."[267]

Second, when law requires or permits segregation of stigmatized groups, it makes it more difficult for those groups to overcome the stereotypes that help to generate their stigma. As Professor William Eskridge has pointed out, "[s]tereotypes weaken as people observe nonstereotypical behavior in minorities they come to know, and prejudices weaken as people cooperate with minorities in win-win projects."[268] But if law supports the segregation of the stigmatized, it is more difficult to eliminate those stereotypes. "By separating blacks from whites and by forcing gay people into closets, the law makes it impossible for either minority to refute stereotypes associated with it or to soften prejudices harbored against its members."[269]

But law does not simply reinforce social meanings that already exist. It also creates categories that can then be used as a basis for stigmatization. During most of American history, for instance, homosexuality did not exist as a separate, semantic category.[270] Although there were laws against sodomy, those laws were rarely enforced and there was no category of persons known as "homosexuals."[271] That term was first used by doctors at the turn of the twentieth century, but only became culturally relevant as legal actors stepped up their efforts to punish homosexual conduct.[272] These efforts transformed "homosexuals" from individuals who were attracted to members of their own sex into sexual deviants who threatened the public order. Thus, Eskridge explains, "law's stigma helped create homosexuality as a totalizing and naturalized identity trait."[273]

Of course, law can also be used to combat stigma.[274] For instance, the Americans with Disabilities Act has helped to reduce the stigma of having a

---

266. *Strauder*, 100 U.S. at 308.

267. Lawrence v. Texas, 539 U.S. 558, 575 (2003). Indeed, according to Justice O'Connor, Texas stipulated in an earlier challenge that its sodomy law "'legally sanctions discrimination against [homosexuals] in a variety of ways unrelated to the criminal law,' including in the areas of 'employment, family issues, and housing.'" *Id.* at 582 (O'Connor, J., concurring) (quoting State v. Morales, 826 S.W.2d 201, 203 (Tex. App. 1992)).

268. Eskridge, *supra* note 257, at 1410.

269. *Id.* at 1333.

270. *Id.* at 1334.

271. *See id.*

272. *See id.* at 1335.

273. Eskridge, *supra* note 257, at 1334.

274. *See* Martin, *supra* note 253, at 146.

STIGMATIC HARM AND STANDING                                    453

physical disability,[275] as have "mainstreaming laws" that require schools to teach disabled students alongside students who are not disabled.[276] Laws prohibiting discrimination on the basis of sexual orientation have also contributed to the improved social standing of gays and lesbians.[277]

But these examples do not undermine the claim that law shapes and reinforces social norms. Instead, they support that claim by demonstrating that when law removes its stamp of inferiority from stigmatized groups, society is likely to do the same. Public officials recognize this, which is why they often fight to maintain laws that stigmatize minority groups. When the District of Columbia proposed repealing its sodomy laws, which had largely gone unenforced, some members of Congress objected that the move would "decriminalize and thus legitimize sodomy."[278] Likewise, conservatives in Massachusetts opposed that state's gay civil rights bill on the ground that it would be viewed as a step toward legal approval of the homosexual lifestyle.[279]

## C.   THE EXPERIENCE OF THE STIGMATIZED

The discussion so far has focused on the nature of stigma and the process through which it develops. But what about those who are stigmatized? What is life like for them and how do they experience being stigmatized? The answer depends somewhat on the type of stigmatizing trait one possesses. Those who can control their stigmatizing trait are often more reviled than those whose trait is uncontrollable.[280] Those whose stigmatizing trait is visible may encounter more overt hostility than those whose trait is concealable.[281] But in general, social scientists have identified several harms associated with being stigmatized.

First, because the stigmatized are marked as less than fully human, they face the "ever-present possibility" that they will be the targets of prejudice and discrimination.[282] In applying for jobs, looking for housing, dating, and a host of other social activities, the stigmatized person is conscious that he could be rejected or looked down upon because of his stigma.[283] This threat of discrimination is harmful in itself, producing anxiety and a feeling that

---

275.   *See* Michelle R. Hebl et al., *Awkward Moments in Interactions Between Nonstigmatized and Stigmatized Individuals, in* THE SOCIAL PSYCHOLOGY OF STIGMA, *supra* note 235, at 298.

276.   *See* Frederick X. Gibbons, *Stigma and Interpersonal Relationships, in* THE DILEMMA OF DIFFERENCE: A MULTIDISCIPLINARY VIEW OF STIGMA, supra note 235, at 128.

277.   *See* Hebl et al., *supra* note 275, at 298; Eskridge, *supra* note 257, at 1338.

278.   Eskridge, *supra* note 257, at 1344.

279.   *Id.* at 1350.

280.   *See* Crocker et al., *supra* note 229, at 508.

281.   *See* GOFFMAN, *supra* note 30, at 48.

282.   *See* Crocker et al., *supra* note 229, at 516.

283.   *See id.* at 516–17 (noting that "the stigmatized are never entirely free of the possibility of encountering prejudice in others").

one must "be constantly on guard."[284] But even more harmful is the actual discrimination experienced by the stigmatized. Research shows that "members of stigmatized groups are more likely to experience derision, exclusion, discrimination, and violence than are those who are not stigmatized."[285] This discrimination makes it harder for the stigmatized to obtain employment, housing, education, and to develop lasting relationships with others.[286] In the words of Goffman, "we exercise varieties of discrimination [against the stigmatized], through which we effectively, if often unthinkingly, reduce his life chances."[287]

Stigmatization also threatens one's self-esteem.[288] Research has shown that most stigmatized individuals are aware that society views them as devalued and tainted.[289] And social scientists have long maintained that people construct their self-identities, at least in part, on the basis of how others react to them.[290] Thus, the knowledge that others view them as less than fully human can undermine the self-esteem of the stigmatized. They may even come to conclude that society is right—that they are in fact "less worthwhile, deserving, or valuable" than others.[291] As the social psychologist Gordon Allport once asked rhetorically, "[W]hat would happen to your own personality if you heard it said over and over again that you were lazy . . . and had inferior blood"?[292]

---

284.    *Id.* at 517; *see also* Hebl et al., *supra* note 275, at 288–89; Carol T. Miller & Brenda Major, *Coping with Stigma and Prejudice, in* THE SOCIAL PSYCHOLOGY OF STIGMA, *supra* note 235, at 244–45.

285.    *See* Miller & Major, *supra* note 284, at 244.

286.    *See* Crocker et al., *supra* note 229, at 517 (noting that prejudice and discrimination against the stigmatized "create barriers to obtaining resources such as employment, housing, and so on, and failure to obtain these resources may threaten or compromise the physical well-being and comfort of stigmatized individuals"); Dovido et al., *supra* note 235, at 5 (noting that "even when stigma and social rejection do not jeopardize physical well-being directly, they can do so indirectly—for example, through limiting access to health care, education, employment, and housing . . . as well as through increasing stress and creating anxiety"); Jussim et al., *supra* note 258, at 388–89 (describing research showing that those who are obese "are less likely to attend elite colleges . . . less likely to get hired . . . and more likely to have a hard time finding dates" than those who are not obese (internal citations omitted)); Miller & Major, *supra* note 284, at 246 (noting that "African Americans have more physical health problems than European Americans, including shorter life expectancies, higher heart disease, and higher infant mortality").

287.    *See* GOFFMAN, *supra* note 30, at 5.

288.    *See* Crocker et al., *supra* note 229, at 517.

289.    *Id.* at 517–18; *see* Dovido et al., *supra* note 235, at 16; Gibbons, *supra* note 276, at 132–33 (noting that studies show that the mentally retarded and the blind are both aware of the negative attitudes others have of them).

290.    *See* Delia Cioffi, *The Looking-Glass Self Revisited: Behavior Choice and Self-Perception in the Social Token, in* THE SOCIAL PSYCHOLOGY OF STIGMA, *supra* note 235, at 185; Jennifer Crocker & Diane M. Quinn, *Social Stigma and the Self: Meanings, Situations, and Self-Esteem, in* THE SOCIAL PSYCHOLOGY OF STIGMA, *supra* note 235, at 155.

291.    Crocker et al., *supra* note 229, at 518.

292.    GORDON W. ALLPORT, THE NATURE OF PREJUDICE 142 (1954).

Early research supported the claim that stigmatization lowers self-esteem. In Kenneth Clark's famous study, black children given a choice between playing with black dolls and white dolls overwhelmingly chose the white dolls.[293] But recently researchers have suggested that the relationship between stigma and self-esteem is more complicated. Citing survey results showing little difference in self-esteem between stigmatized and non-stigmatized groups, some social scientists argue that being stigmatized does not inevitably lead to lower self-esteem.[294] Instead, they maintain that the effect of stigma on self-esteem varies depending upon the situation and the values that are salient to that situation.[295]

In one study, for instance, researchers tested the self-esteem of overweight and normal weight women after giving them a political speech to read.[296] Some of the women read a speech emphasizing the values of inclusion and equality, while others read a speech emphasizing the values of individualism and the Protestant work ethic. In the group that read the speech emphasizing inclusion and equality, there was no difference in self-esteem between overweight and normal weight women.[297] But in the second group, overweight women had lower self-esteem than normal weight women.[298]

Sociologists have also discovered that the stigmatized often find ways to protect their self-esteem. In one study, white evaluators interviewed black students sitting on the other side of a glass partition.[299] Some of the interviews were conducted with the blinds drawn, while others were conducted with the blinds open.[300] Researchers found that when the black students received negative evaluations from white evaluators who did not know their race, their self-esteem suffered.[301] But when they received negative evaluations from evaluators who were aware of their race, their self-esteem stayed the same.[302] The researchers concluded that in the latter situation the students attributed the negative evaluations to prejudice on the part of the white evaluators.[303] In this way, they were able to protect their self-esteem from erosion.

---

293. Crocker & Quinn, *supra* note 290, at 155.
294. *Id.* at 157; Crocker et al., *supra* note 229, at 531.
295. Crocker & Quinn, *supra* note 290, at 157–59, 175.
296. *Id.* at 171–72.
297. *Id.*
298. *Id.*
299. *Id.* at 163.
300. Crocker & Quinn, *supra* note 290, at 163.
301. *Id.* at 164.
302. *Id.*
303. *Id.* at 164–65.

The lesson of these studies, some sociologists argue, is that self-esteem is not a fixed, stable trait.[304] Instead, "self-esteem is constructed at the moment, in the situation, as a function of the meanings that individuals bring with them to the situation, and features of the situation that make those meanings relevant or irrelevant."[305] For this reason, it may be incorrect to assume that being stigmatized necessarily leads to lower self-esteem.[306] Even so, members of stigmatized groups certainly face greater threats to their self-esteem as a result of being stigmatized than they would otherwise.[307] When white students were interviewed in the study above, for instance, their self-esteem did not vary depending upon whether the blinds were drawn.[308] Knowing that others were aware of their race did not affect their self-image. For the black students, however, that knowledge played a key role in shaping their self-esteem. Thus, although being stigmatized may not necessarily lower one's self-esteem, the stigmatized must deal with threats to their self-esteem not faced by the non-stigmatized.[309]

Finally, the stigmatized are usually the targets of negative stereotypes, which can lead to self-fulfilling prophecies.[310] One example is what social scientists have labeled "stereotype threat."[311] In lay terms, stereotype threat exists when the fear of conforming to stereotype creates self-doubt that interferes with one's performance. The best-known study of this phenomenon involved a test given to two groups, each of which included both white and black students.[312] The first group was told the test was to measure intellectual ability, while the second group was told it was a non-diagnostic exercise.[313] Researchers hypothesized that stereotypes about the intellectual capacities of black students would affect those students' performance.[314] The results proved them right. Black students who thought

---

304.    *Id.* at 153–54.

305.    Crocker & Quinn, *supra* note 290, at 153–54.

306.    Crocker et al., *supra* note 229, at 518 (stating that "negative social identity . . . does not lead inevitably or directly to low personal or collective self-esteem").

307.    Miller & Major, *supra* note 284, at 244 (looking at stigma as a "stressor").

308.    *See* Crocker & Quinn, *supra* note 290, at 164.

309.    *See* Miller & Major, *supra* note 284, at 244 ("Stigmatized individuals' awareness that others do not like, value, or respect them is a major threat to self-esteem.").

310.    *See* Jussim et al., *supra* note 258, at 375–78, 391–92. Although stereotype and stigma are similar, they are not identical. For one thing, not all stereotypes are stigmatizing. We may stereotype librarians as quiet and bookish, but we do not generally stigmatize them. *See id.* at 376. In addition, although most stigmatized groups are the targets of negative stereotypes, not all stigmas are associated with a stereotype. For instance, we may stigmatize those with physical disabilities, but we do not usually stereotype them. *See* Monica Biernat & John F. Dovido, *Stigma and Stereotypes, in* THE SOCIAL PSYCHOLOGY OF STIGMA, *supra* note 235, at 90.

311.    *See* Claude M. Steele & Joshua Aronson, *Stereotype Threat and the Intellectual Test Performance of African Americans,* 69 J. PERSONALITY & SOC. PSYCHOL. 797–811 (1995).

312.    *Id.*

313.    *Id.* at 799.

314.    *Id.*

the test measured intellectual ability did worse than black students who thought it was a mere exercise.[315] By contrast, there was no difference between the scores of white students in the first and second groups. The conclusion: black students had internalized the negative stereotypes about their intellectual ability, and those stereotypes fueled self-doubt that undermined their performance.[316] Subsequent studies have shown that other groups are also vulnerable to stereotype threat.[317]

Stereotype threat involves the internalization of negative stereotypes by the stigmatized. Self-fulfilling prophecies also occur when a negative stereotype influences the way we treat a person and the person reacts to this treatment with behavior that confirms the stereotype.[318] To test this phenomenon, researchers conducted a two-part experiment. First, they watched a series of interviews and observed that white interviewers treated black candidates more coldly than white candidates.[319] Second, they trained another group of interviewers to treat white candidates in the cold manner in which the black candidates had initially been treated.[320] When white candidates were then interviewed in this manner, they performed more poorly than white candidates who were treated warmly.[321] The lesson, according to social scientists, is that the stereotypes we bring to interactions with the stigmatized are often self-fulfilling, thereby helping to perpetuate both the stereotype and the stigma.[322]

Stigmatic harms are not insurmountable. Many stigmatized individuals develop ways of coping with their situations.[323] As noted above, they may attribute negative outcomes to the prejudice of others rather than allow those outcomes to affect their self-esteem. They may also try to compensate for, or even eliminate, their stigmatizing traits by changing their behaviors or working harder.[324] In some circumstances, they may simply avoid situations that would expose them to ridicule or prejudice.[325] Overweight people often avoid the beach,[326] and people with physical defects frequently stay at home.[327] But although these strategies can lessen the harms associated

---

315.  *Id.* at 800–08.

316.  Steele & Aronson, *supra* note 311, at 808–10.

317.  Jussim et al., *supra* note 258, at 408–10.

318.  *Id.* at 377–78.

319.  *Id.* at 380.

320.  *Id.* at 380–81.

321.  *Id.*

322.  Jussim et al., *supra* note 258, at 380–84.

323.  Crocker et al., *supra* note 229, at 543; Miller & Major, *supra* note 284, at 249–52.

324.  Miller & Major, *supra* note 284, at 253.

325.  *Id.* at 255.

326.  *Id.*

327.  GOFFMAN, *supra* note 30, at 12 (describing a woman who never left home after becoming disfigured).

with stigma, they also carry costs.[328] Reflexively blaming negative outcomes on prejudice can prevent one from understanding other reasons behind those outcomes.[329] Attempting to change behavior can backfire if those efforts fail, causing one to feel even worse than before.[330] And avoiding situations that might expose one to ridicule or prejudice limits one's access to important resources and "severely circumscribes one's freedoms."[331]

In short, stigmatization is a serious injury with harmful consequences. Not all stigmatized people experience these harms in the same way,[332] and many individuals are able to overcome these harms and lead happy, fulfilling lives.[333] But for the most part, "[p]eople who are stigmatized tend to experience more negative outcomes in their work lives and in their personal lives than do the nonstigmatized."[334]

### D.    *Stigmatic Harm as a Concrete Injury*

Still, the question remains whether stigmatic harm should be sufficient for purposes of standing. In holding that it is not, the Court in *Allen* suggested that individuals who are stigmatized by government action do not suffer a concrete injury, at least when they are not personally denied equal treatment.[335] The Court also compared plaintiffs alleging stigmatic harm to concerned bystanders attempting to vindicate value interests.[336] The Court did not elaborate on these claims, however, and a closer analysis strongly suggests that they are not true.

First, is stigmatic harm "concrete"? The difficulty in answering this question is that the Court has never explained what it means for an injury to be concrete.[337] It has simply labeled some injuries concrete and others

---

328.   *See* Miller & Major, *supra* note 284, at 263 ("Eliminating a stigmatizing condition usually involves physical, emotional, and financial costs.").

329.   Coleman, *supra* note 255, at 224 (noting that "stigmatized individuals sometimes blame the root of their difficulties on the stigmatized trait, rather than confirming the root of their personal difficulties").

330.   Miller & Major, *supra* note 284, at 263.

331.   *Id.* at 264.

332.   Dovido et al., *supra* note 235, at 3 ("[T]he experience of being devalued is [] highly dependent on social context . . . ."); Gibbons, *supra* note 276, at 123 (noting that most theorists "agree . . . there is no single common experience associated with the process of stigmatization").

333.   Dovido et al., *supra* note 235, at 2 (stating that "many people with stigmatized attributes have high self-esteem, perform at high levels, are happy, and appear to be quite resilient, despite their negative experiences").

334.   Crocker et al., *supra* note 229, at 521.

335.   Allen v. Wright, 468 U.S. 750, 754–55 (1984).

336.   *Id.* at 755.

337.   *Id.* at 751 (stating that "the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition"); CHEMERINSKY, *supra* note 66, at 68 (explaining that "no formula exists for determining what types of injuries are adequate to allow a plaintiff standing to sue in federal court").

abstract, as if the distinction were obvious. But the distinction is not obvious, and if we are to determine whether stigmatic harm is sufficiently concrete for standing, we need to understand what the Court means when it uses that term.

One possibility is that the Court uses the term "concrete" to refer to something that is real, not imaginary. A concrete harm would thus be one "existing in reality or in real experience,"[338] as opposed to one existing only in the imagination of the plaintiff. But if that is the definition of concrete, stigmatic harm would certainly qualify. Social scientists have amply documented the harms suffered by the stigmatized, from discrimination and prejudice to threats to self-esteem to self-fulfilling prophecies.[339] Even the Court does not appear to deny that stigmatic harm is real. In *Allen*, the Court acknowledged that stigma is "one of the most serious consequences of discriminatory government action."[340] The Court has also relied on the existence of stigmatic harm to find equal protection violations in cases such as *Brown v. Board of Education*[341] and *Strauder v. West Virginia*.[342] And in *Lawrence v. Texas*, Justice Kennedy wrote that the stigma imposed by the Texas sodomy law "[was] not trivial,"[343] while Justice O'Connor explained that it "subject[ed] homosexuals to 'a lifelong penalty and stigma.'"[344] Thus, *Allen* cannot rest on a conclusion that stigmatic harm is merely imaginary.

Another possibility is that concrete refers to something that is perceptible to the senses.[345] This definition might exclude stigmatic harm, since one cannot see or touch the disgrace of stigma. But this definition would also exclude many other types of harm the Court has recognized as establishing standing. One cannot see or touch the harm experienced by someone who loses the ability to enjoy a forest or see a species of animal.[346] Nor can one see or touch the representational harms in *United States v. Hays*,[347] the loss of opportunity in *Northeastern Florida Contractors*,[348] or the

---

338.  THE AMERICAN HERITAGE COLLEGE DICTIONARY 297 (4th ed. 2002).

339.  *See supra* Part III.C.

340.  *Allen*, 468 U.S. at 755.

341.  Brown v. Bd. of Educ., 347 U.S. 483 (1954).

342.  Strauder v. West Virginia, 100 U.S. 303 (1880).

343.  Lawrence v. Texas, 539 U.S. 558, 575 (2003).

344.  *Id.* at 584 (O'Connor, J., concurring) (quoting Plyler v. Doe, 457 U.S. 202, 239 (1982) (Powell, J., concurring)).

345.  *See* THE AMERICAN HERITAGE COLLEGE DICTIONARY, *supra* note 338, at 297 (defining "concrete" as "perceptible by the senses").

346.  *See* Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 686 (1973) (finding standing where plaintiffs alleged only "harm to their use and enjoyment of . . . natural resources").

347.  United States v. Hays, 515 U.S. 737, 744–45 (1995).

increased competition in *Data Processing*.[349] In fact, other than physical injury and possibly loss of money, very few of the harms the Court recognizes can be seen or touched.

Perhaps by concrete the Court simply means that the harm must be specific or particular to the plaintiff.[350] Indeed, the Court has often stated that plaintiffs must allege a harm that is personal, not general or widely shared.[351] And it has sometimes seemed to use terms such as "concrete" and "personal" interchangeably.[352] But there are two problems with this definition. First, *FEC v. Akins* made clear that standing will not be denied to plaintiffs just because the injuries they suffer are widespread.[353] "[W]here a harm is concrete, though widely shared," the Court held, the injury-in-fact requirement is satisfied.[354] Second, even if concrete means personal or particularized, stigmatic harm would seem to qualify. The Court has traditionally defined generalized injuries as those common to all members of society, such as when the government fails to follow the law.[355] But stigmatic harm is not experienced by everyone in society; it is experienced only by the members of the stigmatized group. Moreover, even within a stigmatized group, the experience differs from person to person.[356] Thus, just as all people who are denied the right to vote suffer a particularized injury, so all people who are stigmatized suffer an injury that is specific and personal to them.[357]

Finally, the Court may use the term "concrete" to distinguish between plaintiffs who simply disagree with the government's action and those with an interest in the case beyond their personal views. In other words, the Court might define a concrete injury as one that is non-ideological. As with

---

348.   Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 664–66 (1993).

349.   Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 152 (1970).

350.   *See* THE AMERICAN HERITAGE COLLEGE DICTIONARY, *supra* note 338, at 297 (defining "concrete" as "of or relating to an actual, specific thing or instance; particular").

351.   *E.g.*, Raines v. Byrd, 521 U.S. 811, 818 (1997) ("[A] plaintiff must allege . . . *personal injury* . . . ."); *Lujan*, 504 U.S. at 560 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way."); *Ex parte* Lévitt, 302 U.S. 633, 636 (1937) (stating that a plaintiff must allege some "direct injury" and that "it is not sufficient that he has merely a general interest common to all members of the public"); Massachusetts v. Mellon, 262 U.S. 447, 488 (1923) (stating that a plaintiff must allege some "direct injury . . . and not merely that he suffers in some indefinite way with people generally").

352.   *See* FEC v. Akins, 524 U.S. 11, 24–25 (1998) ("[T]he informational injury at issue here . . . is sufficiently concrete and specific . . . ."); *see also Lujan*, 504 U.S. at 581 (Kennedy, J., concurring) ("[T]he party bringing suit must show that the action injures him in a concrete and personal way.").

353.   *Akins*, 524 U.S. at 24.

354.   *Id.*

355.   CHEMERINSKY, *supra* note 66, at 89–90.

356.   *See supra* note 332 and accompanying text.

357.   *Akins*, 524 U.S. at 35 (Scalia, J., dissenting).

# EXHIBIT K - DECLARATION 15

STIGMATIC HARM AND STANDING                                461

the previous possibility, there is support in the case law for this definition. The Court has often stated that "a mere 'interest in a problem'" is not sufficient for standing,[358] a statement that generally is interpreted as barring purely ideological plaintiffs.[359] Moreover, the Court has made clear that the primary goal of standing doctrine is to maintain the separation of powers by precluding parties from using the courts to reopen battles they lost in the political sphere.[360] Thus, it makes sense to deny standing to plaintiffs who are merely attempting to "'vindicat[e] . . . value interests.'"[361]

But that does not describe plaintiffs alleging stigmatic harm. It is true that such plaintiffs are likely to disagree ideologically with the government action that stigmatizes them. And if they succeed, their value interests may be vindicated. But their ideological disagreement with the government is not the source of their injury. They are injured because the government's action brands them with a mark of disgrace that invites discrimination and prejudice against them, threatens their self-esteem, and makes them vulnerable to stereotype threats and self-fulfilling prophecies. And they suffer these injuries regardless of whether they disagree with the government's action or whether their value interests might be vindicated by a decision in their favor.

To see the point more clearly, imagine a law that stigmatizes African Americans. Now imagine two plaintiffs who challenge the law, one African American and the other a white civil rights activist. Both plaintiffs may disagree with the law, hold values that are in conflict with it, and feel they have been injured. The white plaintiff may even experience unease and anxiety because of the way African Americans are being treated. But any injury he suffers is due entirely to the fact that he disagrees with the law. If his value interests did not conflict with the law, he would suffer no harm. The African American plaintiff, by contrast, suffers an injury that is unrelated to his value interests. Even if he did not disagree with the law, he would still experience the harm of being stigmatized.[362] Thus, unlike the

---

358.   Sierra Club v. Morton, 405 U.S. 727, 739 (1972) (stating that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient" for standing); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 222 n.11 (1974) (same); United States v. Richardson, 418 U.S. 166, 177 (1974) (same).

359.   CHEMERINSKY, *supra* note 66, at 63.

360.   Lujan v. Defenders of Wildlife, 504 U.S. 555, 577 (1992); Allen v. Wright, 468 U.S. 737, 752 (1984).

361.   *Allen*, 468 U.S. at 756 (quoting United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 687 (1973)).

362.   One might argue that a person cannot be stigmatized by a law with which he agrees. But social scientists have shown that members of stigmatized groups often accept and contribute to the cultural beliefs that underlie their stigma. *See* Coleman, *supra* note 255, at 224; Gibbons, *supra* note 276, at 132–33; Hebl et al., *supra* note 275, at 289; Lenhardt, *supra* note 228, at 842. Moreover, although an African American who supports a law that stigmatizes him

# EXHIBIT K - DECLARATION 15

white plaintiff, whose injury flows entirely from his ideological interest in the case, the African American plaintiff has an interest that is unrelated to his personal views. And if a concrete injury is one that is non-ideological, the African American plaintiff should have standing.

This list may not exhaust all the possible definitions of concrete. But it is hard to see how any definition could include all the injuries the Court has recognized—aesthetic harm,[363] loss of opportunity,[364] the ability to live in an integrated neighborhood,[365] increased competition[366]—and yet not include stigmatic harm. Moreover, recognizing stigmatic harm as a basis for standing does not undermine the primary goal of the standing doctrine, which is to maintain the separation of powers. Therefore, stigmatic harm seems sufficiently concrete to support Article III standing.

## IV. POTENTIAL OBJECTIONS

Even if I am right about this, however, there are several objections that might be raised. In this Part, I explain why none of them are insurmountable. Although some objections are stronger than others, most suffer from the same flaw, which is that they are equally applicable to many other types of injury that are already sufficient for standing. Perhaps we are too accustomed to these injuries to appreciate some of the problems they raise. But once we realize that the problems posed by stigmatic harm are no greater than the problems posed by other injuries, it seems arbitrary to reject stigmatic harm as a basis for standing. To the extent we are willing to base standing on other types of harm despite the complications involved, we should also be willing to base standing on stigmatic harm.

### A. QUESTIONS OF CAUSATION AND REDRESSABILITY

The first objection revolves around issues of causation and redressability. As explained above, the Court has held that a plaintiff must do more than allege an injury in fact to establish standing.[367] A plaintiff must also show that the injury is fairly traceable to the defendant's conduct and is likely to be redressed by a decision in his favor.[368] In *Warth v. Seldin*, for instance, the Court denied standing to low-income residents of Rochester, New York, who challenged exclusionary zoning practices in the nearby

---

may not suffer a loss of self-esteem, he will still face the prejudice and discrimination that the stigmatizing law invites.

363.    *Students Challenging Regulatory Agency Procedures*, 412 U.S. at 686–87.

364.    Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 664–66 (1993).

365.    Havens Realty Corp. v. Coleman, 455 U.S. 363, 375–78 (1982).

366.    Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 152 (1970).

367.    *See supra* note 72 and accompanying text.

368.    Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).

STIGMATIC HARM AND STANDING                                           463

suburb of Penfield.[369] The Court agreed that the plaintiffs' inability to find affordable housing in Penfield was an injury in fact.[370] But it said there was no evidence that developers in Penfield had been willing to build affordable housing in the past or that they would do so in the future if the zoning laws were struck down.[371] As a result, the Court concluded, the plaintiffs had failed to establish that their injury was caused by Penfield or would be redressed by a decision in their favor.[372]

An argument along similar lines might be made about stigmatic harm. As my discussion in Part III made clear, traits are not inherently stigmatizing. Instead, they become stigmatizing because of the social meaning they acquire. This meaning is often shaped by the law, but it is also influenced by other forces in society. Consider homosexuality, which is generally considered to be a stigmatizing trait in the United States.[373] Legal prohibitions on sodomy and gay marriage certainly have contributed to the discredited status of homosexuality.[374] But even if the law did not target gays and lesbians, it seems likely that homosexuality would still be a stigmatizing trait. Most mainstream religions in the United States disapprove of homosexuality, and the Catholic Church, which is the country's largest single religious institution, has taken a particularly strong stance against homosexual conduct.[375] In addition, there are many non-religious conservative forces in the United States that regard homosexuality as unnatural and perverted.[376] Thus, one might argue that laws against sodomy and gay marriage have not caused the stigmatic harm experienced by gays and lesbians because they were stigmatized before those laws were passed and would continue to be stigmatized even if such laws were struck down.

It is true that much of the harm experienced by the stigmatized likely would exist even in the absence of government action. It is also true that we cannot measure precisely the extent to which government action in a given case contributes to stigmatic harm. But it seems clear that when the government stigmatizes members of a particular group, it exacerbates the

---

369.    Warth v. Seldin, 422 U.S. 490, 502–08 (1975).

370.    *Id.* at 505.

371.    *Id.* at 505–07.

372.    *Id.* at 505–06.

373.    Stafford & Scott, *supra* note 248, at 77, 80; Stangor & Crandall, *supra* note 247, at 66.

374.    Leslie, *supra* note 10, at 29–30.

375.    *See, e.g.,* Ian Fisher, *Vatican Officially Releases Document on Banning New Gay Priests,* N.Y. TIMES, Nov. 30, 2005, at A6; Edward Tivnan, *Homosexuals and the Churches,* N.Y. TIMES, Oct. 11, 1987, § 6 ("Traditionally, Christian denominations condemn homosexual behavior as sinful . . . .").

376.    *See, e.g.,* Judith Davidoff, *Focus on Family Joins Fray: Registers to Oppose Same-Sex Marriage,* CAP. TIMES (Madison, Wis.), Sept. 11, 2006, at A1 (detailing the conservative group's efforts to fund anti-gay-marriage legislation in Wisconsin and other states); Lisa Anderson, *Both Sides Putting Faith in Appeals to Religious Voters,* CHI. TRIB., Oct. 7, 2004, at C1 (describing the Republican Party's 2004 platform against gay marriage).

# EXHIBIT K - DECLARATION 15

harm they experience. By reinforcing the social belief that those with a particular trait are discredited, the government adds to the prejudice and discrimination against them, creates additional threats to their self-esteem, and reaffirms the stereotypes that lead to self-fulfilling prophecies. The government's role also likely increases the intensity of these harms, particularly the threat to self-esteem.[377]

Moreover, standing doctrine does not require a plaintiff to show that the defendant is the sole cause of his injuries. Nor does it require a plaintiff to show "that a favorable decision will relieve his *every* injury."[378] To see this point, imagine a plaintiff who alleges that a newly adopted agency rule will cause his business to lose money. Now imagine that other factors are also likely to hurt the plaintiff's business. A recession may be underway. Demand for the plaintiff's product may be declining due to changing tastes and needs. The plaintiff's employees may be threatening to strike unless they receive higher wages. All of these factors will contribute to the plaintiff's loss of money. In fact, the plaintiff may lose $10 million as a result of these factors and only $1,000 as a result of the agency rule. Yet the Court would not deny standing to the plaintiff on the ground that he would suffer economic harm even without the agency rule. It is sufficient for standing that the agency rule is likely to cause the plaintiff some economic harm and that invalidation of the rule would redress that harm.[379]

One might argue that this example is different from a case involving stigmatic harm because my imaginary business owner at least can specify how much of his economic loss is attributable to the agency rule. But in the real world, this is not often the case. Plaintiffs seeking injunctive relief are rarely able to demonstrate precisely how much money they will lose as a result of government action. Nor does the Court require them to do so.[380] Recall *Association of Data Processing Service Organizations v. Camp*,[381] where the Court first announced the injury-in-fact requirement. There, data processing companies alleged that the comptroller's new rule would cause increased competition that "might entail some future loss of profits."[382] They did not indicate how much money they expected to lose or how much of the total

---

377. To use the language of torts, we might say there are multiple and sufficient causes of stigmatic harm. *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARM § 27 cmt. a (Proposed Final Draft No. 1, 2005) (describing the concept of multiple and sufficient causes). Just as two fires that converge upon a house are each sufficient to damage the house, *see* Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry., 179 N.W. 45, 48–49 (Minn. 1920), so government action and social forces are each sufficient to inflict stigmatic harm.

378. Larson v. Valente, 456 U.S. 228, 244 n.15 (1982).

379. *See id.* ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.").

380. Of course, a plaintiff seeking compensatory damages must show how much money he has lost.

381. Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150 (1970).

382. *Id.* at 152.

Healy_CE_AU                                          3/7/2007 11:41:23 AM

*STIGMATIC HARM AND STANDING*                          465

money they might lose in future years would be attributable to the comptroller's rule.[383] Yet the Court held that the plaintiffs had standing.[384]

Even if one accepts that stigmatic harm can sometimes be attributed to government action, one might argue that in certain cases the link is too attenuated to support standing. For instance, if the police force in a small East Coast city implements a policy of racial profiling that targets African Americans, it seems reasonable to conclude that this policy will contribute to the stigmatization of African Americans living in that city. It may even contribute to the stigmatic harms experienced by African Americans throughout the state. But is it plausible to suggest that the policy will make life worse for African Americans in Alaska? Will anyone in Alaska learn of the policy? And even if they do, is the action of a police force thousands of miles away likely to contribute significantly to the cultural beliefs about blacks in Alaska?

The Court was likely expressing this concern in *Allen* when it argued that recognizing standing for stigmatic harm would allow "[a] black person in Hawaii [to] challenge the grant of a tax exemption to a racially discriminatory school in Maine."[385] Indeed, given the Court's acknowledgment in *Allen* that stigmatic harm "is one of the most serious consequences of discriminatory government action,"[386] its characterization of stigmatic harm as abstract may have been driven more by concerns about causation than by concerns about concreteness.

While this may be a legitimate concern, there is a relatively easy solution to the problem, which was suggested by Justice Brennan in his *Allen* dissent.[387] Instead of granting standing to "all members of the particular racial groups" that are stigmatized by government action, the Court could limit standing to those stigmatized individuals who live or work within the political subdivision (e.g., county or city) in which the government action takes place.[388] Under this approach, the black parents in *Allen* would have standing because they lived in cities in which the IRS was failing to enforce the tax laws against allegedly discriminatory schools.[389] But black parents

---

383. *Id.*

384. *Id.*; *see also* Clinton v. New York, 524 U.S. 417, 432–33 (1998) (holding that the presidential veto of a statutory provision "inflicted a sufficient likelihood of economic injury to establish standing" without requiring plaintiffs to specify the extent of their likely economic loss).

385. Allen v. Wright, 468 U.S. 737, 755–56 (1984).

386. *Id.* at 755.

387. *Id.* at 770 n.3 (Brennan, J., dissenting).

388. For a similar suggestion, *see* Note, *Expressive Harms and Standing*, *supra* note 13, at 1327.

389. *Allen*, 468 U.S. at 770 n.3 (Brennan, J., dissenting). Of course, this assumes that the IRS's failure to enforce these laws stigmatized African Americans. For my argument that it did, see *infra* Part V.A.1.

living across the country would not have standing because whatever stigmatic harm they experienced would not be fairly traceable to the IRS's policy.

There are two advantages to this approach. First, it is consistent with the approach taken in other standing cases. For instance, some lower courts have held that plaintiffs have standing to challenge government displays of religious symbols only if they are forced to confront the display as part of their regular routine.[390] In addition, the Supreme Court has held that only those citizens living within an allegedly gerrymandered district have standing to challenge the drawing of that district.[391] Second, this approach mitigates separation-of-powers concerns. Because standing is limited to those living or working within the political subdivision in which the stigmatizing action occurs, there is less risk that the Court will be transformed into a "'vehicle for the vindication of the value interests of concerned bystanders.'"[392]

Of course, there are some cases in which the stigmatizing action does not occur within the confines of a single city or county. When Congress passed the Defense of Marriage Act,[393] defining marriage exclusively as the union of a man and a woman, that action stigmatized gays and lesbians across the country. In such cases, standing should extend nationwide to any member of the stigmatized group. But in cases involving the actions of city and state governments, or those in which the federal government acts within a confined political subdivision, standing should be limited to those living and working within the community in which the stigmatizing action takes place.

### B.  PROVING STIGMATIC HARM

A second possible objection is that there is no objective way to determine whether a plaintiff has been stigmatized. When a plaintiff alleges that a law has caused him economic loss, he can point to his bank records as evidence. Even a plaintiff who alleges an aesthetic injury can describe the forest or river he enjoys and the way in which that enjoyment will be diminished by the challenged action.[394] But when a plaintiff alleges that government action stigmatizes him, how do we know whether this is true? Aside from the plaintiff's assertion, what evidence is there to substantiate his claim? And how can a court possibly make this determination?

This may be the most serious challenge to my argument, in part because it is a problem that is unique to stigmatic harm. But although this problem is unique to stigmatic harm, it is not a new problem. For many years, scholars

---

390.   *See* Rohr, *supra* note 159, at 508–09.

391.   *See* Bush v. Vera, 517 U.S. 952, 957 (1996); Shaw v. Hunt, 517 U.S. 899, 904 (1996); United States v. Hays, 515 U.S. 737, 744–45 (1995).

392.   *Allen*, 468 U.S. at 756 (quoting United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 687 (1973)).

393.   28 U.S.C. § 1738C (2000).

394.   *See* Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181–83 (2000).

STIGMATIC HARM AND STANDING                        467

of race and equality have been arguing that the Equal Protection Clause should be interpreted to prohibit actions that stigmatize racial minorities. In doing so, they have explored various ways for courts to determine when government action inflicts stigmatic harm.

Nearly two decades ago, Charles Lawrence argued that the Equal Protection Clause should be interpreted not only to prohibit intentional discrimination, but also to prohibit government action motivated by unconscious racism.[395] According to Lawrence, "a large part of the behavior that produces racial discrimination is influenced by unconscious racial motivation."[396] But unconscious racism, by its very nature, is not easy to identify. So Lawrence proposed a test to uncover race-based behavior in the context of equal protection. He argued that courts should look to the "cultural meaning" of the challenged action to determine whether it was motivated by unconscious racism.[397] Government actors are part of the larger culture and share in society's beliefs and understandings, Lawrence explained.[398] Therefore, if a significant portion of the population viewed the challenged action in racial terms, a court would "presume that socially shared, unconscious racial attitudes made evident by the action's meanings had influenced the decisionmakers. As a result, it would apply heightened scrutiny."[399]

Lawrence proposed the cultural meaning test to identify acts motivated by unconscious racism. But it can also be used to determine whether government action is stigmatizing. As explained above, stigma is a social construct.[400] Traits and characteristics are not inherently discrediting; they become discrediting because of the meaning they acquire in the context of a particular culture. This meaning becomes part of our collective understanding through a process of social learning.[401] As a result, social scientists say that "in any given social unit, there is likely to be a high degree of consensus about what is considered a stigma."[402]

To borrow an example from Lawrence, consider segregated toilets. In our society, men and women are usually required to use different bathrooms. But the cultural meaning of this requirement is not one that

---

395. *See* Charles R. Lawrence, III, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism*, 39 STAN. L. REV. 317, 323–24 (1987).

396. *Id.* at 322.

397. *Id.* at 324.

398. *See id.*

399. *Id.* at 356.

400. *See supra* Part III.A.

401. *See supra* notes 253–56 and accompanying text.

402. Stafford & Scott, *supra* note 248, at 85; *see also* Stangor & Crandall, *supra* note 247, at 72 ("In sum, consensus theories suggest that there will be general, but not perfect, agreement among the members of a society because they share communications with each other, and this results in shared group representations."); Becker & Arnold, *supra* note 251, at 40; Crocker et al., *supra* note 229, at 511.

stigmatizes women because "our society does not ordinarily interpret sex-segregated toilet facilities as designating the inferiority of women. By contrast, the black who is asked to use a different public bathroom from that of a white companion of the same gender is stigmatized."[403] Given the history of segregation in this country, the cultural meaning of this requirement is clear: blacks are dirty and impure and not fit to mix with whites.[404]

Of course, this is an easy example, where the cultural meaning of the act in question is relatively clear. But there are other cases in which the cultural meaning of government action is less clear. Take affirmative action. Many people believe that affirmative action sends a positive message about minorities—and in particular about African Americans—in this country. Affirmative action, from this vantage, does not designate the inferiority of African Americans or other minorities; instead, it reflects a willingness to make up for past sins and to recognize the basic equality of all people. But some prominent scholars and judges have argued that affirmative action sends a different message. To them, granting special privileges to African Americans sends a message that blacks cannot compete on their own and need the government's intervention to achieve social and financial equality.[405] In the words of Justice Thomas, affirmative action programs "stamp minorities with a badge of inferiority."[406]

When views about the meaning of government action vary this dramatically, how can a court determine what the cultural meaning of the action is? Does it even make sense to talk about a single cultural meaning? Or does the meaning of every action depend upon the interpretive community of which one is a member?[407]

Several scholars have attempted to answer these questions. In a recent article, for instance, Professor Robin Lenhardt proposes what she calls a "structured analysis" for determining whether a challenged policy stigmatizes racial minorities.[408] Under Lenhardt's analysis, a court would first look to the socio-historic context of the challenged policy, asking whether there are historical analogues that might shed light on its meaning. Next, a court would examine the current context of the policy, taking into account its impact on minority groups. Finally, a court would look to the likely future effects of the policy, examining how it might affect the ability of minorities

---

403.   Lawrence, *supra* note 395, at 351–52.

404.   *See id.* at 351.

405.   *See* CARL COHEN & JAMES P. STERBA, AFFIRMATIVE ACTION AND RACIAL PREFERENCE: A DEBATE 164 (2003); PETER H. SHUCK, DIVERSITY IN AMERICA: KEEPING GOVERNMENT AT A SAFE DISTANCE 155 (2003).

406.   Grutter v. Bollinger, 539 U.S. 306, 373 (2003) (Thomas, J., dissenting).

407.   *See* Todd Rakoff, Washington v. Davis *and the Objective Theory of Contracts*, 29 HARV. C.R.-C.L. L. REV. 63, 84 (1994) (posing a similar question).

408.   Lenhardt, *supra* note 228, at 809, 890–96.

*STIGMATIC HARM AND STANDING*                                            469

to participate in society as full and equal citizens. At any step in the analysis, a court might consider testimony from experts, such as sociologists, historians, and economists.[409] A court might also hear testimony from members of the group alleged to be stigmatized.[410] Lenhardt acknowledges that her test will not eliminate all disputes about the cultural meaning of government actions.[411] But she argues that her "structured" approach will provide needed guidance to courts in making this determination.[412]

Professor Jerry Kang has also proposed a method for identifying the social meaning of government actions. "Social meaning is the meaning gleaned by interpreting the governmental practice, its text, history, and implementation in the context of American culture."[413] Kang suggests a two-step process for determining whether the social meaning of a challenged practice is stigmatizing. First, a court would consider the meaning of the governmental action from the perspective of each side to the dispute.[414] Second, the court would step back and test "the various social meanings" for "blind spots, insensitivities, and oversensitivities."[415] In doing so, the court would be guided by prior cases and "moments in legal history that generated similar disputes over the meaning of governmental acts."[416] The goal is to "reconstitute an 'objective' social meaning that gives due respect to the concept of equality."[417]

Professor Deborah Hellman proposes a less structured approach.[418] Instead of creating a multi-step test, she says a court seeking to identify the social meaning of government action must be guided by the principle of coherence.[419] "The interpretation given to a practice must . . . 'fit' other aspects of the social world of which the practice is a part," Hellman argues.[420] "Those interpretations that cohere with more extensive aspects of the social reality, which make sense of them as well as of the particular practice whose meaning is being evaluated, are better for that reason."[421] But how can we decide which interpretation is more coherent with the broader social reality? Drawing on the work of Jurgen Habermas, Hellman responds that the

---

409.   *Id.* at 893.

410.   *Id.* at 893–94.

411.   *Id.* at 930.

412.   *Id.* at 890.

413.   Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability of Dworkin's Defense of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1, 25 (1996).

414.   *Id.* at 26.

415.   *Id.* at 27.

416.   *Id.*

417.   *Id.* at 27–28.

418.   *See* Deborah Hellman, *The Expressive Dimension of Equal Protection*, 85 Minn. L. Rev. 1, 21 (2000).

419.   *See id.*

420.   *Id.*

421.   *Id.*

HEALY_CE_AU                                                            3/7/2007 11:41:23 AM

470                    92 *IOWA LAW REVIEW*                [2007]

meaning of a law or policy is the one that members of society would arrive at if they discussed the issue "under fair conditions"—that is, "under conditions in which [all members of society] are equally able to contribute . . . and are committed to . . . learning" from each other.[422] Thus, a court seeking to identify the meaning of a challenged policy must attempt to replicate a Habermasian conversation by listening "closely . . . with an open mind to the views" of the parties and amici to a case.[423] Though not as formalized, Hellman's approach seeks to generate the same kind of empathic insights that Kang emphasizes in his two-step test.[424]

   I acknowledge that none of these approaches is entirely satisfying. Even under Lenhardt's test, which is the most detailed, there will still be many instances in which the social or cultural meaning of government action is not perfectly clear. But absolute clarity is probably impossible anyway. Instead, the determination of cultural meaning in most cases will come down to a judgment—albeit a judgment informed by evidence and arguments.[425]

   Moreover, absolute clarity is not necessary. Under the Court's standing doctrine, the plaintiff has the burden of establishing that he has suffered an injury in fact.[426] Thus, if the plaintiff can persuade a court, through the presentation of evidence and argument, that the cultural meaning of the challenged action is stigmatizing, he should be granted standing. However,

---

   422.   *Id.* at 23.

   423.   Hellman, *supra* note 418, at 23.

   424.   Kang and Hellman seek to identify the meaning of government action from the standpoint of an objective observer. *See* Hellman, *supra* note 418, at 24; Kang, *supra* note 413, at 25. In doing so, they follow the example of Justice O'Connor. Professor Rachel Godsil has advocated a different approach. She argues that courts should evaluate the meaning of government action not from the perspective of an objective observer in society at large, but from the perspective of "a reasonable member of the allegedly affected community." Rachel D. Godsil, *Expressivism, Empathy and Equality*, 36 U. MICH. J.L. REFORM 247, 285–94 (2003). Godsil's approach has much to recommend it. By focusing on the perspective of a defined community, it lessens the possibility of disagreement about the meaning of government action. But I am hesitant to embrace this approach for purposes of standing. When a reasonable member of the community at large views the government's action as stigmatizing, it is hard to claim the plaintiffs are simply trying to vindicate value interests. But when only the members of the affected community view the action as stigmatizing, this claim seems more plausible.

   425.   *See* Van Orden v. Perry, 545 U.S. 677, 700 (2005) (Breyer, J., concurring). Breyer states that in Establishment Clause cases:

      I see no test-related substitute for the exercise of legal judgment. That judgment is not a personal judgment. Rather, as in all constitutional cases, it must reflect and remain faithful to the underlying purposes of the Clause, and it must take account of context and consequences measured in light of those purposes.

*Id.* (internal citations omitted); *see also* Rakoff, *supra* note 407, at 88 (stating that the social meaning test calls for "the exercise of judgment based upon evidence").

   426.   *See* Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103–04 (1998) (stating that the party invoking federal jurisdiction has the burden of establishing injury in fact, causation, and redressability).

STIGMATIC HARM AND STANDING                                          471

if the plaintiff cannot make this case, standing should be denied. The burden of proof requirement will ensure that standing is recognized only when the cultural meaning of a challenged action is relatively clear. In cases where the cultural meaning is disputed and where an examination of historical and contemporary context cannot resolve the dispute, courts should deny standing.

Even if one accepts that the cultural meaning test is an appropriate and effective way to identify stigmatizing actions, several concerns remain. First, one might argue that judges are not competent to apply the cultural meaning test. Judges may be able to evaluate whether a plaintiff has lost money, faces increased competition, or has been deprived of the ability to enjoy a particular forest. But they are simply not competent to evaluate the meaning of social phenomenon.

However, judges often are called upon to evaluate cultural meaning.[427] In Establishment Clause cases, the Court frequently considers whether a particular religious display constitutes an endorsement of religion. In making this determination, the Court asks whether the display "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."[428] This focus on the message rather than on the government's intent requires the Court to make judgments about the cultural meaning of the display at issue.[429]

One might respond that this doctrine is itself misguided and therefore does not demonstrate that judges are competent to interpret cultural meaning. But the role of courts in evaluating cultural meaning is not limited to one or two doctrinal areas. As Professor Robert Post has recently argued, there is a "dialectical relationship" between constitutional law and culture so that "culture is inevitably (and properly) incorporated into the warp and woof of constitutional law."[430] Indeed, "if we conceptualize culture as including the full repertoire of a society's norms and meanings, it is difficult to imagine how a court could ever decide a case without relying upon cultural ideas and constructs."[431]

---

427. *See* Lawrence, *supra* note 395, at 358–59; *see also* Kang, *supra* note 413, at 26–28; Post, *supra* note 195, at 8, 77–81; Rakoff, *supra* note 407, at 89–90.

428. Lynch v. Donnelly, 465 U.S. 668, 687–88 (1984) (O'Connor, J., concurring).

429. *See* Lawrence, *supra* note 395, at 359. For recent and interesting examples, see *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 869 (2005) (holding that a reasonable observer would view the display of the Ten Commandments in a Kentucky courthouse as an endorsement of religion); *Van Orden v. Perry*, 545 U.S. 677, 698–703 (2005) (Breyer, J., concurring) (concluding that display of the Ten Commandments on the Texas State Capitol Grounds did not send a message of endorsement).

430. Post, *supra* note 195, at 8.

431. *Id.* at 77. To illustrate his point, Post examines the recent challenge to a federal law requiring public libraries that receive federal funds for Internet service to install filters to prevent patrons from accessing indecent material. *See* United States v. Am. Library Ass'n, 539

472                        92 *IOWA LAW REVIEW*                    [2007]

Second, one might think that the cultural meaning test is simply too complex and nuanced for purposes of standing. Standing is a threshold determination that should be relatively easy and straightforward. Indeed, one of the reasons the Court adopted the injury-in-fact test was because the legal interest test had become too difficult to apply.[432] Thus, one might legitimately object to the use of a test that asks courts to sift evidence and make sophisticated judgments about the meaning of government actions.

Although this is a serious objection, it ignores the extent to which many standing determinations are already very complex. Consider *Friends of the Earth v. Laidlaw Environmental Services*.[433] In that case, both sides analyzed in detail the affidavits filed by the plaintiffs to determine whether they had suffered an injury. In fact, the combined discussion of standing by the majority and the dissent covered twenty pages in the Federal Reporter.[434] Nor is that unusual. In *Animal Legal Defense Fund, Inc. v. Glickman*,[435] members of the D.C. Circuit engaged in a twenty-four-page debate over whether animal activists had standing to challenge the Department of Agriculture's regulations on the treatment of primates.[436] One might argue that these cases are simply evidence that standing doctrine has become too confused.[437] But that is an argument for overhauling standing doctrine entirely, not for denying standing only to those who allege stigmatic harm.[438] If we are willing to accept the complications involved in evaluating other types of harm, it is arbitrary to exclude stigmatic harm just because it also poses complications.

## C. OPENING THE FLOODGATES

The third main objection to the recognition of stigmatic harm as a basis for standing is that it will trigger a flood of lawsuits. If the government

---

U.S. 194, 198–201 (2003). Though the Court did not discuss cultural meaning explicitly, Post shows that the case did not "turn on legal material alone, but also on cultural meanings that the Court can discern only by drawing upon its knowledge as a literate participant in American culture." Post, *supra* note 195, at 79–80.

432.    *See* Sunstein, *supra* note 39, at 1450 (noting that the standing doctrine adopted in *Data Processing* was intended to ensure that "jurisdictional inquiries were reasonably simple and crisp, and did not unduly complicate the case before courts reached the merits").

433.    Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167 (2000).

434.    *See id.* at 180–88, 198–210.

435.    Animal Legal Def. Fund, Inc. v. Glickman, 154 F.3d 426 (D.C. Cir. 1998).

436.    *See id.* at 431–55. Although some of the discussion focused on causation and redressability, the discussion of injury in fact itself covered eleven pages. *See id.* at 431–38, 447–50.

437.    *See* Sunstein, *supra* note 39, at 1464 ("There is something seriously wrong with standing principles that produce so high a degree of confusion in what is, after all, a jurisdictional determination.").

438.    As discussed in Part II, several scholars have proposed an overhaul of standing doctrine. My own view is that, while standing doctrine might be clarified somewhat, it will always remain complex because access to federal courts is such a contested issue.

STIGMATIC HARM AND STANDING                                        473

inflicts stigmatic harm whenever it marks a group as discredited or disvalued, then nearly every criminal statute inflicts stigmatic harm.[439] And if stigmatic harm is sufficient for standing, anyone who engages in activity that has been criminalized would have standing to challenge the law making that activity criminal, even if the person has not been arrested. Thus, drug dealers might challenge federal statutes banning the distribution of illegal drugs, claiming that such laws stigmatize them. Pederasts might argue that they are stigmatized by laws barring sexual contact with children. And murderers might claim that homicide laws stigmatize them.

My initial response is that, unless arrested, no drug dealer or pederast would likely challenge the laws criminalizing those activities since doing so would require acknowledging that he deals drugs or molests children (or at least credibly intends to do so).[440] And if a drug dealer or pederast has been arrested, he does not need to rely on stigmatic harm. The threat of conviction is sufficient to give him standing to challenge the law under which he is being prosecuted.[441]

But the more important point is that there is a difference between having standing and having a meritorious claim, as the Court made clear in *Data Processing*.[442] To have standing means only that a plaintiff is permitted to be heard in federal court. The plaintiff must still show that the defendant violated a duty or obligation imposed by law. So although a drug dealer might have standing to challenge the federal drug statutes, he will not necessarily prevail. He must also show that the statutes are unlawful, either because they were not properly enacted, or violate the Constitution, or for some other reason. The same is true of laws banning molestation, murder, or any activity. A plaintiff may have standing to challenge these laws if he can show they stigmatize him. But that does not mean he has a meritorious claim.

Still, one might object that even if these lawsuits are dismissed for failure to state a claim, the courts will nonetheless be flooded with frivolous lawsuits. But it seems unlikely that a large number of plaintiffs would file lawsuits challenging criminal laws without any chance of success.[443] And in any event, the risk of frivolous lawsuits is present whenever the Court

439.   I say "nearly every" because some criminal laws do not seem to stigmatize those who violate them. The laws against speeding are one example. Speeders may receive tickets, but it would be a stretch to claim that they are deeply discredited.

440.   *See generally* Steffel v. Thompson, 415 U.S. 452 (1974) (reviewing the petitioner's prayer for injunctive relief where the petitioner's claim that the law infringed his constitutional right rested upon the petitioner's admission that he intended to commit the prohibited activity in the future).

441.   *See* Younger v. Harris, 401 U.S. 37, 42 (1971).

442.   Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970); *see supra* notes 55–68 and accompanying text.

443.   Even if they wanted to, their lawyers would be deterred, at least to some extent, by the risk of sanctions. *See* FED. R. CIV. P. 11(b)(2), (c).

recognizes a particular injury as sufficient for standing. By holding that economic loss qualifies as an injury in fact, the Court runs the risk that anyone who has lost money as the result of government action will file a lawsuit challenging that action. For instance, a thief might challenge the laws against robbery, arguing that they cause him economic harm. But the Court has not let that possibility stop it from recognizing economic harm as an injury in fact. Nor should the possibility of frivolous lawsuits prevent the Court from recognizing stigmatic harm as sufficient for standing.[444]

### D. FINDING THE BEST LITIGANT

Finally, one might object that someone who suffers stigmatic harm is not the best litigant to challenge a given policy or law. In a racial profiling case, for instance, one might argue that an individual who was arrested as a result of profiling would be in a better position to challenge the policy than someone who is merely stigmatized by the profiling. But despite occasional claims that standing doctrine ensures the participation of the best litigants, the Court has not adopted a best litigant rule, nor has it created a hierarchy of injuries. If one party stands to lose $1,000 as a result of an agency's action, the Court does not deny standing to that party just because another party stands to lose ten times that amount.[445] And if the members of an environmental organization claim that an agency's action impairs their enjoyment of natural resources, the Court does not deny standing to that party just because the action may cost another party millions of dollars.[446] Standing doctrine is not designed to ensure that the Court hears only from the best plaintiff. It is designed to ensure that the Court hears from a plaintiff with a sufficient stake in the outcome of the case to justify judicial intervention and to ensure an adverse presentation of the issues.[447] If stigmatic harm is concrete, a plaintiff who is stigmatized by unlawful governmental action satisfies that standard.

---

444.   *Cf.* Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 410 (1971) (Harlan, J., concurring) (arguing that "the possibility of 'frivolous' claims" does not "warrant[] closing the courthouse doors" to those with meritorious claims and that "[t]here are other ways . . . of coping with frivolous lawsuits").

445.   *See* United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14 (1973) (rejecting argument that standing is limited "to those who have been 'significantly' affected by agency action" and noting that "a direct stake in the outcome of a litigation—even though small" is sufficient for purposes of standing).

446.   *See id.* at 683–90 (holding that a student environmental group had standing to challenge a railroad surcharge because students alleged that the surcharge would reduce the use of recyclable materials and thus harm natural resources that students used for recreational and other purposes); *see also* Fletcher, *supra* note 40, at 244–45 (noting that shippers who had to pay the surcharge were "more directly and seriously affected than the students").

447.   *See* CHEMERINSKY, *supra* note 66, at 57–59.

*STIGMATIC HARM AND STANDING*                                              475

## V.   Stigmatic Harm in Application

So far, I have argued that stigmatic harm should be sufficient for purposes of standing. But whether or not I have been persuasive, one might wonder what difference this would make in practice. What would it mean to recognize stigmatic harm for purposes of standing? And what kinds of cases might be heard in federal court that cannot be heard under current standing rules?

Let me start by repeating what my argument would not mean. It would not mean that courts could strike down any stigmatizing action taken by the government. As explained above, a grant of standing means only that a plaintiff can be heard in federal court. The plaintiff must still show that the defendant violated a duty or obligation imposed by law.[448] Thus, the mere

---

448.   Presumably, a plaintiff must also have a cause of action, by which I mean some legal authorization to sue. I say "presumably" because the precise relationship between the concepts of standing and cause of action are somewhat murky. It is clear that having a cause of action does not relieve a plaintiff of the burden of establishing standing. *See supra* note 214 and accompanying text. In other words, having a cause of action is not enough; a plaintiff must also have standing. But is it enough to have standing? Or must a plaintiff also have a cause of action, whether provided explicitly by statute or implied by a statutory or constitutional provision?

Some writers claim the answer is obviously yes. *See* Currie, *supra* note 204, at 42 ("No one can sue, I should have thought, unless authorized by law to do so . . . ."); Sunstein, *supra* note 38, at 166 (stating that "an 'injury-in-fact' is neither a necessary nor a sufficient condition for standing"). The Court has been more equivocal. In some cases, it has allowed suits to proceed once it found plaintiffs had standing without asking whether plaintiffs had a cause of action. *See* Currie, *supra* note 204, at 42–47. In other cases, the Court has indicated that plaintiffs must have both standing and a cause of action. *See* Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414 U.S. 453, 464–65 (1974) (dismissing suit for lack of a cause of action and stating that it was thus unnecessary to reach the issue of standing). And the entire premise of the implied right-of-action cases is that, at least when one seeks damages, there must be authorization, explicit or implicit, to sue. *See* Chemerinsky, *supra* note 66, at 380–89.

Perhaps the clearest statement of the relationship between standing and cause of action is found in *Davis v. Passman*, 442 U.S. 228 (1979). "[*S*]*tanding* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy," the Court wrote. *Id.* at 239 n.18. "[*C*] *ause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court . . . ." *Id.* at 240 n.18. Under this formulation, both standing and a cause of action would seem to be necessary for a successful suit. Indeed, one might think the requirement of a cause of action is captured by the prudential prong of standing doctrine that prohibits a plaintiff from raising the rights of third parties. After all, to say that a plaintiff is attempting to enforce the rights of a third party is simply another way of saying that the plaintiff is not a member of the class of litigants that may sue. *See* Warth v. Seldin, 422 U.S. 490, 500 n.12 (1975) (noting the similarity between the two concepts).

There is also a link between cause of action and another prudential standing element, the zone-of-interests test. Under that test, a plaintiff must show that the interest he seeks to protect "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970). The zone-of-interests test "is not meant to be especially demanding." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987). A plaintiff need not show that the legal provision he invokes was intended to benefit him; he need only show "a plausible relationship" between his interests and the policies advanced by the provision. *Id.* at 400–03. Nonetheless, the test

# EXHIBIT K - DECLARATION 15

fact that government action stigmatizes a particular group does not mean that the action would be struck down. It means only that members of the stigmatized group would be able to argue that the challenged action is unlawful.

So what kinds of cases might plaintiffs bring? In this Part, I describe a number of situations in which plaintiffs likely would have standing to challenge stigmatizing actions. I first discuss three past cases in which the Court denied standing and explain how these cases might come out differently if stigmatic harm were sufficient for standing. I then discuss two additional scenarios in which plaintiffs might have standing on the basis of stigmatic harm. Of course, a court would have to determine in each of these cases whether the government action actually does stigmatize the plaintiffs, and that determination would turn on a full analysis of the evidence and arguments made by each side. For the sake of brevity, I do not attempt such an analysis here. Instead, I explain in broad terms why I think the plaintiffs would have standing on the basis of stigmatic harm.[449]

## A.  PAST CASES

### 1.  *Allen v. Wright*

The first case that might come out differently under my argument is *Allen v. Wright*.[450] Recall that the plaintiffs in *Allen* were black parents who alleged that the IRS was granting tax-exempt status to racially discriminatory private schools. In earlier cases, the Supreme Court had held that the Internal Revenue Code forbids the granting of tax-exempt status to such schools.[451] Thus, if the plaintiffs' allegations were correct, the IRS was

---

resembles the cause-of-action inquiry in that both look to the legal provision at issue to determine whether the plaintiff is authorized to seek judicial relief.

449.   I also identify in each example the cause of action that authorizes suit to be brought, and I mention briefly whether the zone-of-interests test appears to be met. *See supra* note 448. I do not analyze the zone-of-interests question in detail because doing so would require a full analysis of the statutory regime at issue in each example. *See Clarke*, 479 U.S. at 401 (stating that, in determining whether plaintiff has met the zone-of-interests test, the Court is not limited to considering the statute under which the plaintiff sued, "but may consider any provision that helps us to understand Congress' overall purposes" in the relevant regulatory scheme). Such an analysis would take me far beyond the purpose of this Part, which is to suggest areas in which stigmatic harm might help plaintiffs obtain standing without definitively resolving all the questions that would be raised in each case. I also limit my examples to requests for injunctive relief to avoid the complexities that are raised when plaintiffs seek money damages. *See* CHEMERINSKY, *supra* note 66, at 380–89 (discussing the issue of implied rights of action).

450.   Allen v. Wright, 468 U.S. 737 (1984).

451.   *See* Bob Jones Univ. v. United States, 461 U.S. 574, 585–602 (1983); Coit v. Green, 404 U.S. 997, 997 (1971) (summarily affirming district court order enjoining IRS from granting tax exempt status to racially discriminatory schools in Mississippi).

STIGMATIC HARM AND STANDING                                                  477

violating federal law. The only question is whether the plaintiffs were
entitled to have their allegations heard in federal court.[452]

If stigmatic harm were sufficient for standing, the answer likely would
have been yes. By itself, I acknowledge, the failure of the government to
enforce a law benefiting a particular group is not necessarily stigmatizing. If
the IRS failed to deny tax-exempt status to for-profit schools, it would be a
stretch to conclude that those attending non-profit schools had been
stigmatized. However, there are two factors supporting the conclusion that
the IRS's failure to deny tax-exempt status to racially discriminatory schools
stigmatized African Americans.

First, there is the historical context. For centuries, African Americans
were the victims of a legally sanctioned regime of slavery that denied them
any claim of equal citizenship. Slavery ended in 1863, but in many parts of
the country the law continued to treat African Americans as second-class
citizens, denying them access to housing, employment, education, and the
ballot box.[453] Government officials also refused to protect blacks from
violence and discrimination in the private sphere.[454] Given this history of
racial discrimination and the repeated failure of government officials to
provide equal protection for African Americans, the IRS's failure to enforce
antidiscrimination laws enacted for their benefit seems clearly stigmatizing.

Second, there is the sequence of events behind the *Allen* litigation. As
explained in Part I.B, *Allen* arose in the aftermath of the Supreme Court's
decision in *Brown v. Board of Education*.[455] Although that decision declared
segregation unconstitutional, many southern school districts refused to
implement *Brown*'s mandate.[456] Others attempted to circumvent *Brown* by
starving the public schools of money and encouraging the creation of
racially discriminatory private schools.[457] The IRS initially abetted this
strategy by declaring that these schools were eligible for tax-exempt status as

---

452.    In its decision in *Allen*, the Supreme Court did not indicate the source of the plaintiff's
cause of action. It could not have been the provisions of the Internal Revenue Code invoked by the
plaintiffs because those provisions, although they imposed certain duties on the IRS, did
not expressly confer upon the plaintiffs a right to sue. *See* Bellia, *supra* note 210, at 833.
However, the plaintiffs could have pointed to 5 U.S.C. § 702, which provides that "[a] person
suffering legal wrong because of agency action, or adversely affected or aggrieved by agency
action within the meaning of a relevant statute, is entitled to judicial review thereof." This
provision permits plaintiffs to seek judicial review of "final agency action" that injures them
even if the particular statute that the agency allegedly violated does not provide a cause of
action. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990) (citing 5 U.S.C. § 704). The only
limit is that the plaintiffs must show that they are within the zone of interests sought to be
protected by the statute in question. *See id.* As explained, *supra* note 448, this is not a
demanding test, and it seems likely that the plaintiffs in *Allen* could have met it.

453.    *See* Kluger, *supra* note 88, at 748.

454.    *See id.*

455.    Brown v. Bd. of Educ., 347 U.S. 483 (1954).

456.    Kluger, *supra* note 88, at 751–52.

457.    *See id.* at 523, 777–78.

# EXHIBIT K - DECLARATION 15

478            92 *IOWA LAW REVIEW*            [2007]

long as they did not receive state aid.[458] It was only when a federal court ruled that this policy violated federal law that the IRS changed its position.[459] And even then, according to the plaintiffs' allegations, the IRS did not fully enforce the law.[460] It permitted racially discriminatory schools to qualify for tax-exempt status as long as they certified that they did not discriminate, even if they actually did.[461]

The result was that, in spite of *Brown*, many public school systems remained segregated.[462] The IRS did not create this situation, but by refusing to enforce the law, it placed the government's stamp of approval on the efforts to undermine *Brown*. And taken together with the historical treatment of African Americans, its actions sent the message that blacks are second-class citizens not worthy of the law's protection. Thus, black parents in school districts in which racially discriminatory schools received tax-exempt status should have been granted standing to challenge the IRS's policies.[463]

### 2. *Linda R.S. v. Richard D.*

The second case that might come out differently is *Linda R.S. v. Richard D.*[464] In that case, an unwed mother challenged a Texas criminal statute that had been interpreted to require the payment of child support from fathers of legitimate children but not from fathers of illegitimate children.[465] The mother claimed the policy violated the Equal Protection Clause because it discriminated on the basis of legitimacy.[466] The Court had previously struck

---

458.    *See supra* note 89 and accompanying text.

459.    *See supra* notes 89–90 and accompanying text.

460.    Allen v. Wright, 468 U.S. 737, 744–45 (1984).

461.    *Id.* at 744.

462.    *Id.*

463.    Though it did not engage in extensive analysis, the court of appeals in *Allen* also reached the conclusion that the IRS's actions stigmatized African Americans. *Allen*, 468 U.S. at 755; *see* Wright v. Regan, 656 F.2d 820, 827 (D.C. Cir. 1981). The Supreme Court overruled that decision because it rejected the view that stigmatic harm is sufficient for standing. *See Allen*, 468 U.S. at 755–57. But it expressed no opinion as to whether the plaintiffs had actually been stigmatized. *See id.*

464.    Linda R.S. v. Richard D., 410 U.S. 614 (1973).

465.    *Id.* at 614–15.

466.    *Id.* at 616. As in *Allen*, the Court did not indicate the source of the plaintiff's cause of action, but the lower court opinion suggests that it was 42 U.S.C. § 1983. Linda R.S. v. Richard D., 335 F. Supp. 804, 808 (N.D. Tex. 1971) (Hughes, J., dissenting). That statute provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

down other laws that discriminated against illegitimate children.[467] But in *Linda R.S.*, it ruled that the mother lacked standing.[468] In an early articulation of the causation and redressability requirements, the Court held that there was no "'direct' relationship between the alleged injury and the claim sought to be adjudicated."[469] Even if the mother won her claim, the Court stated, there was no assurance the father would pay child support instead of going to jail.[470]

If stigmatic harm were recognized as an injury in fact, the mother in this case likely would have standing. Illegitimate children and their mothers have long been stigmatized in this country. For many years, illegitimate children were considered "filius nullius"—a child of no one—and were not provided the same rights as legitimate children.[471] Many states denied them the ability to inherit from their parents, to sue for the wrongful death of their parents, or to receive welfare benefits.[472] The stigma of illegitimacy has lessened somewhat over time, as the number of illegitimate births has increased and as alternative models of the family have become more accepted.[473] But in 1972, the year in which *Linda R.S.* was decided, illegitimate children and their mothers were still frequently subject to prejudice and discrimination.[474] Moreover, the state's exclusion of

---

42 U.S.C. § 1983 (2000). The mother in *Linda R.S.* alleged that the defendants violated her rights under the Equal Protection Clause, so § 1983 authorized her to sue. Her interest in the case—to be free from discrimination based on the legitimacy of her child—would also appear to be within the zone of interests of both § 1983 and the Equal Protection Clause because it is "plausibly related" to the purposes advanced by those provisions. And the bar on third-party standing was not an issue because parents generally can sue as "next friend" on behalf of their minor children. *See, e.g.*, Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 290 (2000) (hearing claim brought by a mother as next friend of her minor children).

467.   *See, e.g.*, Gomez v. Perez, 409 U.S. 535, 537 (1973) (striking down Texas civil child support statute that discriminated against illegitimate children); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 175–76 (1972) (holding that illegitimate children cannot be excluded from receiving workmen's compensation benefits for the death of their parents); Levy v. Louisiana, 391 U.S. 68, 71 (1968) (ruling that states cannot exclude illegitimate children from a statute permitting lawsuits for the wrongful death of a parent).

468.   *Linda R.S.*, 410 U.S. at 619.

469.   *Id.* at 618.

470.   *Id.* at 618–19. As the dissent pointed out, this conclusion contradicts the entire premise of the criminal law, which is that penalties influence behavior. *Id.* at 621 (White, J., dissenting).

471.   Linda Kelly, *Republican Mothers, Bastards' Fathers and Good Victims: Discarding Citizens and Equal Protection Through the Failures of Legal Images*, 51 HASTINGS L.J. 557, 561–62 (2000).

472.   *See* Harry D. Krause, *Equal Protection for the Illegitimate*, 65 MICH. L. REV. 477, 480–83 (1967) (discussing the denial of the right to receive welfare benefits); Richard F. Storrow, *The Policy of Family Privacy*, 66 MO. L. REV. 527, 594, 602 (2001) (discussing the denial of inheritance and the right to sue for wrongful death).

473.   *See* Edward Ginsberg, Anita W. Robboy & Amy M. Feinberg, C.C. v. A.B. *and Beyond*, 35-FEB. B. B.J. 11, 11 (1991) ("The stigma of illegitimacy has been greatly reduced.").

474.   *See* EDWIN M. SCHUR, LABELING WOMEN DEVIANT: GENDER, STIGMA, AND SOCIAL CONTROL 87 (1983) (arguing that social stigmatization of unwed mothers may be "lessening

illegitimate children from a law designed to ensure parental support placed a stamp of dishonor on those children and their mothers. Justice White recognized as much in his dissent, stating that under the Texas law illegitimate children and their mothers "are rendered nonpersons."[475] Thus, the Texas statute stigmatized unwed mothers and their children, and they should have been granted standing to challenge the law.

### 3. *Doe v. Commonwealth's Attorney for the City of Richmond*

The third case that might come out differently is *Doe v. Commonwealth's Attorney for the City of Richmond*.[476] The plaintiffs in *Doe* were gay men who challenged a Virginia statute that made sodomy a crime.[477] The men sought a declaratory judgment that the statute was unconstitutional and an injunction to prohibit the state from enforcing the law.[478] The district court rejected their claim, holding that the statute did not violate the Due Process Clause of the Fourteenth Amendment.[479] On appeal, the Supreme Court summarily affirmed the district court judgment without explaining the basis for its decision.[480] But several courts and commentators have interpreted the Court's summary affirmance as a decision that the plaintiffs lacked standing.[481] In support of this interpretation, they note that the plaintiffs in *Doe* had not been arrested or threatened with prosecution.[482] They also point

---

somewhat, but often it remains substantial"); *see also* Roe v. Wade, 410 U.S. 113, 153 (1973) (referring to the "continuing stigma of unwed motherhood").

475.   *Linda R.S.*, 410 U.S. at 621 (White, J., dissenting).

476.   Doe v. Commonwealth's Att'y for Richmond, 403 F. Supp. 1199 (E.D. Va. 1975), *aff'd*, 425 U.S. 901 (1976).

477.   *Id.* at 1200.

478.   *Id.*

479.   *Id.* at 1200–03. The district court opinion did not indicate the source of the plaintiff's cause of action, but, as in *Linda R.S.*, it was likely 42 U.S.C. § 1983. *See supra* note 466. In addition, the plaintiffs' interest in protecting their privacy is certainly within the zone of interests of both § 1983 and the Due Process Clause. Indeed, *Lawrence v. Texas*, 539 U.S. 558 (2003), made clear that the Due Process Clause prohibits laws against sodomy. Even if it did not, the plaintiffs' interest would still be "plausibly related" to the purposes advanced by the Clause, and they would therefore have standing to challenge a ban on sodomy. *See supra* note 448. They would simply lose on the merits. This illustrates that although the zone-of-interests test requires a "peek at the merits," it does not require resolution of the merits. *See* Thomas W. Merrill, Marbury v. Madison *as the First Great Administrative Law Decision*, 37 J. MARSHALL L. REV. 481, 491 n.44 (2004) ("The zone of interests test notoriously involves a peek at the merits before it can be resolved.").

480.   Doe v. Commonwealth's Att'y for Richmond, 425 U.S. 901, 901 (1976).

481.   *See* Bowers v. Hardwick, 760 F.2d 1202, 1207–10 (11th Cir. 1985) (concluding that *Doe* was decided on standing grounds); Miller v. Rumsfeld, 647 F.2d 80, 84 (9th Cir. 1981) (same); People v. Onofre, 415 N.E.2d 936, 943 (N.Y. 1980) (same); LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW § 15-13, at 943 (1978) (same). *But see* Berg v. Claytor, 436 F. Supp. 76, 79 (D.D.C. 1977) (relying on *Doe* to conclude that the Constitution does not protect the right to private consensual homosexual activity).

482.   *Bowers*, 760 F.2d at 1207 n.5; *Onofre*, 415 N.E.2d at 954.

# EXHIBIT K - DECLARATION 15

STIGMATIC HARM AND STANDING                                      481

to subsequent cases in which the Court treated the constitutionality of sodomy statutes as an open question.[483]

Assuming that *Doe* did rest on a denial of standing, the outcome (at least as to standing) would likely have been different under my argument. Gays and lesbians have long been treated as second-class citizens in the United States.[484] They have been the victims of violence and discrimination.[485] In most states, they are forbidden from marrying or adopting children.[486] In public life, they have been forced to conceal their homosexuality for fear of the repercussions.[487] It is true that homosexuality, like illegitimacy, has become more accepted in recent years.[488] But there is no question that it is still a stigmatizing trait in almost all communities across the United States.[489] Moreover, laws banning sodomy are clearly designed to mark gays and lesbians as tainted and discredited.[490] Given this context, it seems clear that the sodomy statute in *Doe* stigmatized gays and lesbians in that state. As a result, they should have been granted standing to challenge that law.

Of course, the Court ultimately did address the constitutionality of sodomy statutes in *Bowers v. Hardwick* and then again in *Lawrence v. Texas.* For that reason, one might argue that its failure to address the issue in *Doe* was harmless. But the Court's willingness to address an issue when raised by a subsequent plaintiff does not excuse its refusal to hear the claim when raised by the initial plaintiff. If that plaintiff alleges an injury in fact and meets the causation and redressability requirements, he is entitled to have his claim heard in court. Telling him that the Court will address the issue in someone else's case down the road only adds to the injury he has already suffered.

---

483.    *See Miller,* 647 F.2d at 84 (citing Carey v. Population Servs. Int'l, 431 U.S. 678, 694 n.17 (1977), in which the Court stated that it had not "definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating such behavior among adults"); *Bowers,* 760 F.2d at 1210 (same); *Onofre,* 415 N.E. at 954 (same). One might also note that it would be unusual for the Court to decide such an important constitutional question without explanation.

484.    Leslie, *supra* note 10, at 29–30.

485.    *See, e.g.,* Nancy Levit, *A Different Kind of Sameness: Beyond Formal Equality and Antisubordination Strategies in Gay Legal Theory,* 61 OHIO ST. L.J. 867, 879 (2000) (noting that anti-homosexual violence is increasing more than any other type of hate crime); Anthony S. Winer, *Hate Crimes, Homosexuals, and the Constitution,* 29 HARV. C.R.-C.L. L. REV. 387, 407 (1994) ("[H]ate crimes against homosexuals, like those against other groups, are widespread, persistent, and significant.").

486.    Levit, *supra* note 485, at 876–77.

487.    *Id.* at 878.

488.    Judith E. Koons, *"Just" Married?: Same-Sex Marriage and a History of Family Plurality,* 12 MICH. J. GENDER & L. 1, 81 (2005).

489.    *See* Stangor & Crandall, *supra* note 247, at 66.

490.    *See* Leslie, *supra* note 10, at 94–95 (explaining that most sodomy laws were rarely enforced and were put on the books to express condemnation of gays and lesbians).

482                    92 *IOWA LAW REVIEW*              [2007]

Moreover, *Doe* is not the only case in which courts have denied standing to gay plaintiffs challenging sodomy laws. In the years between *Bowers* and *Lawrence*, a number of plaintiffs attacked sodomy laws in state courts, arguing that they violated state constitutional rights of privacy.[491] But many state courts, relying on federal standing rules, dismissed these suits for lack of standing.[492] Where the plaintiffs had not been arrested or threatened with prosecution, these courts ruled that the plaintiffs had not suffered an injury sufficient for standing.[493] Recently, two federal courts relied on similar reasoning to reject challenges to state sodomy laws that remained on the books after *Lawrence*. Although *Lawrence* makes clear that these laws are unconstitutional, the Tenth and Eleventh Circuits have dismissed suits brought by gay plaintiffs seeking declaratory and injunctive relief.[494] Because the plaintiffs in these cases had not been arrested, the courts ruled that they lacked the requisite injury for purposes of standing.[495] Neither case was appealed to the Supreme Court, and it is not clear whether similar challenges will be brought elsewhere. It is also not clear whether the mere existence of these laws, without any possibility of enforcement, violates the Equal Protection Clause.[496] But because these laws stigmatize gays and lesbians, they should at least have standing to make that argument.

### B. FUTURE CASES

The preceding section demonstrates that the recognition of stigmatic harm as sufficient for standing likely would have made a difference in several important Supreme Court cases. But there are other contexts in which plaintiffs in the future might challenge laws that inflict stigmatic harm.

### 1. Racial Profiling

The first area is racial profiling. Many law enforcement agencies selectively target members of particular racial and ethnic groups for surveillance and interrogation.[497] These practices are vulnerable to attack under both the Equal Protection Clause and Title VI of the Civil Rights Act

---

491.  *Id.* at 37.

492.  *Id.* at 46.

493.  *Id.* at 46–52 (describing cases).

494.  D.L.S. v. Utah, 374 F.3d 971, 974–75 (10th Cir. 2004); Doe v. Pryor, 344 F.3d 1282, 1287–88 (11th Cir. 2003).

495.  *D.L.S.*, 374 F.3d at 974–75; *Doe*, 344 F.3d at 1287–88.

496.  The answer to this question would likely depend on whether the Equal Protection Clause prohibits government actions that stigmatize minorities. *See* Lenhardt, *supra* note 228, at 809–13 (arguing that it does).

497.  *See* Brandon Garrett, Note, *Standing While Black: Distinguishing* Lyons *in Racial Profiling Cases*, 100 COLUM. L. REV. 1815, 1815 n.2 (listing examples).

STIGMATIC HARM AND STANDING     483

of 1964.[498] But plaintiffs seeking to challenge these practices must contend with the Supreme Court's decision in *City of Los Angeles v. Lyons*.[499] In *Lyons*, a man sued the Los Angeles police for injuries he sustained after a police officer put him in a chokehold as part of a traffic stop.[500] The plaintiff sought an award of damages and an injunction prohibiting officers from using chokeholds in future stops.[501] The Court held that the plaintiff had standing to seek damages, but rejected his request for an injunction.[502] Because the plaintiff could not show that he likely would be subjected to the chokehold in the future, the Court held that his injury was speculative and he lacked standing to seek equitable relief.[503]

Relying on *Lyons*, several lower courts have dismissed suits seeking to enjoin racial profiling. In *Chavez v. Illinois State Police*,[504] plaintiffs alleged that the Illinois State Police had a policy of stopping, detaining, and searching black and Hispanic motorists because of their race.[505] In support of their claim for injunctive relief, one of the plaintiffs alleged that he had been stopped three times in the past and drove regularly on Illinois highways.[506] But the court held that there was not a "sufficient likelihood" that the plaintiff would be pulled over again in the future.[507] As a result, it denied the plaintiffs standing to seek an injunction.[508]

---

498. *See id.* at 1829–34 (discussing challenges to racial profiling based on the Equal Protection Clause and Title VI). Title VI prohibits discrimination on the basis of race, color, or national origin "under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d (2000). Many local and state law-enforcement agencies receive federal financial assistance. Although the Supreme Court recently ruled that Title VI does not provide a private cause of action in cases alleging disparate impact, *see* Alexander v. Sandoval, 532 U.S. 275, 275 (2001), it reaffirmed that private individuals may sue to enforce Title VI and obtain both injunctive relief and damages. *See id.* at 279. In addition, plaintiffs would have a cause of action under 42 U.S.C. § 1983 to bring a suit alleging that racial profiling violates the Equal Protection Clause. *See supra* note 466.

499. City of L.A. v. Lyons, 461 U.S. 95, 95–96 (1983).

500. *Id.* at 97–98.

501. *Id.* at 98.

502. *Id.* at 111.

503. *Id.* at 101–03.

504. Chavez v. Ill. State Police, No. 94 C 5307, 1999 WL 592187 (N.D. Ill. Aug. 2, 1999).

505. *Id.* at *1.

506. *Id.* at *15.

507. *Id.* at *19.

508. *Id.* at *15–19; *see also* Gerald v. Dep't of Pub. Safety, No. Civ. 99-676-R, slip op. at 15 (W.D. Okla. Dec. 21, 1999) (holding that plaintiff lacked standing to seek an injunction of alleged racial profiling because he could not prove a "'real and immediate'" injury or threat of injury (quoting *Lyons*, 461 U.S. at 101)); Washington v. Vogel, 156 F.R.D. 676, 679–83 (M.D. Fla. 1994) (holding that plaintiffs did not have standing to seek injunctive relief because plaintiffs had not established a sufficient likelihood of future injury); *cf.* Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1044 (9th Cir. 1999) (holding that plaintiffs' claim for declaratory relief was not ripe because they failed to establish a likelihood of future injury). One might argue that the result in *Vogel* would not change under my proposal since the individual plaintiffs did not live in Florida, where plaintiffs alleged the racial profiling to have occurred. But the court also denied

Some courts have attempted to distinguish *Lyons*, pointing to the Court's statement that the plaintiff might have prevailed had he shown that the officers were acting pursuant to a city policy.[509] Other courts have noted that the plaintiff in *Lyons* was subjected to the chokehold only after being pulled over for a traffic violation, a factor the Court said made it less likely the plaintiff would suffer the same injury again.[510] Thus, in some courts, plaintiffs have been permitted to seek injunctive relief where they could show (1) that the racial profiling was the result of an administrative policy[511] or (2) that the likelihood of recurrence did not depend upon their violating the law.[512]

If stigmatic harm were sufficient for standing, however, plaintiffs would not have to make either showing. Instead, if police officers engaged in a practice of racial profiling, any member of the targeted racial group living or working within the affected community would have standing to challenge the practice. By targeting a particular race for surveillance, investigation, and interrogation, the government brands members of that race as discredited and inherently suspect.[513] Racial profiling sends the message that those with a certain skin color or appearance are more likely to be criminals and thus more deserving of police scrutiny.[514] It also shows a lack of respect for members of the targeted race who are innocent yet are treated as presumptive criminals. This conclusion is bolstered by the fact that racial profiling is most often used against racial and ethnic minorities who have traditionally been the targets of police harassment and abuse.[515] Thus, the cultural meaning of racial profiling is stigmatizing, and members of the targeted race should have standing to challenge that practice in federal court.

## 2.  Discrimination and HIV

The second area in which plaintiffs might rely on stigmatic harm for standing involves discrimination against those with HIV. Many states have

---

standing to the Florida Conference of NAACP Branches, in part because the organization failed to show that its members "face[d] a real and immediate threat of again being stopped" by the defendant sheriff's department. *Vogel*, 156 F.R.D. at 682–83.

509.   DeShawn E. *ex rel.* Charlotte E. v. Safir, 156 F.3d 340, 344–45 (2d Cir. 1998); Church v. City of Huntsville, 30 F.3d 1332, 1338–39 (11th Cir. 1994); Thomas v. County of L.A., 978 F.2d 504, 507–08 (9th Cir. 1993).

510.   LaDuke v. Nelson, 762 F.2d 1318, 1326 (9th Cir. 1985); Nat'l Cong. for P.R. Rights v. City of N.Y., 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999); *Thomas*, 978 F.2d at 507–08.

511.   *See supra* note 509 and accompanying text.

512.   *See supra* note 510.

513.   *See* Garrett, *supra* note 497, at 1816 (stating that critics believe "racial profiling brands minorities as criminals").

514.   Anthony E. Mucchetti, *Driving While Brown: A Proposal for Ending Racial Profiling in Emerging Latino Communities*, 8 HARV. LATINO L. REV. 1, 10 (2005).

515.   *See* Garrett, *supra* note 497, at 1817–18.

*STIGMATIC HARM AND STANDING*                                           485

policies that discriminate against individuals who have tested positive for
HIV.[516] These policies are vulnerable to challenge under the Equal
Protection Clause and federal disability laws.[517] Yet some courts have denied
plaintiffs standing to challenge such laws on the ground that they have not
alleged an injury in fact. In *Casey v. Lewis*, for instance, a group of inmates
challenged a prison policy prohibiting inmates with HIV from working in
food services.[518] The inmates argued that this policy violated § 504 of the
Rehabilitation Act of 1973, which bars any state agency receiving federal
funds from discriminating against an individual with a handicap.[519] The
district court agreed and enjoined the prison from adhering to its policy.[520]
But the Ninth Circuit reversed this decision.[521] Although one of the plaintiffs
had tested positive for HIV, the court noted that she had not been identified
as HIV-positive until three months after the district court's decision.[522] And
even if she had been identified earlier, the court stated, she had neither
applied for a food service job nor demonstrated that she intended to do
so.[523] Therefore, the court held, she lacked standing to challenge the
prison's policy.[524]

    If stigmatic harm were sufficient for standing, the plaintiff in *Casey*
would have standing to challenge the prison's policy.[525] Some diseases are
not a source of stigma in our society, but AIDS clearly is. Those who have
AIDS or have tested positive for HIV are treated as pariahs in the United

---

    516.    *See* Robert P. Wasson, Jr., *AIDS Discrimination Under Federal, State, and Local Law After
Arline*, 15 FLA. ST. U. L. REV. 221, 227–32 (1987).

    517.    *See id.* at 232–33, 254–63.

    518.    Casey v. Lewis, 4 F.3d 1516, 1516 (9th Cir. 1993).

    519.    *See* 29 U.S.C. § 794 (2000). A handicapped person is defined as any person who "(i)
has a physical or mental impairment which substantially limits one or more of such person's
major life activities; (ii) has a record of such impairment; or (iii) is regarded as having such an
impairment." *Id.* § 705(20)(B)(i)–(iii).

    520.    Casey v. Lewis, 773 F. Supp. 1365, 1370–72 (D. Ariz. 1991).

    521.    *Casey*, 4 F.3d at 1518.

    522.    *Id.* at 1524.

    523.    *Id.*

    524.    *Id.*

    525.    There would also be a cause of action, as the Court has recognized an implied private
right of action to enforce § 504 of the Rehabilitation Act. *See* Consol. Rail Corp. v. Darrone, 465
U.S. 624, 630 n.7, 637 (1984). It is less clear whether the zone-of-interests test would be met.
One of the main goals of § 504 is to prevent employment discrimination against the disabled.
However, the Court has made clear that a private right of action is available against a state
agency that receives federal funding even if the funding is not received for employment
purposes. *See id.* at 631–37. In addition, the stated purpose of the Rehabilitation Act is to
"empower individuals with disabilities to maximize employment, economic self-sufficiency,
independence, and inclusion and integration into society through . . . the guarantee of equal
opportunity." 29 U.S.C. § 701(b), (b)(F). Given the breadth of this language, a court might find
a "plausible relationship" between the Act and the *Casey* plaintiff's interest in not having the
prison discriminate against those with HIV.

States.[526] People fear touching them or even getting close to them.[527] Patients have refused to see doctors with HIV,[528] and doctors have refused to treat patients with HIV.[529] Parents have objected to the hiring of teachers with HIV, and schools have objected to the presence of students with HIV.[530] Much of this reaction can be attributed to the deadly nature of AIDS and the fact that it can be transmitted from one person to another.

But the stigma of HIV also derives from perceptions and misperceptions about those who have the disease. They are often viewed as either sexual deviants who became infected through reckless behavior or drug addicts who became infected through dirty needles.[531] Some of these misperceptions have diminished in recent years as a result of education campaigns and high-profile patients such as Arthur Ashe.[532] Education has also lessened people's fear of becoming infected through casual contact.[533] But the stigma attached to HIV and AIDS is still significant.[534] And the prison policy in *Casey* reinforces that stigma by sending the message that those with HIV are not fit to prepare food. Whether that policy violates the Rehabilitation Act is a separate question (though the district court held that it does).[535] But the plaintiff in *Casey* should at least have standing to make that claim.

## C.  SUMMARY

These cases are not the only ones in which plaintiffs might rely upon stigmatic harm for standing. But they are representative of the types of suits that might be brought, and they demonstrate that recognizing stigmatic harm as a basis for standing might make a difference in some areas. An important qualification needs to be made, however. Even if standing were recognized in these cases, there is no guarantee the plaintiffs would obtain the relief they seek. The reason is that standing decisions are often

---

526.   *See* Edward Caspar, Comment, Doe v. Mutual of Omaha*: Do Insurance Policy Caps on AIDS Treatments Violate the Americans with Disabilities Act?*, 75 NOTRE DAME L. REV. 1539, 1557 (2000).

527.   *See* Robert P. Wasson, Jr., *The AIDS Crisis as an Impetus to Law Reform in the United States and Kenya*, 17 SUFFOLK TRANSNAT'L L. REV. 1, 11–12 (1994).

528.   *See* Anne Whitford Stukes, Doe v. University of Maryland Medical System Corporation*: Should Doctors with AIDS Continue to Practice?*, 74 N.C. L. REV. 2013, 2013, 2028 (1996).

529.   *See* Michael L. Closen, *The Decade of Supreme Court Avoidance of AIDS: Denial of Certiorari in HIV-AIDS Cases and Its Adverse Effects on Human Rights*, 61 ALB. L. REV. 897, 900 (1998).

530.   *Id.* at 900, 975.

531.   Caspar, *supra* note 526, at 1557 ("Persons with AIDS in particular are unduly ostracized because AIDS is so often associated with homosexuality and drug use.").

532.   Scott Burris, *Dental Discrimination Against the HIV-Infected: Empirical Data, Law and Public Policy*, 13 YALE J. ON REG. 1, 65–66 (1996).

533.   *Id.*

534.   *See* Mary Lane Gallagher, *Stigma Still Barrier to Treating AIDS*, BELLINGHAM HERALD (Bellingham, Wash.), Sept. 13, 2006, at 3A.

535.   *Casey v. Lewis*, 773 F. Supp. 1365, 1373 (D. Ariz. 1991).

# EXHIBIT K - DECLARATION 15

influenced by other considerations, such as the court's view of the merits and of appropriate judicial remedies.[536] *Linda R.S.* is a good example. Although the Court framed its decision as a denial of standing,[537] some scholars have argued that the decision in fact turned on the Court's reluctance to order officials to enforce the law against a third party.[538] Scholars have made the same claim about *Allen v. Wright.*[539] If this is correct, relying upon stigmatic harm as a basis for standing likely would not have changed the outcome in these cases. The Court simply would have exercised its equitable discretion to deny the plaintiffs' requested injunctions.[540]

This qualification might lead one to question whether there is anything to be gained by arguing for the recognition of stigmatic harm as a basis for standing. I believe there is. For one thing, we have to assume a certain amount of good faith on the part of courts. Even if they sometimes have used standing as a cover for other concerns, we must assume that they will faithfully apply the law in future cases. A lawyer cannot decline to argue that his client has standing simply because he thinks the court is determined to rule against him. It is the job of lawyers (and scholars) to make the best argument within the legal framework and to encourage the court to deal with that argument on its terms.

Second, bolstering plaintiffs' argument for standing in these cases may force the courts to deal openly with their real concerns. If the Supreme Court was worried about the issue of remedies in *Linda R.S.* and *Allen,* the Court should have addressed that issue directly. More importantly, the plaintiffs should have been given a chance to respond to those worries and explain why they were unfounded. They may not have succeeded, of course. But the whole point of bringing a lawsuit is to get a hearing on the merits. If courts are permitted to use jurisdictional doctrines as a dodge, plaintiffs will never have that opportunity.

## CONCLUSION

My argument is both bold and modest. It is bold in that it would give access to the federal courts to plaintiffs who have been denied access in the past. It also would allow some claims to be heard in federal court that

---

536.  Fallon, *supra* note 209, at 648–83.

537.  *See supra* notes 464–70 and accompanying text.

538.  *See* Fallon, *supra* note 209, at 670–71; Sunstein, *supra* note 39, at 1453. Indeed, Justice White highlighted this concern in his dissent, but argued that it was relevant only to the question of what relief the court might grant, not to the plaintiff's standing. Linda R.S. v. Richard D., 410 U.S. 614, 620 (1973) (White, J., dissenting). One response to the Court's concern is that it need not have ordered the prosecution of any particular individual. Instead, it could have simply issued an injunction prohibiting the state from enforcing its child support laws in a discriminatory fashion.

539.  Fallon, *supra* note 209, at 665–67, 670–71; Sunstein, *supra* note 39, at 1454.

540.  Fallon, *supra* note 209, at 699.

# EXHIBIT K - DECLARATION 15

currently cannot be heard there. But my argument is modest in that it does not propose a change in substantive law. I do not argue that the government is prohibited from stigmatizing individuals or groups. Nor do I suggest that courts should invalidate most, or even many, of the government actions that inflict stigmatic harm. I argue only that when the government does stigmatize a group, members of that group should have standing to argue that the government's action is unlawful. If they do not have a meritorious claim, their cases will be dismissed. But they should not be turned away on the supposition that their injury is abstract. As I have tried to show, this is not true. Those who are stigmatized by government action are not simply concerned bystanders seeking to vindicate value interests. They suffer serious and concrete injuries and should therefore have the same standing in federal court as other plaintiffs alleging concrete harms.